## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTIETAM BATTLEFIELD KOA, *et al.*, | * | |
| | * | |
| *Plaintiffs*, | | |
| | * | No. 20-CV-01130-CCB |
| v. | | |
| | * | |
| LAWRENCE J. HOGAN, JR., *et al.*, | | |
| | * | |
| *Defendants*. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

A little

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
Bar No. 27523
KATHLEEN A. ELLIS
ASSISTANT ATTORNEY GENERAL
Bar No. 04204
SARAH W. RICE
Assistant Attorney General
Bar No. 29113
JUSTIN FINE
Assistant Attorney General
Bar No. 18731
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6398
asnyder@oag.state.md.us
kathleen.ellis@maryland.gov
srice@oag.state.md.us
jfine@oag.state.md.us

May 8, 2020

Attorneys for Defendants

## TABLE OF CONTENTS

Page

BACKGROUND ............................................................................................... 1

    The COVID-19 Pandemic ........................................................................ 1

    Governor Hogan's Response to the Pandemic ........................................ 2

    Plaintiffs' Complaint ............................................................................... 5

ARGUMENT ................................................................................................... 6

I.     LEGAL STANDARD .............................................................................. 6

II.    THE PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS
     ON THE MERITS AND THEIR COMPLAINT SHOULD BE DISMISSED. .......................... 7

    A.    The State's Paramount Interest in Preserving Lives During this
        Unprecedented Public Health Crisis Justifies the Restrictions Imposed
        in the Stay-at-Home Order. .......................................................... 8

    B.    The Executive Order's Neutral Limitations on Gatherings, Including
        Faith-Based Activities, Are Laws of General Application. ...................... 18

    C.    The Order Does Not Regulate Speech but, in any Event, Meets the
        Test for Permissible Time, Place, and Manner Restrictions. .................... 28

    D.    Plaintiffs' Equal Protection Claim Fails Because the State's
        Distinction Between Essential and Non-Essential Businesses Has a
        Rational Basis and Is Supported by the State's Compelling Interest in
        Saving Lives During this Once-In-a-Century Pandemic. ........................... 34

    E.    Plaintiffs' Form-of-Governance Claims Are Either Non-Justiciable or
        Fail as a Matter of Law .............................................................. 36

    F.    Plaintiffs' Takings and Commerce Clause Claims Fail as a Matter of
        Law. ..................................................................................... 38

        1.    Exercises of State Police Power in Times of Public Necessity
            Do Not Give Rise to a Takings Claim. ............................... 40

        2.    State Regulation of Businesses Does Not Violate the Dormant
            Commerce Clause. ..................................................... 44

III.   THE OTHER FACTORS THAT WOULD SUPPORT INJUNCTIVE RELIEF
       ARE NOT PRESENT. ............................................................................................... 46

CONCLUSION ............................................................................................................... 50

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANTIETAM BATTLEFIELD        *
KOA, *et al.*,

                        *

         *Plaintiffs*,

                        *   No. 20-CV-01130-CCB

     v.

                        *

LAWRENCE J. HOGAN, JR., *et al.*,

                        *

         *Defendants*.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

For the reasons set forth below, the plaintiffs' motion for a temporary restraining order should be denied, and the defendants' motion to dismiss for failure to state a claim should be granted.

## BACKGROUND

### The COVID-19 Pandemic

The coronavirus that has come to be known as "COVID-19" has caused a global pandemic of a scope and severity not seen since the 1918 influenza epidemic.  This Court is already familiar with the toll it has taken, *see Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020), as are the many district courts that have addressed, and rejected, claims like those made by plaintiffs here, *see, e.g.*, *Lighthouse Fellowship Church v. Northam*, No. 2:20CV204, 2020 WL 2110416 (E.D. Va. May 1, 2020), *appeal docketed*, No. 20-1515 (4th Cir. May 4, 2020); *Cassell v. Snyders*, No. 3:20-

cv-50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020), *appeal filed* (May 4, 2020); *Cross Culture Christian Ctr. v. Newsom*, No. 220-CV-00832-JAM-CKD, 2020 WL 2121111 (E.D. Cal. May 5, 2020); *see also* Exhibit 1 (Declaration of Dr. Clifford Mitchell). Worldwide, COVID-19 has infected more than 3,700,000 people and has caused the deaths of more than 259,000 people.  In the United States alone, at least 1,208,000 people have been infected and 71,000 people have died.  *Id.* ¶11.

The virus has taken its toll here in Maryland, too, with more than 28,000 confirmed cases and 1,338 deaths, as of May 6, 2020.  *Id.* ¶33.  And the epidemic shows few signs of abating.  Although the number of new cases in Maryland is no longer increasing as quickly as at the outset of the pandemic, it is not decreasing significantly, either.  *Id.* ¶34.  Indeed, CDC projections indicate that the rate of transmission will increase as States begin to reopen their economies, with 100,000 additional deaths projected by the beginning of August.  *Id.* ¶37.

### Governor Hogan's Response to the Pandemic

As COVID-19 began to spread swiftly across the rest of the world, Governor Hogan moved to protect Marylanders, even before any confirmed cases had been identified in Maryland.  *See, e.g.*, Press Release, "Governor Hogan Provides Update on Maryland's Response to Novel Coronavirus" (Jan. 29, 2020).[1]  The Governor submitted a supplemental budget including $10 million for emergency coronavirus preparedness, Press Release,

---

[1] All gubernatorial press releases are available at https://governor.maryland.gov/ category/press-releases/

"Governor Hogan Announces Additional Steps to Protect Marylanders From Coronavirus" (Feb. 27, 2020), and later announced that the Maryland Department of Health labs in Baltimore were approved for COVID-19 testing, which allowed for swifter test results, Press Release, "Maryland Department of Health Approved for Testing for Novel Coronavirus Cases" (Mar. 3, 2020).

On March 5, 2020, the State announced its first three confirmed cases of COVID-19. Press Release, "Governor Hogan Statement Regarding Novel Coronavirus in Maryland" (Mar. 5, 2020). On that same day, Governor Hogan issued a proclamation declaring a state of emergency, *see* Md. Code Ann., Pub. Safety § 14-303 (LexisNexis 2018), and the existence of a catastrophic health emergency, *see id.* § 14-3A-02, due to the outbreak of COVID-19 in Maryland. Exhibit 4 (Proclamation, Declaration of State of Emergency and Existence of Catastrophic Health Emergency—COVID-19 (Mar. 5, 2020)).[2] Soon thereafter, on March 11, 2020, the World Health Organization characterized the outbreak of COVID-19 as a pandemic.

Governor Hogan continued to issue additional orders and proclamations as new information became available from the medical and public health communities, which included an expanded understanding of the infectious disease itself and the impact it was having on the people of the State of Maryland. One such order, and its related guidance, is particularly relevant here.

---

[2] All of the Governor's COVID-related orders and proclamations are available at https://governor.maryland.gov/covid-19-pandemic-orders-and-guidance/.

On March 30, 2020, the Governor issued Order No. 2020-03-30-1, entitled "Amending and Restating the Order of March 23, 2020, Prohibiting Large Gatherings and Events and Closing Senior Centers, and All Non-Essential Businesses and Other Establishments, and Additionally Requiring All Persons to Stay at Home." *See* Exhibit 5. As relevant here, the order (1) required the closure of all "Non-Essential Businesses," which it defined to include campgrounds, amusement parks, and other recreational establishments."[3] Exhibit 5, ¶IV.a; (2) prohibited "large events and gatherings," which it defined as "[s]ocial, community, spiritual, religious, recreational, leisure, and sporting gatherings and events of more than 10 people . . . including but not limited to parades, festivals, conventions, and fundraisers," *id.* ¶III.a; and (3) added, for the first time, the requirement that all persons living in the State of Maryland "stay in their homes or places of residences," except "to conduct or participate in Essential Activities," which were defined to include things like shopping for groceries and household goods or seeking medical services, *id.* ¶II.b.

The March 30 order was accompanied by guidance clarifying that "[c]hurches, synagogues, mosques, and other similar religious facilities are considered 'Non-Essential Businesses' under the Order," but that churches could continue to perform certain "minimal operations," which "includes, but is not necessarily limited to, facilitating remote worship."

---

[3] A subsequent order, dated May 6, 2020, authorized campgrounds to reopen, subject to the continuing restriction on large gathering and all applicable MDH directives and CDC social distancing guidance.   Exhibit 7, ¶V.f.iii (Order No. 20-05-06-01). Amusement parks remain closed.

*See* Exhibit 10, ¶6 (Interpretive Guidance No. COVID 19-08).  Additional guidance issued

two days later clarified that churches could conduct "drive-in" services and could continue

to provide in-person services of no more than 10 people.  Exhibit 11, ¶¶1-2 (Interpretative

Guidance No. COVID 19-09).  As a result of this order, then, churches are currently not

allowed to hold in-person services involving more than 10 people, but are free to provide

in-person services to smaller groups, or conduct online services or drive-in services without

restriction as to the number of participants.

**Plaintiffs' Complaint**

Plaintiffs filed suit on Saturday, May 2, 2020, challenging several aspects of the

Stay-at-Home Order.  The plaintiffs fall into five groups.  The first group consists of the

owners of a campground and amusement park, who allege that the closure of their facilities

has caused them to lose income.  They appear to assert claims under the Takings Clause of

the Fifth Amendment and the Dormant Commerce Clause.   The second group consists of

two veterans who object to the restrictions on their ability to access business and

recreational opportunities and attend physical therapy, and to the requirement to wear

masks.  They appear to assert their First Amendment right of assembly.  The third and

largest group of plaintiffs consists of 10 clergymen, who object to the requirement that

churches not hold in-person services of more than 10 people.  They assert religious liberty

claims under the United States and Maryland Constitutions and the First Amendment right

of assembly.  Fourth is a group of three members of the Maryland House of Delegates; they

allege that the restrictions on large gatherings violates their rights to assemble at rallies and

speak on matters of public concern.  Finally, "Reopen Maryland" is an LLC that claims

22,000 members who object to the restrictions imposed in the gubernatorial orders. It was a "Reopen Maryland" rally on May 2 that apparently prompted the filing of the complaint.

On the same day that they filed the complaint, the plaintiffs moved for a temporary restraining order. ECF No. 2. The motion is not supported by a memorandum of law and does not otherwise elaborate on the basis of their claims.

The defendants here are Governor Hogan, who issued the orders at issue, Secretary of Health Robert Neall, who has issued certain other orders related to health care facilities, Frances B. Phillips, the Deputy Secretary of Public Health at the Maryland Department of Health, and Woodrow Jones III, the Superintendent of the Maryland State Police. All defendants join in opposing plaintiffs' motion for preliminary relief and in moving to dismiss the complaint for failure to state a claim.

## ARGUMENT

### I.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the Court must accept as true the well-pleaded factual allegations in a complaint, the Court is not required to accept conclusory factual allegations or legal conclusions disguised as factual allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). Nor is the Court required to accept allegations that "'contradict matters properly subject to judicial notice or by exhibit.'" *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)). Rather, the complaint must

contain direct and plausible allegations respecting all material elements necessary to sustain recovery under a viable legal theory. *Twombly*, 550 U.S. at 570. Plaintiffs' claims should be dismissed under this familiar standard.

A plaintiff seeking preliminary relief must demonstrate "'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs have failed to establish each of these required elements.

## II.    THE PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS AND THEIR COMPLAINT SHOULD BE DISMISSED.

Although the complaint makes passing references to a number of different legal theories, the claims it purports to state fall into five categories:  religious liberty claims under federal and state law (Counts 1, 4, 7, 8); First Amendment claims of free speech and assembly (Counts 2, 3, 8); equal protection (Count 5, 8); form-of-governance claims (Count 6, 9); and a takings claim and a Dormant Commerce Clause claim (Count 10). Some of these claims need not detain the Court long; for example, it is by now well established that "the Guarantee Clause"—which plaintiffs invoke as the basis for Count 6—"does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (citing *Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912)).  But *all* of plaintiffs' claims suffer from a common defect, namely, that the

constitutional rights they assert must yield to the State's paramount interest in combating

a once-in-a-century public health emergency.

> **A.     The State's Paramount Interest in Preserving Lives During this Unprecedented Public Health Crisis Justifies the Restrictions Imposed in the Stay-at-Home Order.**

This Court need not reach the merits of plaintiffs' various claims because

controlling precedent holds that such claims must yield to the State's paramount

responsibility to protect the lives of its residents against the spiraling threat presented by

the COVID-19 coronavirus.  The Supreme Court has long recognized that "a community

has the right to protect itself against an epidemic of disease which threatens the safety of

its members."  *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905) (internal quotation

marks omitted).  In that regard, the Court has permitted States to enact "quarantine laws

and 'health laws of every description,'" *id*. at 25 (citation omitted), similar to the Stay-at-

Home Order's measures, to combat the COVID-19 pandemic. *See, e.g., Compagnie

Francaise de Navigation a Vapeur v. Board of Health of State of La*., 186 U.S. 380 (1902)

(upholding quarantine law against constitutional challenges); *Rasmussen v. Idaho*, 181

U.S. 198 (1901) (permitting a ban on certain animal imports if evidence of disease was

found); *see also Benson v. Walker*, 274 F. 622 (4th Cir. 1921) (upholding board of health

resolution that prevented carnivals and circuses from entering a certain county in response

to the 1918-1919 influenza epidemic); *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J.

2016) (upholding the eighty-hour quarantine of a nurse returning from treating Ebola patients in Sierra Leone).

Although the Constitution is not suspended during a state of emergency, the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Jacobson*, 197 U.S. at 26. The Governor's proclamation of a state of emergency and invocation of emergency powers "necessarily restrict[] activities that would normally be constitutionally protected"; "[a]ctions which citizens are normally free to engage in become subject to criminal penalty." *United States v. Chalk*, 441 F.2d 1277, 1280 (4th Cir. 1971). But "measures [that] would be constitutionally intolerable in ordinary times [] are recognized as appropriate and even necessary responses to the present [COVID-19 pandemic] crisis." *In re Abbott*, 954 F.3d 772, 787 (5th Cir. 2020). "[U]nder the pressure of great dangers," like those that Maryland faces, constitutional rights may be reasonably restricted "as the safety of the general public may demand."[4] *Jacobson*, 197 U.S. at 29. This "settled rule" allows

---

[4] That is why courts have routinely upheld mandatory vaccination programs against infectious diseases even in the face of challenges based on freedom of religion and other liberties. *See, e.g.*, *Jacobson*, 197 U.S. at 37-38 (upholding a mandatory vaccination program for smallpox against a Fourteenth Amendment challenge); *Zucht v. King*, 260 U.S. 174 (1922) (upholding the exclusion of non-vaccinated children from a school district against a due process and equal protection challenge); *Phillips v. City of N.Y.*, 775 F.3d 538 (2d Cir.) (finding that a challenge to mandatory vaccination law was "foreclosed" by *Jacobson*), *cert. denied*, 136 S. Ct. 104 (2015); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1083 (S.D. Cal. 2016) (finding no likelihood of success on a free exercise challenge to a law removing a religious- or conscious-based exemption for mandatory vaccination of school children).

9

States facing emergencies to "restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." *Abbott*, 954 F.3d at 778.

To emergently combat a virulently infectious disease in a pandemic, the State must be able to take swift and decisive action. *Cf. Chalk*, 441 F.2d at 1281. The Court's review of temporary measures taken during such an emergency, accordingly, is "limited to a determination of whether the [executive's] actions were taken in good faith and whether there is some factual basis for [the Governor's] decision that the restrictions he imposed were necessary to maintain order." *Id*. (citing *Moyer v. Peabody*, 212 U.S. 78 (1909)); *see also Jacobson*, 197 U.S. at 29 (stating that "reasonable regulations" may be implemented in the face of an infectious disease epidemic); *Abbott*, 954 F.3d at 786-88 (applying a deferential, rational-basis standard to an executive order restricting otherwise constitutionally protected abortion access in the face of the COVID-19 crisis); *Murphy v. Palmer*, No. 14-cv-6896, 2017 WL 2364195, at *10 (D.N.J. May 31, 2017) ("Courts have concluded that, during a state of emergency, governmental entities may impose more onerous restrictions upon its citizens, as long as such restrictions are reasonably necessary for the preservation of order.").

This deferential standard recognizes that, in a public health crisis, "it is no part of the function of a court . . . to determine which one of two modes was likely to be the most effective for the protection of the public against disease." *Jacobson*, 197 U.S. at 30.  And it reflects the reality that "governing authorities must be granted the proper deference and wide latitude necessary for dealing with . . . emergenc[ies]." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds, Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83 (1998); *see also Chalk*, 441 F.2d at 1281 (recognizing the "'broad discretion' necessary for the executive to deal with an emergency situation" (quoting *Sterling v. Constantin*, 287 U.S. 378, 398 (1932)). Judicial review of the executive's response to public health emergencies is limited as courts are hesitant to "usurp the functions of another branch of government" by deciding the legitimacy of "the mode adopted under the sanction of the state, to protect the people at large." *Jacobson*, 197 U.S. at 28.

And yet that is precisely what plaintiffs ask this Court to do. Theirs is not a targeted complaint, seeking to adjust one aspect of the Governor's emergency orders. It is instead a wholesale denial of every aspect of those orders, the emergency proclamation on which they are based, and even the factual premise that the COVID-19 pandemic presents a significant risk to Maryland public health. In fact, the complaint seeks as relief an order invalidating "*ab initio* each and every proclamation of catastrophic health emergency and related executive order of Governor Hogan." Compl. ¶52. If ever there were a case asking a federal court to usurp a State's emergency powers, this is it.

The current emergency brought on by the COVID-19 pandemic is undoubtedly a moment calling for deference to temporary public health measures undertaken by the executive in response. The Governor issued the March 30 Stay-at-Home order and ensuing guidance in good-faith response to what plaintiffs concede is the "unprecedented" threat that COVID-19 presents. Compl. ¶19. To date, the disease has infected more than 3,700,000 people worldwide and caused the deaths of more than 259,000 people. Exhibit 1, ¶11. In the United States alone, COVID-19 has infected more than 1,200,000 people and caused the deaths of more than 71,000 of them. Maryland has not, as plaintiffs seems

to think, been spared.  Despite having taken early measures to prevent the spread, Maryland has seen 28,163 infections and 1,338 deaths as of May 6, 2020.  *Id.* ¶33.  And while Maryland has successfully "flattened the curve," the rate of infection and death is not decreasing significantly, *id.* ¶34, is increasing in rural areas, *id.* ¶37, and is expected to increase even more as States re-open their economies, *id.*

The virulently infectious nature of the novel coronavirus and the absence of any vaccination or widely effective treatment has made the Stay-at-Home Order's temporary prohibition on gatherings crucial to slowing spread of the disease.  As discussed in greater detail below, public gatherings generally—including, but not limited to, in-person religious services—have fueled the spread of COVID-19.  The clear and manifest need for the order's temporary prohibition on in-person gatherings in light of this emergency—which parallels similar measures by other state, local, and national officials—refutes any suggestion that the Governor acted in bad faith or arbitrarily.  As one district court observed earlier this week, "[u]nder these rare conditions, the judiciary must afford more deference to officials' informed efforts to advance public health—even when those measures encroach on otherwise protected conduct; even when thoughtful minds could disagree about how to best balance the scales."  *Cross Culture Christian Ctr. v. Newsom*, No. 220CV00832JAMCKD, 2020 WL 2121111, at *5 (E.D. Cal. May 5, 2020).

Although the plaintiffs' decision not to file a memorandum in support of their motion makes it difficult to discern what arguments they believe support their claims, plaintiffs seem to agree that *Jacobson* controls the outcome of this case.  *See* Compl. ¶51.  Under *Jacobson*, the only circumstance in which "there is any . . . power in the judiciary

to review" executive actions taken "to protect the public health, the public morals, or the public safety," is when the action "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31.   Plaintiffs have not met their burden of showing that the Governor's actions were taken in bad faith, *Chalk*, 441 F.2d at 1281; in fact, they suggest precisely the opposite.   *See* Compl. ¶20.   Instead of arguing bad faith, they make the counter-factual argument that the Governor's action has no real or substantial relation to protecting public health because, according to plaintiffs, "no threat or danger or emergency conditions exist or continue to exist" with respect to COVID-19, Compl. ¶58, and, as a legal matter, the Governor did not have the state-law authority to issue any pandemic-related orders in the first place, Compl. ¶¶54-67.

Plaintiffs concede that the present situation is "unprecedented," Compl. ¶19, and that COVID-19 constitutes a "national crisis," Compl. ¶21.   Construing the allegations of the complaint in the manner most favorable to them, plaintiffs seem to be taking the position that, while the rest of the world suffers from a once-in-a-century pandemic, Maryland is somehow immune, and there is no reason to believe that an "extensive loss of life" has occurred, or will occur, here in Maryland, Compl. ¶64.   If only that were so.

Attached as Exhibit 1 to this memorandum is the declaration of Dr. Clifford Mitchell, who is the Director of the Environmental Health Bureau within the Maryland Department of Health and an adjunct professor in the Johns Hopkins University School of Public Health.   As Dr. Mitchell describes, plaintiffs' depiction of the COVID-19 pandemic is in no way supported by actual facts.   In just two months, the number of COVID-19 cases

in Maryland increased exponentially—from 3 to more than 28,000—and the number of deaths caused by COVID-19 increased from 0 to more than 1,300. Exhibit 1, ¶ 33. More than 80 percent of the deceased individuals were aged 60 or older. *Id.* ¶ 36. Staff and residents of congregate living facilities have been especially hard hit. As of May 8, 2020, 1895 staff members have been infected with COVID-19, and 11 have died. More than 4,300 residents have tested positive, and 792 have died. *See* https://coronavirus.maryland.gov/pages/hcf-resources (last viewed May 8, 2020). The Secretary of Health has directed that all nursing home residents and staff be tested for COVID-19, and when that testing is complete, the numbers of infected residents and staff will likely grow considerably.

The poultry industry has also been hard hit. As of May 6, 2020, there have been more than 300 cases of COVID-19 associated with that industry. Exhibit 1, ¶37. With the implementation of the plans to test all workers at the two Maryland poultry plants, the number of positive cases will only increase. And the effect of COVID-19 on the poultry industry extends more than the individuals who test positive; it threatens the food supply for Maryland and beyond. It defies reality to suggest that the public health impact on Marylanders has not been extensive.

Nor is there any *legal* merit to the plaintiffs' related argument that the Governor did not have the state-law authority to issue any pandemic-related orders in the first place. *See* Compl. ¶¶54-67. The Governor declared a state of emergency and a catastrophic health emergency under the Maryland Emergency Management Agency Act, Md. Code Ann., Pub. Safety §§ 14-101 to -115 (LexisNexis 2018); the Governor's Emergency Powers

subtitle of the Public Safety Article, *id.* §§ 14-301 to -309; and the Catastrophic Health Emergency Act, *id.* §§ 14-3A-01 to -08.   These statutes grant the Governor "broad authority in the exercise of the police power of the State to provide adequate control over persons and conditions during impending or actual public emergencies" and "shall be broadly construed to carry out [their] purpose."   *Id.* § 14-302(a), (b) (referring to the Governor's Emergency Powers subtitle).   They authorize the Governor to order "the evacuation, closing, or decontamination of any facility," Pub. Safety § 14-3A-03(d)(1); require "individuals to . . . refrain from congregating," *id.* § 14-3A-03(d)(2); control "places of assembly" and "establish[ing] curfews," *id.* § 14-303(b); and direct "the movement of individuals in the area, and the occupancy of premises in the area," *id.* § 14-107(d)(1). Further, the Governor may "suspend the effect of any statute or rule or regulation of an agency of the State or a political subdivision."   *Id.* § 14-107(d)(1)(i).

Plaintiffs maintain that these statutes do not authorize the Governor to "require the population to stay-at-home, wear face masks, refrain from assembling in church, refrain from doing business or participating in commerce," Compl. ¶54, but each and every example they provide is authorized by law.[5]  Requiring Marylanders to remain at home as much as possible and wear masks when riding transit or visiting retail establishments falls within the Governor's power to direct "the movement of individuals in the area, and the

---

[5] The mask requirement applies to individuals only when riding on public transportation or when visiting retail establishments.  *See* Exhibit 6, ¶II.a (Order No. 20-04-15-01, Requiring Use of Face Coverings Under Certain Circumstances, and Requiring Implementation of Certain Physical Distancing Measures).

occupancy of premises in the area," Pub. Safety § 14-107(d)(1); requiring that we refrain from assembling in churches or in other large gatherings falls within the Governor's power to require "individuals to . . . refrain from congregating," *id*. § 14-3A-03(d)(2), and to control "places of assembly," *id*. § 14-303(b); and requiring the closure of non-essential businesses falls within the Governor's authority to order the "evacuation" or "closing . . . of any facility," *id*. § 14-3A-03(d)(1).  There is simply no textual merit to plaintiffs' claim.

In light of the clear textual basis for the Governor's orders, the Court need not address the plaintiffs' legislative history argument, Compl. ¶55, but that argument is equally meritless.  Plaintiffs allege that the emergency-response legislation that serves as the basis for the Governor's Order was never intended to address the current situation, because it was enacted "in 2002 in the wake of 9/11 and its focus was on war and emergencies such as radiological, biological and chemical warfare causing and creating mass casualties and extensive death, not a percentage increase in virus carriers among healthy Marylanders which results in a death rate of less than .012 percent of primarily limited population segments such as elderly and nursing home residents, as horrible as that is."  Compl. ¶55.

Where to begin?  Plaintiffs acknowledge that the loss of life from COVID-19 is "horrible" and that the present situation is an "unprecedented" "national crisis," Compl. ¶¶ 19, 21, and yet they seem to believe that the General Assembly would not have been concerned with the death of more than 1,300 Marylanders or the risks presented by a once-in-a-century global pandemic, because the Legislature would not have deemed the loss of life "extensive" enough to authorize a coordinated response.  But the toll from COVID-19

is far greater than that of the September 11 attack, reportedly 24 times greater nationally, and 21 times greater here in Maryland. *See* Julie Bykowicz, *How Maryland's 9/11 victims list grew by 20*, Balt. Sun, May 3, 2011 (stating that 63 Marylanders died in the 9/11 terrorist attacks). In fact, the more than 1,338 Marylanders who have died from COVID-19 in just three months already exceeds the number of Marylanders killed in World War I (975) or the Vietnam War (1,014). Cong. Research Serv., *American War and Military Operations Casualties: Lists and Statistics* 31, 39 (Sep. 25, 2019), https://fas.org/sgp/crs/ natsec/RL32492.pdf. Putting aside that, were it not for the steps the Governor has taken to slow the spread of the virus, the death toll from COVID-19 would be even more extensive than it is, there is no basis in the legislative history on which to conclude that the General Assembly would not have endorsed the actions taken by the Governor under the statutes it enacted. In fact, the only passages that plaintiffs quote prove the opposite.

Plaintiffs allege that the Governor's authority under Title 14 of the Public Safety Article was intended to be "limited to 'a situation in which extensive loss of life or serious disability is threatened imminently'" and is expressly stated to include, among other things, threats caused by a "'viral agent . . . capable of causing extensive loss of life or serious disability.'" Compl. ¶63 (quoting Pub. Safety § 14-3A-01(c)(1)). But this describes the current pandemic to a tee, as Dr. Mitchell observes. *See* Exhibit 1, ¶36. And even if one accepted plaintiffs' dismissal of more than 1,300 lives lost as not "extensive," it seems clear, based on the experience of New York City, Italy, and elsewhere, that the coronavirus

is "capable of causing extensive loss of life," especially if measures are not taken to slow its march.

In sum, plaintiffs downplay the significance of the current public health crisis, and they ignore entirely the Governor's rationale behind the Stay-at-Home Order, the Order's temporary nature, and its effectiveness so far in slowing the spread of COVID-19.   But Maryland has a legitimate—and, indeed, compelling—interest in slowing the spread of COVID-19 and protecting public health, and the temporary Order issued by the Governor is rationally related to that purpose.   And though plaintiffs' religious exercise rights are fundamental, they do not include the "liberty to expose the community . . . to communicable disease," *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944), especially one as contagious and deadly as COVID-19.   Because, as discussed next, the Stay-at-Home Order does not violate plaintiffs' First Amendment rights at all, much less "palpabl[y]" and "beyond all question," *Jacobson*, 197 U.S. at 31, plaintiffs are unlikely to succeed on the merits of their claims.

> **B.     The Executive Order's Neutral Limitations on Gatherings, Including Faith-Based Activities, Are Laws of General Application.**

The law particular to pandemics explains fully that the Stay-at-Home Order is constitutional.   But the Order also meets the traditional tests for the religious liberty claims brought by plaintiffs.   Plaintiffs have asserted that the limitation on large gatherings violates the Free Exercise clause, Compl. ¶¶ 11-12; 112-27, but there is nothing about "the right of free exercise" that "relieve[s] an individual of the obligation to comply with a valid and neutral law of general applicability."  *Employment Div., Dep't of Human Res. of Or.*

*v. Smith*, 494 U.S. 872, 879 (1990).  "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  That "conduct springs from sincerely held and strongly felt religious beliefs does not imply that the [government's] desire to regulate that conduct springs from antipathy to those beliefs."  *Fulton v. City of Phila.*, 922 F.3d 140, 159 (3d Cir. 2019).

"[T]he minimum requirement of neutrality is that a law not discriminate on its face."  *Lukumi*, 508 U.S. at 533.  The Stay-at-Home Order easily meets this initial threshold.  It prohibits all "large gatherings and events" of "more than 10 people" at "all locations and venues," including "[s]ocial, community, spiritual, religious, recreational, leisure, and sporting gatherings," and "parades, festivals, conventions, and fundraisers."  Exhibit 5, ¶III.  Spiritual and religious events and gatherings are only one type of a broad swathe of gatherings that are prohibited.

Next, courts inquire whether the law "targets religious conduct for distinctive treatment."  *Lukumi*, 508 U.S. at 546.  Plaintiffs have not sufficiently alleged or demonstrated that the orders at issue "target[] [their] religious beliefs or practices."  *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 556 (4th Cir. 2013).  A law does not target religious beliefs or practices merely because "'the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  *Smith*, 494 U.S. at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3 (1982) (Stevens, J., concurring in judgment)).  Instead, a law departs from neutrality to target religious beliefs

or practices only when "the object of a law is to infringe upon or restrict practices *because of* their religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis added). And while plaintiffs allege that their sincerely held religious beliefs and practices include communal gathering, Compl. ¶15, there is no evidence that the Stay-at-Home Order sought to prohibit gatherings of more than 10 people because of the religious nature of some gatherings of that size. On the contrary, the Order is broad and expressly incorporates non-religious gatherings. Exhibit 5, ¶III.a.

In fact, religious gatherings are, if anything, given flexibility that some other non-essential businesses are not. Whereas non-essential stores remain closed to the public, *id.* ¶IV.a., religious facilities of any faith are allowed to remain open and hold services in a number of different ways—through online, "drive-in," and small in-person services.[6] Religious facilities were therefore given *greater* ability to continue their public operations than many commercial businesses.

Moreover, plaintiffs' unsupported inference that "two Maryland State Police cars" were "apparently" "surveilling [a] church drive-in service," under unspecified "orders," Compl. ¶69, are belied by the record. The Maryland State Police has no policy to surveil churches. *See* Exhibit 2, ¶ 8 (Declaration of Maj. Norman W. Dofflemyer, M.S.). Instead,

---

[6] Exhibit 11, ¶¶1-3 (Interpretive Guidance No. COVID 19-09). The Order also excepts from the 10-person limit any "facility providing essential services to low income persons, including, without limitation, homeless shelters, food banks, and soup kitchens." Exhibit 5, ¶VI.a.iii. To the extent the plaintiffs allege that the Stay-at-Home Order prevents them from "operating social welfare and food bank services," Compl. ¶7, they are mistaken.

the Maryland State Police have undertaken an outreach effort to answer questions from religious institutions in connection with major holidays.  *Id.* at ¶ 7.  As the State Police affiants explain, the State Police seeks to ensure compliance with the order on a voluntary basis, and has lodged only four charges, all against businesses and not religious organizations.  Exhibit 3, ¶¶10-11 (Declaration of Sgt. Travis Nelson).  Indeed, in one incident in St. Mary's County, officers approached a pastor who was hosting an outdoor prayer gathering of more than 10 people and provided him with educational material, rather than citing him.  *Id.* at ¶7.

The State Police work "on a daily basis" with the Department of Health to share information and determine what type of enforcement is necessary for the public health.  *Id.* at ¶12.  "The Religion Clauses of the Constitution aim to foster a society in which people of all beliefs can live together harmoniously."  *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019).  Efforts by the Maryland State Police to allow input from religious institutions about how they can safely continue their practices while simultaneously upholding pervasive public health interests through education and wide-ranging monitoring of the public safety is in keeping with the overriding purpose of the Religion Clauses.

To the extent plaintiffs complain that some businesses are operating as "essential" businesses, the in-person activities carried on in those businesses are not analogous to in-person religious services.  When individuals shop for groceries, food, medicine, and other necessities, they "enter a building quickly, do not engage directly with others except at points of sale, and leave once the task is complete."  *Gish v. Newsom*, No. ED-CV-20755-

JGB-KKX, 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020), *appeal docketed*, No. 20-55445 (Apr. 28, 2020).  As Dr. Mitchell explains in his declaration, one must distinguish between the public health risks presented by "activities like shopping, where it is possible for the participant to socially distance oneself from others during the process of shopping, and activities where a group congregates for a prolonged (longer than 15 minutes) period of time in one location."  Exhibit 1, ¶23.  In this respect, religious services are akin to schools, concerts, and sporting events—all of which the Order prohibits—because during these activities "people sit together in an enclosed space to share a communal experience." *Gish*, 2020 WL 1979970, at *6.  Moreover, even "essential" businesses are subject to regulation if they are designated an "unsafe facility" for failure to follow social distancing guidelines.  *See* Order No. 20-04-05-02, "Delegating Authority to Local Health Officials to Control and Close Unsafe Facilities."  The Maryland State Police will refer for enforcement essential businesses that are not following face-covering and social distancing guidelines to the applicable health department for enforcement.  Exhibit 3, ¶¶12-13. Because the Stay-at-Home Order, on its face or as applied, does not single out religious institutions, plaintiffs fail to allege a violation of the Free Exercise Clause.

The Establishment Clause—a violation of which plaintiffs also allege, Compl. ¶161—yields no different result.  In evaluating such claims, the Fourth Circuit applies "the three-prong test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 [ ] (1971)."  *Wood v. Arnold*, 915 F.3d 308, 313 (4th Cir.), *cert. denied*, 140 S. Ct. 399 (2019).  "Under this test, to withstand First Amendment scrutiny, 'government conduct (1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion;

and (3) must not *excessively entangle* church and State.'" *Id.* at 314 (quoting *Moss v. Spartanburg County Sch. Dist. 7*, 683 F.3d 599, 608 (4th Cir. 2012)).  As discussed above, it is undisputed that the government conduct at issue in this case was driven by the purpose to prevent the ongoing infections and deaths of thousands of Marylanders from COVID-19, not to restrict religious activities.

To evaluate the second prong of the *Lemon* test, the Fourth Circuit evaluates whether an "informed observer would understand that 'the practice under review in fact conveys a message of endorsement or disapproval' of a religion." *Wood*, 915 F.3d at 316 (quoting *Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003)).  Imposing a 10-person limit on large gatherings, including religious gatherings, while clarifying the types of religious activities that are permissible in the context of a pandemic that spreads through sustained, close social contact demonstrates no disapproval of a religion.  And even though the Stay-at-Home Order, as interpreted, allows religious organizations additional modes of gathering, the Establishment Clause does "not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994).  Accommodating religion insofar as possible when extraordinary circumstances arise by suggesting alternative methods of gathering is an appropriate step in an historic tradition of government coexistence with religion.  Nor is there is any risk of entanglement in enforcing the Order; because all large gatherings are limited to 10 people or fewer, there is no need to distinguish what is and what is not a religious activity when enforcing the Order.

The growing body of case law addressing First Amendment claims related to COVID-19 stay-at-home orders supports the denial in this case of plaintiffs' motion for a temporary restraining order and dismissal of the complaint. *See, e.g.*, *Lighthouse Fellowship Church*, 2020 WL 2110416, at *1 (denying motion to temporarily enjoin a stay-at-home order prohibiting large, in-person religious services); *Roberts v. Neace*, No. 2:20CV054 (WOB-CJS), 2020 WL 2115358, at *3 (E.D. Ky. May 4, 2020), *appeal filed* May 5, 2020 (same). Every court that has been asked to temporarily enjoin a stay-at-home order, like Maryland's, which contains exclusions for drive-in religious services and limited in-person services, has concluded that the plaintiffs were unlikely to prevail.

In *Cassell v. Snyders*, for example, the district court considered the plaintiffs' request to temporarily enjoin enforcement of Illinois' stay-at-home order. No. 20 C 50153, 2020 WL 2112374, at *2 (N.D. Ill. May 3, 2020), *appeal filed* (May 4, 2020). That order contained an exception for faith-based organizations that allowed them to congregate in groups of fewer than ten people and to use "drive-in services" with more than 10 people. *Id.* The *Cassell* plaintiffs—like plaintiffs here, Compl. ¶15—alleged that the Illinois order violated their rights under the Free Exercise Clause because their church "could not accommodate drive-in services." 2020 WL 2112374 at *3. The plaintiffs also alleged—again, as do plaintiffs here, Compl., p.102—that their congregants could maintain social distancing inside the church and would be provided with face coverings and hand sanitizer. *Cassell*, 2020 WL 2112374 at *3.

After considering the plaintiffs' claims under both the *Jacobson* public-health crisis standard and the rational-basis test for neutral, generally applicable laws affecting religion,

the district court concluded that the "Plaintiffs have a less than negligible chance of prevailing on their constitutional claim" and denied their request for a temporary restraining order. *Cassell*, 2020 WL 2112374, at *7. The court's decision was based in part on the religious-services exception to the Illinois order, which like the Stay-at-Home Order, "expressly preserves various avenues for religious expression, including gatherings of up to ten people and drive-in services." *Id.* at *8.

The Northern District of Mississippi reached the same result in *First Pentecostal Church of Holly Springs v. City of Holly Springs*, No. 3:20CV119 M-P, 2020 WL 1978381, at *3 (N.D. Miss. Apr. 24, 2020). There, the district court also denied a request to temporarily allow in-person religious services where city officials interpreted their stay-at-home order to allow worshipers to congregate in their vehicles. The court concluded that "allowing drive-in church services involving congregants sitting in vehicles whose windows are closed represents the practical middle ground upon which concerns about religious freedom and the safety of the community may co-exist." *Id.*

The first of two cases that plaintiffs appear to rely on, *On Fire Christian Center, Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020), *see* Compl. ¶ 8, only confirms the conclusion that Maryland's Stay-at-Home Order is consistent with Free Exercise precedent. Although the district court in *On Fire* misapplied that precedent by applying strict scrutiny, *see Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 WL 1905586, at *36 (D.N.M. Apr. 17, 2020) ("disagree[ing] [with *On Fire*] that strict scrutiny applies"), the temporary restraining order it granted allowed only drive-in religious services, not in-person services. *Id.* at *1. Even applying the more

25

rigorous standard of review, the district court in *On Fire* concluded that "it appears likely that [defendant's] interest in preventing churchgoers from spreading COVID-19 would be achieved by allowing churchgoers to congregate in their cars as [plaintiff] proposes." 2020 WL 1820249, at *7.

The Sixth Circuit reached this same conclusion in *Maryville Baptist Church, Inc. v. Beshear*, __ F.3d __, No. 20-5427, 2020 WL 2111316 (6th Cir. May 2, 2020). The plaintiffs there appealed the lower court's denial of its motion for a temporary restraining order against two Kentucky stay-at-home orders, which precluded both drive-in and in-person religious services. *Id.* at *1. The plaintiffs asked for an injunction pending appeal that would allow them to practice both types of religious services. *Id.* The court of appeals granted the plaintiffs' request with respect to drive-in services but denied it with respect to in-person services. *Id.* at *5.

The other case plaintiffs rely on—*First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020), *see* Compl. ¶¶11-12—also applied strict scrutiny to enjoin a ban on in-person services, but like *On Fire*, it too has been called into question by other district courts. *See Cassell*, 2020 WL 2112374, at *10 (stating that the "approach in *First Baptist* is difficult to square with *Lukumi*"). In other respects, as well, the circumstances of the case make it a clear outlier. For example, because *First Baptist* evaluated a Kansas stay-at-home order that was "a wholesale prohibition on in-person religious services," 2020 WL 1910021 at *6, it apparently did not have the opportunity to address the potential availability of drive-in services, which other courts have found significant. Also, the court concluded that churches and religious activities had been

"singled out" for stricter treatment because they qualified as an "essential function" under the Kansas order, and yet were the "only essential function whose core purpose—association for the purpose of worship—had been basically eliminated." *Id.* at *7. Here, by contrast, *all* large gatherings—whether faith-based or secular, in churches or at concerts, schools, theaters, sporting events, or restaurants—are treated the same, because they all carry a heightened risk of spreading the COVID-19 virus. *See* Exhibit 5, ¶¶ IV, V.

To the extent that *First Baptist* stands for the proposition that the First Amendment requires in-person services during times of pandemic, it runs squarely into the many district courts that have denied motions for temporary restraining orders on those grounds, without even addressing whether the plaintiff could conduct drive-in services. In *Cross Culture Christian Center v. Newsom*, for example, California public-health officials ordered that the plaintiffs' in-person religious services violated state and county stay-at-home orders, and the police barred access to the plaintiffs' church. No. 220CV00832JAMCKD, 2020 WL 2121111, at *2 (E.D. Cal. May 5, 2020). After recognizing that the stay-at-home orders "flow from valid exercises of state and local emergency police powers," the court concluded that the plaintiffs were not likely to succeed under the *Jacobson* standard or rational-basis review. *Id.* at *5-7. Another federal district court in California denied a similar motion for a temporary restraining order. *See Gish*, 2020 WL 1979970, at *5 (stating that "[a]lthough physical contact with others is curtailed, a wide swath of religious expression remains untouched by the [stay-at-home] Orders"). In fact, nearly all of the recent court decisions involving COVID-19 and the Free Exercise Clause have declined to enjoin the enforcement of stay-at-home orders prohibiting large, in-person religious

gatherings, in particular when alternative ways of worshiping like drive-in services are permitted.  These authorities support denying the motion for a temporary restraining order here and dismissing the complaint.

### C.    The Order Does Not Regulate Speech but, in any Event, Meets the Test for Permissible Time, Place, and Manner Restrictions.

The Stay-at-Home Order also withstands constitutional scrutiny as a time, place, and manner restriction, but it is important at the outset to underscore that the Order does not regulate any expressive activity; it "neither limits what [citizens] may say nor requires them to say anything." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) ("*FAIR*").   Nor does it restrict any "expressive conduct" that would fall within the First Amendment.  The test for whether conduct is expressive is "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).

Plaintiffs have complained about three aspects of the order—the requirement to wear masks, the inability to attend physical therapy appointments, and the 10-person limit on gatherings—but many of their complaints are based on a misunderstanding of how the Governor's orders operate.  The April 15 order about masks requires their use only when entering a retail establishment or taking public transportation, Exhibit 6, ¶II.a, and subsequent guidance exempts "[p]eople with disabilities who are unable to wear a mask." MDH, Frequently Asked Questions (FAQs) About the Stay-at-Home Order and Self-

Isolation (Updated May 7, 2020).[7]   As a result, the scope of plaintiffs' concern about wearing masks and seeing others wearing them is more limited than they suggest.   More importantly, the *meaning* that plaintiffs attribute to wearing a face mask—that it is a "sign of capture on the battlefield, and subservience to the captor," Compl. ¶73—is not readily apparent to the average observer, who is more likely to construe the mask as a fellow citizen's efforts to protect the public health.   Requiring necessary protective equipment be worn to engage in certain public activities is simply not the equivalent of mandating expressive conduct.

It is even less clear to an observer what message could be conveyed by attending physical therapy, but the orders and guidance do not require physical therapy offices to close or prohibit travel to them, as plaintiffs appear to believe.   Compl. ¶25.   The Stay-at-Home Order specifically allows for travel to "seek[] medical or behavior health or emergency services," Exhibit 5, ¶II.b.ii., and allows the businesses federally recognized as part of our Nation's "critical infrastructure sectors"—which includes physical therapy offices—to remain open.   *See* Exhibit 8, ¶2.a (Interpretive Guidance No. COVID 19-02); Exhibit 9, ¶k.iv (Interpretive Guidance No. COVID 19-04).   As for the businesses that *do* have to close for public health reasons, the First Amendment is not implicated with every closure of a restaurant for health code violations, even though that means people can no longer gather there.

---

[7] All directives and guidance issued by the Maryland Department of Health are available at https://phpa.health.maryland.gov/Documents

If any aspect of the Order has First Amendment implications, it would be only by way of an indirect restriction on the time or place of speech: the plaintiffs may not engage in expressive activity in the same location as 10 other people and must either wait until their preferred place is available or choose another place to speak. But "[t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana*, 379 U.S. 536, 554 (1965). "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech . . . ." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation omitted). To do so, the government's regulation must (1) be content neutral; (2) be "'narrowly tailored to serve a significant governmental interest'"; and (3) "'leave open ample alternative channels for communication of the information.'" *Id.* (citation omitted).

As to the first prong, a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* In other words, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). The Order's purpose is not aimed at expression at all, let alone the content of any potential expression that might be captured in its sweep. Instead, the Order serves the purpose of controlling infectious disease by reducing individual contacts that can lead to rapid exponential spread of the virus. Exhibit 1, ¶¶17-23. Any effect on speakers will be uniform,

but if it is incidentally more burdensome to those wishing to gather in larger groups to protest Maryland's efforts at containing the virus, the restriction still is not *justified* by anything other than concern for public health.  *See Ward*, 491 U.S. at 791.

Second, a regulation is narrowly tailored to a significant government interest "'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  *Id*. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).  But "it need not be the least restrictive or least intrusive means of" promoting that interest.  *Id.* at 798.  Here, Maryland has a substantial interest in the health and well-being of its citizenry, 1,338 of whom have died from COVID-19 in little more than months.  There is no doubt that, absent the restriction on gatherings and the requirement for facemasks, more death and illness would result, undermining the State's compelling interest in public health.

Moreover, the restrictions are temporary.  The Governor has already released a plan for lifting the restrictions and announced measurable exit criteria for achieving each stage of reopening, *see* Maryland Strong, Roadmap to Recovery, available at https://governor.maryland.gov/recovery/ (last visited May 8, 2020), and just two days ago, he announced an initial relaxation of restrictions on outdoor recreational activities—including the operation of campgrounds like the one the lead plaintiff operates.  *See* Exhibit 7.  This shows that the Order is narrowly tailored to address the aspects of the continuing public health risk that require continuing attention.

Meanwhile, the Order, coupled with interpretive guidance, provides ample alternatives for speech, while still protecting public health.  In order to satisfy the ample

31

alternative standard, "the available alternatives need not 'be the speaker's first or best choice' or 'provide [ ] the same audience or impact for the speech.'" *Ross v. Early*, 746 F.3d 546, 559 (4th Cir. 2014) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)).   "[T]he relevant inquiry is simply whether the challenged regulation provides avenues for 'the more general dissemination of a message.'"  *Id.* (citation omitted).  That the Order "may reduce to some degree the potential audience for [the protestor, delegate, and pastor plaintiffs'] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." *Ward*, 491 U.S. at 802.

As for overbreadth, to the extent that doctrine has any application, it would require the Order, as a content-neutral regulation, to pass intermediate scrutiny, which is closely analogous to the time, place, and manner standard discussed above.  *Doe v. Cooper*, 842 F.3d 833, 845-46 (4th Cir. 2016).  "To pass intermediate scrutiny, a statute must 'materially advance[ ] an important or substantial [government] interest by redressing past harms or preventing future ones,'" *id.* at 846 (quoting *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1082 (4th Cir. 2006)), and "it cannot 'burden substantially more speech than is necessary to further the government's legitimate interests,'" *id.* (quoting *Ward*, 491 U.S. at 799).

Here, the government's interest in protecting the public health is materially advanced by the Order, which acts directly to reduce the number of contacts each individual has while maintaining vitally important sectors of the economy to provide the food, shelter, and technology needed to sustain the populace and combat the outbreak.  And, to the extent the Order incidentally burdens speech, it seeks to minimize those burdens through

interpretive guidance, enforcement protocols, and a published plan for lifting the restrictions as soon as publicly available metrics are achieved that demonstrate a decreased risk of transmission.

Finally, there is no merit to the two other speech-related claims the plaintiffs make. First, the Stay-at-Home Order is not a prior restraint. Compl. ¶¶ 130, 144. "The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted). Prior restraints include judicial orders, like injunctions and gag orders, *see, e.g.*, *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018), and licensing schemes, *see, e.g.*, *American Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018). The Order, by contrast, is not aimed at expression at all, nor does it require an advanced permit for any type of gathering. Instead, it is an order forbidding certain gatherings for public health purposes that is enforceable only after-the-fact.

Nor is the Order unconstitutionally vague. The word appears only twice in the complaint, Compl. ¶¶ 52, 139, and in neither place do plaintiffs specify what portion of the Order they consider vague. And it is hard to see how it is; the Order specifically defines various types of conduct and limits gatherings based on a numerical standard ascertainable to all. Therefore, "persons can determine whether they are violating the statute" and it provides more than "minimal guidelines to govern law enforcement," and is thus not unconstitutionally vague. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) (quotation marks omitted).

**D.      Plaintiffs' Equal Protection Claim Fails Because the State's Distinction Between Essential and Non-Essential Businesses Has a Rational Basis and Is Supported by the State's Compelling Interest in Saving Lives During this Once-In-a-Century Pandemic.**

The only non-religion-based discrimination alleged in plaintiffs' equal protection claim involves the two business plaintiffs—Antietam Battlefield KOA and Adventure Park U.S.A.—which assert that the Stay-at-Home Order impermissibly treats their businesses differently from other types of businesses, depriving them of the right to equal protection under the 14th Amendment.[8]  Compl., Count 5.  The business plaintiffs have not asserted that they belong to any protected class.  Instead, it appears that they view themselves as members of the class of businesses not included in "the critical infrastructure sectors identified by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency," which the Order incorporates by reference, Exhibit 5, ¶IV.a., and which therefore are prohibited from operating under the current Stay-at-Home Order.  But "'[t]he Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases.'"  *American Entertainers*, 888 F.3d at 723 (quoting *Nebbia v. New York*, 291 U.S. 502, 527-28 (1934)).

----

[8] Plaintiffs also allege religious discrimination under the Fourteenth Amendment, but that claim is analyzed above with their religious liberty claims under a single, "unitary analysis."  *See Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 288 (4th Cir. 2005) (rejecting plaintiff's equal protection claim and evaluating it instead under First Amendment religious liberty principles); *see also Columbia Union Coll. v. Clarke*, 159 F.3d 151, 155 n.1 (4th Cir. 1998) (stating that free exercise and equal protection claims are treated "as one constitutional inquiry").

"[W]hen no fundamental right or suspect classification is at issue, the Equal Protection Clause" requires only that a classification be "rationally related to a legitimate state interest." *Siena Corp. v. City of Rockville Md.*, 873 F.3d 456, 465 (4th Cir. 2017) (quotation marks omitted).  This test is easily met; it "is simply whether the governmental end is legitimate and whether the means chosen to further that end are rationally related to it." *Id.*

Here the rational basis test is met and exceeded.  It is a legitimate governmental end to protect Marylanders from a novel viral infection that has spread rapidly throughout the world, sickening more than 3.7 million people and resulting in 1,338 deaths here in Maryland in less than three months.  Exhibit 1, ¶11.  To consider an appropriate response to this once-in-a-century pandemic, the Governor formed an expert advisory commission made up of doctors, public health professionals, and infrastructure experts. *Id.* ¶26.  Based on their advice, the Governor adopted the federal definition of "critical infrastructure sectors" as the basis for distinguishing between essential and non-essential businesses. Exhibit 5, ¶IV.a.

Because COVID-19 "is emitted through an infected person's respiratory 'droplets,'" "avoiding other people is the safest approach." *Id.* ¶15.  And because *any* contact with other people risks infection,[9] it is rational to limit the potential for even passing contact to

---

[9] That applies to plaintiffs' clientele as well as to other people.  As Dr. Mitchell explains in his declaration, "there is no public health basis," Exhibit 1, ¶38, for plaintiff Adventure Park U.S.A.'s belief that it "primarily serv[es] an age-group and clientele which is not impacted or endangered in by COVID-19 in any scientific significance," Compl. ¶24. There are already more than 1,200 cases of COVID-19 infection involving people under 20, and the rate of infection is growing in rural communities, which increases the likelihood

those activities and industries that cannot be closed without serious societal effects.  That

is, if a person must risk infection by interacting with others in a retail setting, it is rational

to enact policy motivated by the conclusion that that risk should be taken only to supply

the basic necessities of life or critical infrastructure.

The "government enjoys great regulatory latitude" both in "pure economic

regulation" and in exercise of the "states' inherent police powers." *American Entertainers*,

888 F.3d at 723.  Distinguishing between businesses that supply food, healthcare, and

shelter, and those that provide recreation or other goods and services, makes sense when

deciding whether the business must temporarily close. It is a rational and justified policy

response to a public health threat that spreads through contact with other people to limit

citizens' contact with each other, and, in doing so, to recognize an "undeniable difference

between certain activities that are, literally, life sustaining and other that are not." *Roberts*,

2020 WL 2115358, at *3.

E.     **Plaintiffs' Form-of-Governance Claims Are Either Non-Justiciable or Fail as a Matter of Law.**

The complaint contains two claims that the Governor's orders violate foundational

principles of federal and state governance, but neither has any merit.  Count 6 alleges that

the Governor's orders violate the Guarantee Clause of Article IV, § 4 of the United States

Constitution, which "guarantee[s] to every State in this Union a Republican Form of

Government."   As the Supreme Court "has several times concluded," however, "the

---

that young people will infect older adults who clearly are more vulnerable.  Exhibit 1,
¶¶37-38.

Guarantee Clause does not provide the basis for a justiciable claim." *Rucho*, 139 S. Ct. at 2506. Even under an express declaration of martial law, the Guarantee Clause does not provide an avenue for resolution of disputes over the legitimacy of State government actions. *Luther v. Borden*, 48 U.S. 1, 42 (1849).

And, although it is not clear from the complaint for what purpose plaintiffs invoke Article 2 of the Maryland Declaration of Rights, it seems to have no application in the present case. Article 2 "does not 'adopt'" any part of the federal constitution, "it simply recognized that the provisions of the United States Constitution supersede any law enacted by the General Assembly." S*cherr v. Handgun Permit Review Bd.*, 163 Md. App. 417, 450 (2005). Because the federal Guarantee Clause does not support a justiciable controversy here, neither does Article 2 of the Maryland Declaration of Rights.

The other form-of-governance claim comes in Count 9, which alleges that the Governor's order violates the requirement of Article 9 of the Maryland Declaration of Rights that "that no power of suspending Laws or the execution of Laws, unless by, or derived from the Legislature, ought to be exercised, or allowed." *See* Compl. ¶¶ 223, 224. The central flaw in this claim is that the Maryland General Assembly *has* authorized the Governor to suspend Maryland laws when he proclaims a catastrophic health emergency. *See* Pub. Safety § 14-107(d)(1)(i) (The Governor may "suspend the effect of any statute or rule or regulation of an agency of the State or a political subdivision."). The Governor

having made the necessary proclamation, *see* Exhibit 4, his power to suspend laws that obstruct the State's COVID-response is entirely consistent with Article 9.

**F.      Plaintiffs' Takings and Commerce Clause Claims Fail as a Matter of Law.**

The United States Constitution and the Maryland Constitution both provide that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see also* Md. Const. art. III, § 40.[10]   The Supreme Court's takings cases distinguish between two types of takings: (1) physical appropriation of private property and (2) regulatory burdens on private property.  *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43 (2017) (discussing the distinct types of takings cases).  In the case of a physical appropriation of land or personal property for public use, the Supreme Court has found the plain language of the Takings Clause to require compensation.  *See id.*; *see also Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2427-28 (2015).

Regulatory takings cases "ha[ve] been characterized by 'ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.'"  *Murr*, 137 S. Ct. at 1942 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)).  The Court has articulated "a complex of factors" to guide courts, including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct

---

[10] Maryland courts consider the Supreme Court's takings decisions to be "'practically direct authorities'" for takings claims brought under the Maryland Constitution, Article III, § 40.  *Litz v. Maryland Dep't of Env't.*, 446 Md. 254, 266 (2016) (citation omitted).

investment-backed expectations; and (3) the character of the governmental action." *Id.* at

1943 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)).

Plaintiffs' takings challenge is limited to the allegation that the requirement that

they close their campground and amusement park to prevent the spread of the coronavirus

constitutes a taking of their property because they have had to forgo income during the

period of closure. Compl. ¶235. Their claims thus do not state a physical taking, but a

regulatory taking, which is ordinarily evaluated under the "more flexible and forgiving"

*Penn Central* standard.[11] *Horne*, 135 S. Ct. at 2425.

But the Takings Clause presupposes that the governmental action is lawful; it is not

designed to "'limit the governmental interference with property rights *per se*, but rather to

secure *compensation* in the event of otherwise proper interference amounting to a taking.'"

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citation omitted). Here, plaintiffs

do not seek compensation,[12] and therefore their claim appears to be limited to an assertion

---

[11] Although there are two types of "categorical" regulatory takings, neither applies here. The first, concerns "regulations that compel the property owner to suffer a physical 'invasion' of his property," which is not at issue here. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). The second concerns cases "where regulation denies all economically beneficial use of land," *id.*, but temporary governmental action like that at issue here does not implicate that categorical rule. *See Tahoe-Sierra*, 535 U.S. at 334. Even in this latter category, however, the State may act under its "power to abate nuisances that affect the public generally," without paying compensation. *Lucas*, 505 U.S. at 1029.

[12] Even if plaintiffs had sought just compensation, *Tahoe-Sierra* would foreclose it, as it concluded that a temporary restriction on the use of property—there, for 32 months— did not amount to a taking. 535 U.S. at 341-42. So held the only court to have addressed the merits of a COVID-related takings claim. *See Friends of DeVito v. Wolf*, No. 68 MM 2020, 2020 WL 1847100, at *17 (Pa. Apr. 13, 2020), *cert. filed* No. 19-1265 (U.S., Apr. 27, 2020).

that the Stay-at-Home Order does not "serve[] a 'public purpose.'"  *Kelo v. City of New London*, 545 U.S. 469, 480 (2005).  Plaintiffs' claim must be dismissed on the merits, though, as a string of cases reaching back more than a century establishes that governmental actions taken in response to a public emergency—whether war-time exigencies or a public-health crisis—do not constitute a taking.

### 1.   Exercises of State Police Power in Times of Public Necessity Do Not Give Rise to a Takings Claim.

Two related doctrines defeat plaintiffs' takings claim as a matter of law.  First, the "public necessity" doctrine provides that state actions taken in response to war-time exigencies and other public crises do not constitute a taking.  *See, e.g.*, *United States v. Central Eureka Mining Co.*, 357 U.S. 155 (1958).  Second, governmental exercises of the "police power" to address a public health emergency do not constitute a taking because they are not an exercise of eminent domain.  *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623 (1887).  These two principles, if satisfied, more than fulfill the requirement that a taking be for a public use.  "For more than a century, . . . public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power."  *Kelo*, 545 U.S. at 483.  Satisfaction of the public necessity doctrine and the exclusion of actions taken under the police power fulfill the constitutional requirement that a governmental taking be for the public use.

The "public necessity" doctrine provides that exigent circumstances can require "strict regulation of nearly all resources" to prevent imminent loss to life or property.

*Eureka Mining*, 357 U.S. at 168.  Applying that doctrine, the Supreme Court in *Eureka Mining* held that the Government's decision "ordering nonessential gold mines to close down" during wartime did not constitute a taking, despite the economic impact on the proprietors.  *Id.* at 156.  In language that evoked its earlier decision in *Jacobson* and the circumstances that the State faces today, the Court observed that war "makes demands which otherwise would be insufferable," but we as a society suffer them because they are "temporary in character" and "are insignificant when compared to the widespread uncompensated loss of life and freedom of action which war traditionally demands."  *Id.* at 168.

Although the public necessity doctrine originated within the context of wartime restrictions, *see United States v. Caltex (Philippines), Inc.*, 344 U.S. 149 (1952), it has been applied more broadly to immunize a variety of governmental actions to protect public health and safety.  For example, under this "rule of necessity," if a State creates a firebreak by destroying a person's house to save the homes of others, the State need not compensate the party whose property was sacrificed.  *Ralli v. Troop*, 157 U.S. 386, 405 (1895) ("By our law, indeed, either public officers or private persons may raze houses to prevent the spreading of a conflagration. But this right rests on public necessity, and no one is bound to compensate for or to contribute to the loss. . . .").

We see the same results in cases where the State exercises its "police powers." Indeed, over a century ago, in *Mugler*, the Supreme Court rejected a takings claim from breweries that had effectively been outlawed by the enactment of a state law prohibiting the manufacture and sale of alcoholic beverages.  The Court ruled that a "prohibition

simply on the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any sense, be deemed a taking or an appropriation of property for the public benefit." 123 U.S. at 668-69; *see also Samuels v. McCurdy*, 267 U.S. 188, 198 (1925) (applying *Mugler* and holding no compensation due for liquor rendered valueless where prohibition fell "within the police power of the states"). The same rule applied in *Miller v. Schoene*, which upheld the constitutionality of an order to destroy diseased cedar trees to prevent infection of nearby orchards without compensating the owners. 276 U.S. 272, 279-80 (1928).

Relying on *Mugler* and its progeny, the Fourth Circuit has recognized the ability of States to restrict the use of private property without effecting a compensable taking when it does so to protect the public. In *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, the Fourth Circuit held that South Carolina's ban on the possession or sale of certain gambling machines, which had previously been legal to possess and sell, was not a taking, even though as a result of the newly enacted law, the machines "lost all market value" and the owner's "business became worthless." 493 F.3d 404, 406 (4th Cir. 2007). The Fourth Circuit analogized the State's exercise of its police power to regulate gambling to "another classic exercise of state police power: regulation of the sale of alcoholic beverages" and noted that "[t]he Supreme Court consistently rejected takings challenges to Prohibition-era regulations of previously acquired stock." *Id.* at 410.

As the Supreme Court explained in *Mugler*, "the supervision of the public health . . . is a governmental power, 'continuing in its nature,' and 'to be dealt with as the special exigencies of the moment may require.'" 123 U.S. at 669 (citation omitted). Here,

42

in response to a once-in-a-century global pandemic, the Governor has exercised the police powers conferred upon him to limit the spread of the coronavirus by closing businesses that do not provide groceries, household goods, and other essential services. Although requiring plaintiffs' businesses to close might be unprecedented, so too is the public health emergency that Maryland faced and continues to face, and all property owners hold title subject to the State's power to act in these circumstances.

The Supreme Court has characterized the Government's ability to act in times of crisis as a "limitation" that "inhere[s]" in a party's title to property as part of the "background principles" of property law that inform Takings Clause analysis. *Lucas*, 505 U.S. at 1029. In this way, the doctrine is a corollary to the government's ability to abate nuisances without implicating the Takings Clause. As the Court put it in *Lucas*, governmental action does not constitute a taking—regardless of its economic impact—if it does "no more than duplicate the result that could have been achieved . . . by the State under its . . . power to abate nuisances that affect the public generally, or otherwise." *Id.* And the Court went on to specify that the "otherwise" is "litigation absolving the State (or private parties) of liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent the spreading of a fire' or to forestall other grave threats to the lives and property of others." *Id.* at n.16 (citing *Bowditch v. Boston*, 101 U.S. 16, 18-19 (1880), and *United States v. Pacific R.R.*, 120 U.S. 227, 238-39 (1887)).

The public necessity and police power cases that establish the "settled" principle that "a state may take, damage, or destroy private property without compensation, when the public necessity, the public health, or the public safety require it to be done." *Hulen v.*

*City of Corsicana*, 65 F.2d 969, 970-71 (5th Cir. 1933); *see Warner/Elektra/Atl. Corp. v. County of DuPage*, 991 F.2d 1280, 1286 (7th Cir. 1993) (stating that governmental action to "[a]bat[e] a nuisance" or to pull "down a private house to create a firebreak" are "immune . . . from the duty to compensate"). As this Court recently explained, "the Supreme Court has routinely upheld property regulations, even those that 'destroy[]' a recognized property interest, where a state 'reasonably concluded that the health, safety, morals, or general welfare' would be advanced." *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 409 (D. Md. 2018) (citing *Penn Cent.*, 438 U.S. at 125, and *Mugler v. Kansas*, 123 U.S. at 668); *see also Holliday Amusement*, 493 F.3d at 411 n.2.   The temporary public health closures required by the Order easily survive scrutiny by that standard.

### 2.    State Regulation of Businesses Does Not Violate the Dormant Commerce Clause.

Count 10 of the complaint includes with its takings claim an argument that "[t]he Constitution of the United States reserves the sole and exclusive power of regulating commerce among the several states to the federal authority," Compl. ¶230, and that the Governor's orders have "unlawfully burdened and interposed his own purported authority over the commerce and businesses of the State of Maryland by closing those he deems non-essential and allowing to remain open those he deems essential, among other burdens."[13]

---

[13] The "other burdens" include the allegation that Governor Hogan arranged for the acquisition of COVID-19 test kits and did so in way that "prevent[ed] the inspection and careful FDA approval and/or distribution of the COVID-19 test kits." Compl. ¶233. Not so; FDA approved the "emergency use" of the test kits. *See* https://www.fda.gov/media/137484/download. The complaint also contains an unsubstantiated claim that "COVID-19

Compl. ¶231.  The only authority cited for these claims appears to be *Gibbons v. Ogden*, 22 U.S. 1, 37-38 (1824).  *See* Compl. 66.

But *Gibbons v. Ogden* is not the Supreme Court's last word on the subject of the Dormant Commerce Clause.  If it had been, "and States been denied the power of concurrent regulation, history might have seen sweeping federal regulations at an early date that foreclosed the States from experimentation with laws and policies of their own." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090 (2018).  "Just five years after *Gibbons*, however, in another opinion by Chief Justice Marshall, the Court sustained what in substance was a state regulation of interstate commerce." *Id.* (citing *Willson v. Black-Bird Creek Marsh Co.*, 2 Pet. 245 (1829)).  And, as the Court has recently made clear, its doctrine in this area "has developed further with time." *Id.*  Under modern Dormant Commerce Clause precedents, the federal and state governments share the power to regulate commerce, though federal law, if it occupies the field, takes precedence.

"[T]wo primary principles . . . mark the boundaries of a State's authority to regulate interstate commerce.  First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Id.* at 2090-91.  The Stay-at-Home Order does not in any way discriminate against interstate

---

tests, medicines and treatments are being unlawfully rationed, withheld, prevented and denied to Plaintiffs," Compl. ¶234, but the only other allegation about plaintiffs' need for COVID-19 treatment is speculative, with Sgt. Anderson expressing a concern about access "should he ever need" such treatment, Compl. ¶75.  Suffice it to say, the Governor has the authority to ration COVID-19 supplies, *see* 100 Md. Op. Att'y Gen. 160 (2015), but because of our collective efforts to "flatten the curve" here in Maryland, has not yet needed to do so.

commerce.  It does not impose interstate tariffs, tax interstate transactions differently, or in any way favor Maryland businesses.  To the contrary, the order, by definition, can restrict *only* Maryland businesses.  Nor does it unduly burden commerce.  The test for undue burden is "less scrutinizing than the test for affirmatively discriminatory state actions"; it invalidates state enactments only if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *PPL Energyplus, LLC v. Nazarian*, 974 F. Supp. 2d 790, 854–55 (D. Md. 2013), *aff'd,* 753 F.3d 467 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).  Whatever the burden on interstate commerce might be (as opposed to the burden on the plaintiff), it does not "clearly" outweigh the important public health benefits that the Stay-at-Home Order provides.  *See generally* Exhibit 1.

Finally, "the state may legislate freely upon those phases of the commerce which are left unregulated by the nation."  *Cloverleaf Butter Co. v. Patterson*, 315 U.S. 148, 155 (1942).  That is where we are with respect to the current pandemic, as the federal government—and the President himself—has repeatedly left it to the States to determine how best to respond to the pandemic and determine when conditions are appropriate for re-opening their economies.  There is no merit to the claim that the State is foreclosed from doing what is necessary to protect the health and safety of its residents.

## III.   THE OTHER FACTORS THAT WOULD SUPPORT INJUNCTIVE RELIEF ARE NOT PRESENT.

For the reasons discussed above, plaintiffs do not have a likelihood of success on the merits of their claims, which itself is fatal to their motion for preliminary relief.  *See Di*

*Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  But plaintiffs have also failed to establish, as they must in order to prevail, that "'the balance of equities tips in [their] favor, and that an injunction is in the public interest.'"  *Id.* (quoting *Winter v. Natural Res. Defense Counsel*, 555 U.S. 7, 20 (2008)).

Plaintiffs claim that they suffer irreparable harm "from the threat of criminal prosecution" for engaging in the speech, assembly, commercial, and religious activities they wish to engage in, Compl. ¶16, but the factual record here does not substantiate that a threat has occurred.  For example, plaintiffs make much of an exchange between Delegate Cox and the Governor's Office, Compl. ¶¶ 1, 68, which they interpret as "threat of arrest," *id.* ¶68, when all the Governor's Office does is refer Delegate Cox to the language of the Order.  *See* Compl., Exhibit A.  They also allege that the Maryland State Police's "COVID-19 Emergency Compliance Check" pamphlet constitutes a "threat," Compl. ¶¶ 10, 84, when all it does is urge precautions to slow the spread of the disease, summarize the Governor's COVID-related orders, and inform that reader of the possible consequences of violating their requirements.  *See* Compl., Exhibit G.

Plaintiffs have not, moreover, adequately supported their claims of chilling. "Subjective or speculative accounts . . . are not sufficient"; instead a plaintiff is required to demonstrate the government action "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights."  *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (internal quotations and alterations omitted).  A pamphlet stating the law and plaintiffs' subjective "fear of surveillance" do not amount to a "threat of certainly impending" enforcement.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013).

Even if the plaintiffs had demonstrated a chilling of their First Amendment rights, that harm is significantly mitigated by the close tailoring of the orders and their temporary nature.  The orders leave open other options to continue their religious practices to the extent feasible during the current crisis, including by holding religious services online (using the many free services now available) or by holding drive-in services without any direct or indirect physical contact.  And even for the plaintiffs who preside over churches and congregations that do not have the capability to hold drive-in or online services, the Order is only temporary, and it does not prohibit them from conducting religious services, only from conducting in-person gatherings of more than 10 people at a time during the present health emergency.

The plaintiff-businesses' asserted claims are all in the nature of economic harms. "'The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm.'" *DiBiase*, 872 F.3d at 230 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *see also Wisconsin Cent. Ltd. v. Public Serv. Comm'n of Wis.*, 95 F.3d 1359, 1369 (7th Cir. 1996) (because "the question" in takings cases is "one of monetary compensation, a plaintiff would be hard pressed to demonstrate either irreparable harm or an inadequate remedy at law").  Loss-of-livelihood or bankruptcy, *see* Compl. ¶¶ 23, 24, do not provide a basis for irreparable harm in the takings context, because there is an express remedy available—just compensation—if a property owner succeeds on the merits of its claim.

Finally, any harm that plaintiffs might suffer as a result of such temporary restrictions is far outweighed by the potential harm to public health.  Permitting large

indoor gatherings could have detrimental effects far beyond those individuals who attend public gatherings by threatening people who did not choose to take the risk that plaintiffs seem willing to take.  One reason COVID-19 is so contagious, and thus dangerous, is that "a significant portion of individuals with coronavirus lack symptoms ('asymptomatic') and that even those who eventually develop symptoms ('pre-symptomatic') can transmit the virus to others before showing symptoms."[14]  There is thus "no public health basis," Exhibit 1, ¶38, for plaintiffs' assurances that their businesses "primarily serv[e] an age-group and clientele which is not impacted or endangered in by COVID-19 in any scientific significance."  Compl. ¶24.

Likewise, plaintiffs' representations that, if permitted to hold in-person religious services, they will abide by CDC guidance on physical distancing are insufficient.  *See* Compl. at p.102.  Notably, even while recommending that individuals maintain physical distance and wear face coverings, the CDC also states that "[t]his recommendation complements and does not replace the President's Coronavirus Guidelines for America," which advises individuals to "avoid social gatherings in groups of more than 10 people."[15]

The rights of all Marylanders to practice their religion freely are of fundamental importance. But those rights must be considered along with the public health reality that

---

[14] CDC, "Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission," (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html#studies (last visited May 8, 2020); *see also* Exhibit 1, ¶6.

[15] "30 Days to Slow the Spread," https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited May 8, 2020).

each and every gathering—whether at a church, temple, or mosque, or in a stadium, park, school, or concert hall—places the lives of Marylanders at risk.  In light of the ongoing global pandemic, a temporary restraining order exempting religious and faith-based gatherings from the Stay-at-Home Order would not be in the public interest but, instead, would threaten the effectiveness of the State's efforts to stop the spread of COVID-19 and protect the health of all individuals in Maryland.

With few exceptions, the district courts that have addressed similar motions for preliminary relief have concluded that the public interest in keeping in place pandemic-related restrictions greatly outweighs any harm caused to plaintiffs.  This Court should hold the same.

## CONCLUSION

The plaintiffs' motion for a temporary restraining order should be denied, the defendants' motion to dismiss should be granted, and the complaint should be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Adam D. Snyder

_____
ADAM D. SNYDER
Assistant Attorney General
Bar No. 27523
KATHLEEN A. ELLIS
Assistant Attorney General
Bar No. 04204
SARAH RICE
Assistant Attorney General
Bar No. 29113
JUSTIN FINE
Assistant Attorney General
Bar No. 18731
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6398
asnyder@oag.state.md.us
kathleen.ellis@maryland.gov
srice@oag.state.md.us
jfine@oag.state.md.us

Attorneys for Defendants