**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**Baltimore Division**

| | | |
|---|---|---|
| ANTIETAM BATTLEFIELD KOA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE J. HOGAN, in his official capacity as Governor of the State of Maryland, | ) | Civil No. 1:20 cv 01130 CCB |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

I.      Introduction and Factual Background ................................................................3

II.     Argument ...........................................................................................................9

A.      Plaintiffs Are Substantially Likely to Succeed on the Merits of its Commerce Clause and Takings      Clause      Claims      under      the      United      States Constitution………………………………………………………..…..9

III.    Free Exercise Argument and Standard of Review……………………………..24

B.      Plaintiff Ministers, Legislators and Veterans Are Substantially Likely to Succeed on the Merits of their Free Exercise Claim, their Freedom of Assembly Claim, their Free Speech Claim and their claims under the Maryland Constitution ………………………………………………………………………..28

        a.      Plaintiffs are Likely to Succeed on the Merits of their Free Exercise Claim under the U.S. Constitution..........................................…..32

        b.      Plaintiffs are Likely to Succeed on the Merits of their Freedom of Assembly Claim under the U.S. Constitution.............................…36

        c.      Plaintiffs are Likely to Succeed on the Merits of their Free Speech Claim under the U.S. Constitution…………………………………37

        d.      Plaintiffs are Likely to Succeed on the Merits of their Claims under the Maryland Constitution, Declaration of Rights. ................ …38

C.      Enforcement of the Order Will Inflict Irreparable Injury on Plaintiffs if the TRO is Not Issued ........................................................................ 41

D.      Granting A TRO Would Not Cause Substantial Harm to Others .................. 42

E.      The Public Interest in Protecting the Constitutional Rights Enumerated Require Entry of a TRO      ………………………………………………………43

Plaintiffs move for a temporary restraining order, adopting and incorporating each and every allegation in their Complaint and Declarations thereto, and in support thereof, states as follows:

### I.     Introduction and Factual Background.

"We will say **we gave up so much** for a while in order to save our loved ones, our friends, **neighbors**, and countless others that we will never know….Some people, **most people, can handle this illness on their own**... But there are some people who will get into real trouble with this disease…These are people who may have underlying conditions, or as I said earlier, maybe not." – Md. Health Deputy Sec. Fran Phillips, March 30, 2020 (available   https://governor.maryland.gov/2020/03/30/transcript-press-conference-march-30-2020/ , accessed May 12, 2020).

"Some people have said that…covering your faces infringes on their rights. But this…isn't just about protecting your rights…it's about protecting your **neighbors**, and…spreading this disease infringes on your **neighbors'** rights." – Governor Larry Hogan, April 17, 2020 Press Conference.
(available at https://www.youtube.com/watch?v=uggKD0z-sOM , accessed May 12, 2020).

"The purpose of the prohibition on public and private gatherings of more than 10 people, and the order that all Marylanders stay home, is to "flatten the curve" by slowing the spread of COVID-19, which helps ensure that our health care resources do not become overwhelmed…**Maryland has successfully "flattened the curve"…**. Clifford Mitchell, M.D., Declaration, Defs. Ex. 1, ¶¶ 18, 34

As much as many might hold some sympathy for Governor Hogan's "love thy neighbor" approach to the closure of in-person religious services, forced face coverings under criminal penalty, and the closure of what he deems "non-essential" businesses, "the Free Exercise Clause does not protect sympathetic religious practice alone." *Roberts, et al v. Neace, et al,* Sixth Circuit Court of Appeal, Case No. 2:20-cv-00054-WOB-CJS (May 9, 2020).

In that just-issued injunction preventing the Governors under the Sixth Circuit from declaring or preventing in-person religious gatherings as unlawful, the Court explained:

"…that's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it.  *See Emp't Div., Dep't of Human Res. Of Oregon v. Smith*, 494 U.S. 872, 886-87 (1990)."

The argument that one has a duty to a neighbor "to protect" them from unknown disease is surprising, particularly considering the Executive Orders require a non-voluntary surrender of Constitutional liberties under penalty of criminal law.  If the Governor's Executive Orders are imposing such a duty on Marylanders, hospitals and health care facilities would do well to revise their disease detection and prevention to avoid liability and ensure that common communicable infections to third parties closely affiliated with their employees and patients are warned and "protected", although it is doubtful that is even possible considering the scope of such a burden.  Just as it is doubtful to mandate the same to every Maryland citizen towards their "neighbor".

But this is not the law, or else we would all be paralyzed with fear of harming another unknowingly at all times in the future, even after COVID-19, for new viruses and disease never cease to exist, hence the existence of world-class health care facilities and practitioners.[1]

**"State of Emergency" Statutory Background**

The Governor, when announcing a Catastrophic Health Emergency, was required to limit his Proclamation to Subtitle 14-3A-02(a) which states: "if the Governor determines that a catastrophic health emergency exists, the Governor may issue a proclamation under

---

[1] While there is no duty to protect another in Maryland from unknown harms, the duty to warn in Maryland is limited to mental health practitioners who both have direct knowledge of a person's propensity to violence and of that person's intentional plan to act on that violence towards another.  *See MD Code Cts. & Jud. Proc. 5-609, Mental health care providers or administrators (Maryland Code (2019 Edition)).*

this subtitle." *Id.*   This is because the "State of Emergency" statute, Title 14-101, 107 operates to allow the Governor to have the power to issue a proclamation of "catastrophic health emergency" under that subtitle, which then controls the actions of the Governor, and even then, only if it is "imminent" and "impending". *Id.* at 107, 14-3A-01.  At a minimum, when the Governor renewed his Proclamation on May 6, 2020 for another thirty days of a state of emergency, he exceeded his powers under the statute for proclaiming the continuance of an emergency.  By the Governor's own admission and that of his COVID-19 team, there is no extensive loss of life or serious disability in comparison to the general population, nor is there any risk of the same.

The statutory requirement for a "Catastrophic" Health Emergency is the actual or imminent "extensive loss of life or serious disability" because of exposure to a "deadly agent".  Md. Code Ann. Public Safety art. 14-3A-01(b).  "Deadly agent" means, among other biologic attacks, a "viral agent…capable of causing extensive loss of life or serious disability." *Id.* at (c)(1).   Here, by the admission of Governor Hogan's key health care spokesperson and by the evidence itself published daily on the State's "coronavirus.maryland.gov" website, the ongoing health emergency has at the very least been demonstrated to not cause extensive loss of life in comparison to the general population, instead tragically targeting mostly a demographic of older nursing home residents and those with significant comorbidities. When nursing home deaths are removed from the calculations, the total number of Marylanders who, after nearly three months of the virus being in the State, have succumbed to the disease is far less than those who have died even this year from the annual flu or possibly from the effects of being under the stay-in-home lock-down orders from suicide and overdoses.

The same individuals estimating that our State would be "overwhelmed" with "thousands" of deaths from coronavirus by Easter over a month ago, and who were severely wrong, now attempt the irrational continuance of a shut-down by claiming "100,000 additional deaths [are] projected by…August" this year.  Yet Defendants do not specific where they believe this will occur and do not say it will happen in Maryland. Projections for other jurisdictions or broad regions are not permissible under the statute for extending emergency powers of the Governor.  The modeling cited by Defendants regarding projections of pandemics have been severely wrong, and provide no rational basis to continue a state of emergency in Maryland such that constitutional liberties are permitted to be eclipsed and/or severely burdened.

To date, out of over six million Marylanders, there have been 1,643 deaths from coronavirus (COVID-19) reported by the Maryland Health Department in Maryland. If you remove all those who have died from the virus in nursing homes, which tragically is 803 so far and nearly 50% of all COVID-19 deaths, we are left with .014% of the Maryland population who have died of COVID-19.  Even if you add in all those who have tested positive for the virus, which includes thousands of asymptomatic people who are not exhibiting signs of sickness, that total to date being 34,061, we are still left with only .6% of the population of Maryland that has tested positive, most of whom are recovering or never even exhibited signs of illness.  Of that number at least 6218 cases to date occurred from nursing homes.

Even if the Governor was authorized to exercise his extraordinary powers of a State of Emergency March 5, 2020 as to all Counties in Maryland, with only three (3) cases of coronavirus in the State all in only one (1) County on that date, there is no scientific or

factual evidence he may continue to do so now with such a small number of deaths and hospitalizations, and small demographic number of Marylanders who are in danger of any serious risk of death or serious disability.  The numbers are drastically less when considering the fact that most of the cases have occurred in four (4) Counties plus Baltimore City in the Baltimore-DC metro area, while the other sixteen jurisdictions have had much fewer cases and deaths, with a couple having zero deaths.  Frederick County, for instance, has reported 71 deaths from COVID-19, but over 50 of those were solely from nursing home outbreaks, leaving only 21 or less deaths reported from the general population and most of those being over the age of 70.

**Constitutional Background**

Maryland, and the United States of America, exist solely because all people are essential and possess inalienable human and constitutional rights.  In order to preserve and advance those rights, we limited government to a document called the Constitution and made enduring mandates therein, such as a Republican form of government where democracy is protected through three independent Branches.

In Maryland, for nearly 400 years the rights of the individual to religious liberty was initially established in 1649 under the Act of Toleration.  After winning Independence from England, those fundamental rights have included Maryland Declaration of Rights, art. 44 commanding that speech and assembly, property and commerce, religious freedom, a republican form of governance and the ability to petition the government for redress of grievances may not be suspended during any time of emergency.  Only upon due process of law have those rights been scrutinized by courts to countenance any compelling interest of the State, or as here, of the Governor.

Although Governor Hogan may be commended for much of his rapid assertion of interest in saving lives from COVID-19, we now see that the lives of 99.4% of the population of Maryland are more significantly endangered by the overreach of his Orders than the virus itself.  The powers granted the Governor in the Constitutions of Maryland and the United States, as well as in the Emergency Health Powers of Title 14-3A, have been significantly exceeded.

At no time in US history has a Governor taken such sweeping power grabs from churches and religious assemblies, nor ordered all healthy persons to remain inside their homes on "house arrest" now going on 44 days, nor ordered the wearing of face masks under criminal penalty and without significant exceptions, nor prevented the reasonable and equitable continuation of commerce for all persons while most flounder without unemployment payments, regardless of whether they are able to equally comply with health guidelines.  The assertion of a Pandemic by the Governor does not thereupon grant his office the kind of sweeping and discriminatory powers he has exercised.

U.S. Marine and Maryland Army-National Guard veteran plaintiffs hereto have significant interests, for themselves and on behalf of all Marylanders, to ensure the liberty they gave so much for in battle overseas is not ursurped here in Maryland regarding their free and unhibited right to travel as healthy people, to enter commerce without wearing masks, to keep the right to assembly and to access health care deemed "elective" but essential to their physical therapy from battle wounds.

The State Delegates have an absolute right to speak and address their constiutents, and to travel without being subject to a stay-in-home order, including the right to visit constituents at their houses or in public assemblies and to be free from threat of criminal prosecution for doing

so.

The commerce power protecting plaintiffs Antietam Battlefield KOA, Adventure Park USA, LLC and Reopen Maryland, LLCs' business interests and organizations, are reserved to the federal government and the Governor's Executive Orders have extinguished their right to operate their businesses at his choice and upon his whim, which is *ultra vires* to the constitution and emergency powers possessed by the Governor.

There is no statutory authority under either Title 14, which the Governor's Orders cite to, or Title 14-3A which deals with Health Emergency Orders, to order healthy Marylanders to remain in their homes.  Even if the current health declaration of emergency, now admitted by the Governor to be declining, Defs. Mem. Opp. TRO pp. 1, provides authority to quarantine healthy Marylanders who have not exhibited signs of illness, the statute mandates a due process notice to be provided to each person within three (3) days, with the right of review in a circuit court. (Addendum 1, Title 14-3A, Public Safety Article).

Plaintiffs respectfully request this Court issue a temporary restraining order and/or preliminary injunction so that they may, while following reasonable health guidelines, worship freely with in-person church services without limitation similar to large congregating indoors in other contexts from Home Depot and Walmart to liquor stores and the Governor's press conferences, operate their businesses in order to feed their families and prevent bankruptcy, and enjoy their right to speak without intimidation, all without the threat of criminal prosecution.

## II.     ARGUMENT

### A.  Plaintiffs Are Substantially Likely to Succeed on the Merits of its Commerce Clause and Takings Clause Claims.

**To the Extent the Governor's Executive Orders Affect Interstate Commerce, They Violate**

**the U.S. Constitution's Commerce Clause**

The Plaintiffs represent businesses in the State of Maryland that regularly conduct interstate commercial activities in person, over the phone and through the internet and by mail, the internet and other electronic means.   Most small businesses in Maryland have significant transactions with businesses outside the State of Maryland. The effect of the Governor's Orders is to prevent the ability of the Plaintiffs, including, but not limited to, Adventure Park which regularly does business with suppliers and customers throughout the Mid-Atlantic region, including Maryland, D.C., West Virginia, Virginia and Pennsylvania.

Adventure Park regularly sells admission passes, parties and special events to individuals, groups and businesses both in Maryland and throughout the mid-Atlantic region through its website which reaches individuals, groups, organizations and businesses outside the State of Maryland.  *See* generally,  Declaration of Kevin Kaufman, General Manager at Adventure Park ("Kaufman Declaration"), attached as Exhibit A.

Not only does Adventure Park regularly sell admissions and admission packages to individuals, group, and businesses both inside and outside Maryland, but Adventure Park also regularly conducts business with manufacturers, suppliers, and vendors in States other than Maryland for admission and event sales, parts, machinery and equipment, spare parts, supplies and merchandise sold at, or by the Park.  For example, in 2019, for the period January through June, Adventure Park had 75 bookings for individuals, groups or organizations out of state for a total of $103,211.80.  *See* Kaufman Declaration, at ¶ 5 . Because of the shutdown, Adventure Park has already lost more than 60 bookings or reservations for the same period of 2020.   Under the Governor's Orders, Adventure Park will not be able to open its indoor facility until July at the earliest.  That loss alone is more than $90,000 and does not account for additional, indirect income

from the same bookings. Kaufman Declaration at ¶ 5. Furthermore, if Adventure Park is not able to open until July its losses will continue through the summer since Adventure Park will not be able to provide advance notice sufficient to allow advance bookings.  Finally, once the summer season is well under way, the lack of access to the Park for an extended period will have a chilling effect on parties, and particularly groups, from booking events at the Park.  *See* Kaufman Declaration, at ¶¶ 5, 8, 9.

In 2019 Adventure Park conducted substantial business with manufacturers, vendors, suppliers and similar individuals and entities in State other than Maryland.  The total economic impact of those transactions was well over $100,000.  For 2020, after the shutdown caused by the Governor's Orders, Adventure Park has had a reduction in those business transactions of more than $100,000 to date.  *See* Kaufman Declaration at ¶¶ 4, 5, 6, 7.

> "the only freedom which deserves the name is that of pursuing our own good in our own way, so long as we do not attempt to deprive others, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, mental, or spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves, than by compelling each to live as seems good to the rest."

John Stuart Mill *On Liberty*,  28, 29. Additional Citations omitted.  Quoted in *Mugler v. Kansas*, 123 U.S. 623, 653, 8 S. Ct. 273, 293 (1887).  The above quote speaks to the historical concept that individual liberty and freedom require the state to allow competent citizens to form their own opinions, and protect their own businesses, business patrons and workers. A common sense approach which is mindful of the universally recognized safeguards and procedure is far less intrusive and burdensome and much more effective than a "cookie cutter" approach which dictates that what is good for the inner city of Baltimore is best for Western Maryland or what serves well in the mountains and hills is best for the Eastern Shore.

*Mugler* is a case cited by the Defendants in support of their Opposition to the Plaintiffs'

Complaint and Motion for Injunctive Relief.   However, the Defendants reliance on *Mugler* is misplaced.   The history of jurisprudence involving the Commerce Clause, as discussed in detail below, leads to the inescapable conclusion that the actions of the Governor and the arbitrary interpretation of those actions by the Defendants (i.e. the "Interpretative Guidance from the Office of Legal Counsel, Defendants' Consolidated Memorandum ("Defs Memo"), Exhibits 9, 10, 11 and 12) are an attempt to regulate, and do, in fact, regulate interstate commerce.   There is, for sure, a limited exception for states to enact laws which protect the public health.   However that limited exception must be limited to the minimum possible to avoid interference with interstate commerce. Moreover, that limited exception must be equally applied.

By its very nature, imposing impossible rules and regulations with which only large businesses can comply, due a substantial disparity in  resources, legal, financial and others, compared to those available to  small businesses such as the Plaintiffs, including Adventure Park and Antietam Battlefield Campground, does result in  unequal application to Maryland small businesses.   Plaintiffs also argue that the Defendants have already admitted  that small businesses such as the Plaintiffs can open now, using the criteria set forth in Dr. Mitchell's Declaration (Defs Memo, Exh. 2) as a guideline.

There is no established science regarding the affect of the COVID-19 virus on the population at large.   There is substantial evidence, some circumstantial, but widely accepted, that COVID-19 targets elderly and immune deficient persons with much more dire consequences and morbidity.   Those individuals can be protected without shutting down most small businesses.   As of May 13, 2020 more than half of all deaths in Maryland came from nursing homes.   PSAs and other public pronouncements have asserted, for months, that the elderly and the immune deficient are substantially at risk while the extreme majority of others are at minimal risk of even needing

medical care.  In fact most victims of the virus do not need, nor seek medical care.

As the name suggests, this is the 19th coronavirus identified to date.  Yet, at no time in the history of this country, have businesses been forced to shutter and individuals forced to remain under house arrest for the previous coronaviruses or for any other pandemic, including the devastating Spanish flu of the early 20th Century.  Experts are clearly not sure what is most effective in preventing the spread of the virus.  However, states like Georgia, including densely populated Atlanta, and West Virginia, have reopened with no spike in sicknesses.  Countries like Israel and Sweden have been successful at curbing the spread of the virus despite no mandatory business closures and guidelines which do not compel behavior.  Sweden appears to be more of a democracy than our own country.

The conclusion from the above analysis, as argued hereinafter, is that Governor Hogan's orders violate the Commerce Clause (U.S. Const., Art. I, § 8).  Such a violation is permitted only in extraordinary circumstances and only to the extent necessary to protect the public health. Furthermore,  any orders must be limited to the minimum necessary to protect the public interest, be narrowly and uniformly applied and be of short duration.  While Governor Hogan is clearly attempting to provide protection to Marylanders, his orders are largely unnecessary, especially as applied, over burdensome, likely to cause more sickness, illnesses, mental and physical problems than the coronavirus and, more importantly violate the Commerce Clause both in their substance and application.

U.S. Const., Art I, § 8 states unequivocally, that Congress has the authority "To make **all** laws which shall be necessary and proper to carrying into Execution the foregoing (Art I, § 8) Powers..." (Emphasis added).  As discussed in detail below, in circumstances in which the actions, laws (or Executive Orders) affect interstate commerce, as Governor Hogan's Orders clearly do,

those actions are void, unconstitutional, and unenforceable.  An order which in any way restricts business activity is clearly an attempt to regulate commerce and all manner of ordinary, daily, business transactions of all affected Maryland businesses, including the Plaintiffs.  It is axiomatic that an order that indiscriminately forces thousands of businesses to shut down affects commerce. The public reports of business closures, bankruptcies, job loss and other similar reports flood the public domain and are well and widely recognized.  The substantial increase in the number of individual and business bankruptcies across the country confirms that the effect the governor's order and those of other state's leaders on commerce is and continues to be, without question, catastrophic.

Furthermore, if certain businesses, such as grocery and convenient stores, gas stations, manufacturing, supply and delivery businesses, everything from the local grocery store to Walmarts, to Home Depot and FedEx can open safely, then other businesses can do the same. Instead of limit the Governor's Orders in scope and application the Orders are indiscriminate and highly prejudicial to small businesses and those individuals who depend upon employment from small businesses, as most Marylanders do, for their livelihood and that of their families.

Moreover, the current pandemic has hit certain areas and certain demographics much differently than others.  Application of so-called "uniform" restrictions, generally applied, is, in itself, discriminatory.  What might be appropriate to attempt to protect citizens in the more densely populated areas of the country, and the state (such as Baltimore, Montgomery and Prince Georges Counties and Baltimore City) is not necessary in the more rural parts of the State such as Frederick County, Western Maryland and the Eastern Shore.

As the Supreme Court established as early as 1887:

"If a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is a palpable

invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

*Mugler, 123 U.S.* at 661.

The Supreme Court explained, just a decade later, the nature of the limit between the sovereign power of the state and the Federal power to regulate interstate commerce:

> That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the State and that which does belong to commerce is within the jurisdiction of the United States. . . . The same process of legislation and reasoning adopted by the State and its courts would bring within the police power any article of consumption that a State might wish to exclude, whether to that which was drank or to food and clothing

*Scott v. Donald*, 165 U.S. 58, 95, 17 S. Ct. 265, 270 (1897).

*Minnesota v. Barber*, 136 U.S. 313, 326, 328 is a case cited and quoted in *Scott v. Donald.* The facts and circumstances of *Minnesota* are analogous to those now before the Court. The principles expounded by Justice Harlan in *Minnesota* are just as applicable today as they were in 1890.

In *Minnesota* the Supreme Court considered the constitutionality of a statute of the State of Minnesota, entitled "An act for the protection of the public health by providing for inspection, before slaughter, of cattle, sheep and swine designed for slaughter for human food." In its first section, the statute prohibited the sale of any fresh beef, veal, mutton, lamb or pork for human food in the State, except as subsequently provided in the act. Boards of inspectors were used to inspect all cattle, sheep and swine slaughtered for human food.  It was made a matter of fine or imprisonment for any one to sell or expose for sale for human food any fresh beef, mutton, lamb or pork which had not been so inspected.

Justice Harlan, while conceding that the statute was enacted in good faith, for the purpose expressed in the title, namely, to protect the health of the people of Minnesota, held that, as the necessary effect of the act was to deny altogether to the citizens of other States the privilege of

selling, within the limits of Minnesota, for human food, any fresh beef, mutton, veal or pork, from animals slaughtered outside of the State, and to compel the people of Minnesota, wishing to buy such meats, either to purchase those taken from animals inspected and slaughtered in the State, or to incur the cost of purchasing them, when desired for their own domestic use, at points beyond the State, such legislation was void as constituting a discrimination against the products and business of other States in favor of the products and business of Minnesota, and as depriving the people of Minnesota of the right to bring into that State, for the purposes of sale and use, sound and healthy meat, wherever such meat may have come into existence

cited and quoted in *Scott v. Donald*, 165 U.S. at 96-97.

In the instant case, the Defendants argue that the Governor's Orders are a proper exercise of the State's inherent police powers and, therefore, immune from Constitutional prohibition. The Defendants also assert that because the Orders do not impose tariffs, tax interstate transactions or favor Maryland businesses the Orders are constitutional. However, those assertions are naive, misplaced and stop well short of the well established constitutional requirements. The circumstances of *Minnesota*, including the stated purpose of the law at issue, the existence of a good faith attempt to protect the public health and the application of the legislation only in State, were similar to those argued here. Yet the Supreme Court voided the law due to its effect on products and business coming into the State of Minnesota. Here the circumstances are very similar since the result of the shut down is to prevent manufacturers, suppliers and vendors from selling to Maryland businesses and, of course, for Maryland businesses to purchase goods and services for delivery in Maryland. The result of that prohibition is a domino effect on commerce and a direct threat to the thousands of businesses across this country which depend, in whole or in part,

on sales and transactions with Maryland businesses (among others).  These consequences may well be unintended but they are none the less real.

Additionally, there are numerous instances of business owners and employees and even customers that are suffering financially, physically and mentally from the shut down in Maryland. This begs for a reasoned lessening of restrictions to allow Maryland businesses to reopen in a way that allows them to conduct business at limited risk to the public. If grocery stores, certain big box stores, liquor stores and home improvement stores can stay open and be deemed safe for the public, then the same rules and conditions can be applied to small businesses like those of the Plaintiffs, including Adventure Park, Antietam Campground and many thousands of other small businesses. If the State can continue to sell lottery tickets, then Adventure Park should be able to sell admission tickets.

The Southern District of New York, in the case of *United States v. Nichols*, 928 F.Supp. 302 discussed the scope of intrastate activities which have been held to be in violation of the Commerce Clause.

> As *Jones & Laughlin*[2] and its progeny made clear, intrastate, or local, activities are not immune from federal regulation if they are found to have a sufficient impact on interstate regulation. *Jones & Laughlin,* 301 U.S. at 37 (intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" may be regulated by Congress); *Darby*[3], 312 U.S. at 118 ("The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce . . . as to make regulation of them appropriate means to the attainment of a legitimate end . . . ."); *Wrightwood*[4], 315 U.S. at 119 (commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power"); *United States v. Women's Sportswear Mfg. Ass'n,* 336 U.S. 460, 69 S. Ct. 714, 93 L. Ed. 805 (1949) ("If it is interstate commerce that

---

[2] *NLRB v. Jones & Laughlin Steel Corp*., 301 U.S. 1, 81 L. Ed. 893, 57 S. Ct. 615 (1937)

[3]*United States v. Darby*, 312 U.S. 100, 85 L. Ed. 609, 61 S. Ct. 451 (1941)

[4]*United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 86 L. Ed. 726, 62 S. Ct. 523 (1942)

17

feels the pinch, it does not matter how local the operation which applies the squeeze."); *see Hodel*[5], 452 U.S. 264 at 276-80, 69 L. Ed. 2d 1, 101 S. Ct. 2352; *Katzenbach*[6], 379 U.S. at 299-301. More specifically, the *Lopez* Court has clarified that, in order for an intrastate activity to be subject to Federal regulation, it must "substantially affect" interstate commerce. *Lopez*, 115 S. Ct. at 1630[7]. In another apparent clarification, although not consistently applied throughout the opinion, *Lopez* also instructs that the local activity must itself be an "economic activity." *Lopez*, 115 S. Ct. at 1630; *see Robertson*, ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely intrastate commercial activities that nonetheless have substantial interstate effects.") (emphasis added). But see Wickard, 317 U.S. at 128-29 ("Even if [the] activity may be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts substantial economic effect on interstate commerce . . . ."); *United States v. Dinwiddie,* 76 F.3d 913, 920 (1996) (upholding Freedom of Access to Clinic Entrances Act against constitutional challenge that the Act did not regulate a commercial entity, but only private conduct  [*310]  affecting commercial entities which in turn received goods from interstate commerce) (see cases cited); *Cheffer v. Reno*, 55 F.3d 1517, 1521 n.6 (11th Cir. 1995) ("The Court often finds valid under the Commerce Clause statutes which penalize behavior substantially affecting interstate commerce without regard to the actor's commercial or private status.") (citations omitted); *United States v. Wilson*, 73 F.3d 675, 684 (7th Cir. 1995) ("There is no authority for the proposition that Congress's power extends only to the regulation of commercial entities."); *Kegel*[8], 916 F. Supp. at 1238 ("*Wickard*[9] also illustrates that Congress' authority under the Commerce Clause may extend to non-commercial activity by a private actor if it is of the sort capable of repetition to a degree which substantially affects interstate commerce.").

The economic activity which only Congress can regulate is not limited.  For example, support payments passing from one state to another are considered interstate commerce. *See United States v. Sage*, 906 F. Supp. 84, 89-90 (D.Conn. 1995) ("Support payments may not be considered traditional items of 'commerce,' . . . but the non-payment of interstate support obligations is economic activity in a way that mere possession of a handgun in a school zone is not. . . . The non-custodial parent reaps an economic gain each time a support payment is withheld,

---

[5]*Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.* 452 U.S. 264, 276 (1981)

[6]*Katzenbach v. McClung*, 379 U.S. 294 (1964)

[7]*United States v. Lopez*, 514 U.S. 549 (1995)

[8]*United States v. Kegel*, 916 F.Supp. 1233 (M.D. Fla. 1996)

[9]*Wickard v. Filburn*, 317 U.S. 111 (1942)

while the offspring suffers an economic loss."); and *United States v. Hopper* , 899 F. Supp. 389,

392 (S.D.Indiana 1995) ("The court believes that the act of collecting an obligation, though dealing

with an intangible, does amount to commerce.").

This broad scope established by the lower courts is well within the broad definition of

"commerce" as established by Supreme Court precedent. In the seminal case of *Gibbons v. Ogden*,

22 U.S. (9 Wheat.) 1, 196 (1924) at 189-90, Justice Marshall wrote that "commerce, undoubtedly,

is traffic, but it is something more; it is intercourse.   It describes the commercial intercourse

between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for

carrying on that intercourse." Justice Marshall further reasoned that the "power to regulate" an

activity must necessarily include the rule by which the activity "is to be governed." *Id.*    It has

long been recognized that this broadly conceived intercourse includes commerce in intangibles.

*See United States v. Shubert*, 348 U.S. 222, 226-27, 99 L. Ed. 279, 75 S. Ct. 277 (1955) (discussing

the terms "trade and commerce" as inclusive of real estate brokerage, collection and distribution

of news, provision of medical services to health cooperative members, underwriting insurance,

**and producing, booking, and presenting local entertainment**) (emphasis added)*; United States*

*v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 546, 88 L. Ed. 1440, 64 S. Ct. 1162 (1944)

("both before and since *Paul v. Virginia*, [75 U.S. (8 Wall.) 168, 19 L. Ed. 357 (1868)] this Court

has held that Congress can regulate traffic though it consists of intangibles").   In *South-Eastern*

*Underwriters*, upholding the regulation of interstate insurance agreements, the Court assessed the

spectrum of "commerce" for purposes of the Commerce Clause:

> It is interstate commerce subject to regulation by Congress to carry lottery tickets from
> state to state.   So also is it interstate commerce to transport a woman from Louisiana to
> Texas in a common carrier; to carry across a state line in a private automobile five quarts
> of whiskey intended for personal consumption; to drive a stolen automobile from Iowa to
> South Dakota. Diseased cattle ranging between Georgia and Florida are in commerce; and
> the transmission of an electrical impulse over a telegraph line between Alabama and

> Florida is intercourse and subject to paramount federal regulation. Not only, then, may transactions be commerce though non-commercial; they may be commerce though illegal and sporadic, and though they do not utilize common carriers or concern the flow of anything more tangible than electrons and information.

*South-Eastern Underwriters*, 322 U.S. at 549-50 (citations omitted); *see also In the Lottery Case (Champion v. Ames)*, 188 U.S. 321, 352-53, 47 L. Ed. 492, 23 S. Ct. 321 (1903) (upholding Federal statute criminalizing interstate transport of lottery tickets and defining commerce as inclusive of "navigation, intercourse, communication, traffic, the transit of persons and the transmission of messages by telegraph").

The Supreme Court has "identified three broad categories of activity that Congress has (sole) authority to regulate under its commerce power." *United States v, Lopez*, 514 U.S. 549, 558, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995). Congress may (1) regulate the use of the channels of interstate commerce, (2) regulate and protect the instrumentalities of interstate commerce, and (3) regulate activities that have a substantial effect on interstate commerce. Id. at 558-59.  These are reserved to Congress and the States may not interfere.  *See, United States v. Morrison*, 529 U.S. 598, 608-09, 120 S. Ct. 1740, 1749 (2000); and *United States v. Roof*, 225 F. Supp. 3d 438, 451 (D.S.C. 2016).

Furthermore, it is equally clear that the congressional authority under the Commerce Clause should not be restricted by courts applying an unnecessarily technical construction of the term "commerce." See, for example,  *Swift & Co. v. United States*, 196 U.S. 375, 398, 49 L. Ed. 518, 25 S. Ct. 276 (1905) ("commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business").

Even if economic in nature, as support payments, for example,  and sales between suppliers and vendors and Maryland businesses, most certainly are,   a local activity must still have a substantial effect on interstate commerce before it is subject to Commerce Clause-based

regulation. Payment or non-payment of child-support obligations,  viewed in the aggregate, has been determined to have such an effect. *See Sage*, 906 F. Supp. at 90 ("the magnitude of the total economic loss and concomitant gain" to the custodial and non-custodial parent, respectively, caused by non-payment of child-support results in a substantial effect on interstate commerce). Elimination of vendor and supplier purchases, both scheduled and expected in the ordinary course, must, therefore, have the same effect.

In *Hopper*, the court concluded that the collection of child support orders across state lines does involve a continuous and indivisible stream of intercourse among the states involving the transmission of large sums of money and communications by mail, telephone and telegraph. Hopper, 899 F. Supp. at 393 (footnote omitted). These conclusions support the argument here, that the effect of shutting down businesses in Maryland has a dramatic and lasting impact on interstate commerce.  While *Hopper* involved the question whether a federal child support recovery act was constitutional under the Commerce Clause, the same rationale can be applied to whether the Governor's Orders have interfere with Congress's sole authority to regulate interstate commerce. Cited by *Nichols*, *supra*,  928 F. Supp. At  309-12

The Defendants correctly pointed out in their Memorandum that the Commerce Clause is both an affirmative grant of legislative power to Congress and an implied limitation on the power of state and local governments to enact laws affecting foreign or interstate commerce." *See, for example, Bd. of Trs. of the Employees' Ret. Sys. of Baltimore City v. Mayor and City Council of Baltimore*, 317 Md. 72, 131, 562 A.2d 720 (1989), cert. denied, 493 U.S. 1093, 110 S. Ct. 1167, 107 L. Ed. 2d 1069 (1990).  The implied limitation is referred to as the "dormant Commerce Clause. *See  Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S. Ct. 844, 847, 25 L. Ed. 2d 174 (1970)

In *Bruce Church*, the Supreme Court established a two-part inquiry for determining whether a state statute violates the dormant Commerce Clause. A reviewing court must first decide whether "the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental[.]" 397 U.S. at 141.  *See County Comm'rs of Charles County v. Stevens*, 299 Md. 203, 208, 473 A.2d 12 (1984). *In Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552 (1986), the Supreme Court explained that, if the  statute does not regulate evenhandedly, or, in other words, discriminates against out-of-state commerce, then the statute is unconstitutional. Thus, to the extent the Governor's Orders impact interstate commerce or commercial communications ("intercourse"), as discussed above, those Orders are unconstitutional.  The lack of uniform application of the Governor's Orders to all businesses in Maryland, also requires that those Orders be stricken.

As recently noted by this Court in *Just Puppies*, a February, 2020, decision of Judge Hollander, the Fourth Circuit has established a two part test to determine whether acts such as the Governor's Orders violate the Commerce Clause.  The test consists, initially, of analyzing whether the Governor's Orders discriminate against Interstate Commerce.  As the Defendants concede, the Orders do violate the Commerce Clause.  The Defendants assert that the Orders come under an exception allowing the implementation of measures designed to protect the public safety of Maryland citizens.  *See* Defs Memo, p. 46 (whatever the burden on interstate commerce may be...it does not clearly outweigh the important public health benefits that the Stay-at-home Order provides.")

A state law may discriminate in its text, practical effect, or purpose. *Colon Health Ctrs. of Am., LLC v. Hazel ("Hazel II")*, 813 F.3d 145, 155 (4th Cir. 2016); *Envtl. Tech. Council v. Sierra*

*Club*, 98 F.3d 774, 785 (4th Cir. 1996). Second, if the law is not discriminatory, the court considers whether the law nonetheless violates the dormant Commerce Clause under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137  (1970).

The Plaintiffs contend that the Defendants lose on both grounds.  The Orders as applied and in their practical effect, burden, devastate and diminish small businesses and all other small businesses, suppliers and vendors that trade with them.  The practical effect of the shut down order is to limit the ability of all small businesses to transact commerce with Maryland businesses such as the Plaintiffs'.

Under the balancing test mandated by *Bruce Church*, the Defendants lose because there is no science that shows a devastating toll on Maryland residents if the Plaintiffs are allowed to reopen their businesses while the toll on small business owners and their employees, many of whom are already suffering financially, emotionally and physically, is historically unprecedented and tragic.  It will only get worse.

Bruce Church explained the balancing "formula" as follows:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 U.S. 440, 443.If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co. v. Arizona,* 325 U.S. 761, but more frequently it has spoken in terms of "direct" and "indirect"  effects and burdens. See, e. g., Shafer v. Farmers Grain Co., supra.

*Pike v. Bruce Church*, 397 U.S. at 141-42.

Other jurisdictions have recognized the flawed logic of a prolonged shut down.  Doctors have reported an increase in serious illnesses, cancer and suicide as a result of restrictions on doctors offices and hospitals.  Those restrictions are easing or even being eliminated in other

jurisdictions around the country.  The reason for easing restrictions in other jurisdictions is almost certainly based upon the realization that the restrictive measures were actually doing more harm than good, so adjustments were necessary.

In Maryland the same problems exist but are continuing, especially for the small business community which is the lifeblood of Maryland's economy.  There is simply no scientific basis for determining that Walmart and Home Depot can open but Adventure Park (and many others) cannot.  Even the Defendants' response suggests that small businesses can safely reopen.

The Governor's Orders impact and burden interstate commerce.  They do so indiscriminately unfairly targeting vulnerable small businesses which do not have the resources to fight burdensome laws and regulations.  There are clearly reasonable ways, some of which have already been identified by the Defendants, common sense methods already employed in other states and countries.  The Plaintiffs assert that the Governor's Orders, as alleged in the Complaint are overbroad, burdensome, arbitrary, and indiscriminate and that they go well beyond any legitimate authority, are unconstitutional and should be stricken.  In order to prevent any additional, catastrophic results to small businesses in Maryland, the Plaintiffs seek injunctive relief, temporarily and preliminarily halting the implementation, and staying the enforcement, of the Governor's Orders identified in the Complaint as to the Plaintiffs and all similarly situated entities and individuals in Maryland.

### III.     Free Exercise Argument and Standard of Review.

"The standard for granting a TRO under Fed.R.Civ.P. 65(b) is the same as for granting a preliminary injunction. *See*, e.g., *Sindram v. City of Takoma Park Police*, 2010 WL 1375353, at *1-2, 2010 U.S. Dist. LEXIS 29354, at *4 (D.Md. Mar. 24, 2010). The moving party must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer

irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Montgomery v. Hous. Auth. of Baltimore City*, 731 F.Supp.2d 439 (D. Md. 2010)(citing, *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 172 L.Ed.2d 249, 555 U.S. 7, 77 USLW 4001 (2008); addt'l internal citations omitted).

When a party seeks injunctive relief on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. See *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). *Elrod v. Burns*, 427 U.S. 347, 374, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)("Inasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases." 509 F.2d, at 1136. We agree."). *Id.*

Similar to the instant matter where the Governor's police powers are being threatened against plaintiffs, who are being intimidated with the potential for arrest, criminal charges and/or heavy criminal fines for failure to comply with his Executive Orders by holding religious services or speaking as a Delegate at a Rally, the *Elrod* court found that "[s]ince at the time the preliminary injunction was sought one of the named respondents was threatened with job loss,…(if they had not already been coerced into supporting the Democratic Party to avoid discharge), First Amendment interests were either threatened or being impaired. Thus, irreparable injury was shown, and…the issuance of the injunction was proper[]." *Id.* at 348.

The Governor cites *United States v. Chalk,* 441 F.2d 1277, 1280 (4th Cir. 1971), to state this Court has limited review powers of his Executive Orders to whether they were done in "good faith" and with "some factual basis", Defs. Brief pg. 10, ¶ 1.  But that is a 1971 Civil-Rights era criminal case against a black man accused of riot by carrying a shotgun during a three-day state of emergency declared by a Mayor whose local police were battling up to "250 black residents", who had unsuccessfully petitioned the Mayor for redress of grievance and were being accused of ongoing arson, possession of Molotov cocktails, throwing rocks, burning tires and carrying weapons. *Id.*  Yet that case expressly limits its "local state of emergency powers" ruling to those times "[o]nly when local law enforcement is no longer able to maintain order and protect lives and property may the emergency powers be invoked." *Id.* at 1280.  And even there, the court found there was probable cause to search and seize the car for the weapon, not leaving the power to inhibit travel and search and seize a car solely to the proclamation of the emergency.  *Id.* at 1279. Furthermore, in support of the Mayor's power to suspend travel and restrict and burden civil liberties, *Chalk* cites *Toyosaburo Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the American Japanese interment camp case, which is renowned for its bad jurisprudence and has been called into question.  *See, O'Rourke v. City of Norman*, 875 F.2d 1465 (10th Cir. 1989), fn. 1, citing Justice Jackson's dissent objecting to "corruption of blood".  That case also set forth significant argument as to why "general warrants", such as those used in *Chalk*  to abridge free travel, are "illegal." *Id.* at 1472. ("…in April of 1776, the [British] House of Commons resolved that the general warrants were illegal. Coming from the floor debates, William Pitt, Earl of Chatham, eloquently conveyed the clear message: 'The poorest man may, in his cottage, bid defiance to all the forces of the Crown.

It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement. T. Cooley, 7th ed. (1903), A Treatise on the Constitutional Limitations at 425, n. 1".  *O'Rourke v. City of Norman*, 875 F.2d 1465 (10th Cir. 1989) (citing, *Payton v. New York*, 445 U.S. 573, 601, n. 54, 100 S.Ct. at 1388, n. 54; and *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190 1195, 2 L.Ed.2d 1332 (1958))."

Such a criminal riot case has simply no bearing on the instant matter of broad powers to suspend constitutional rights exerted by the Governor dubiously, allegedly under the emergency health care statute.  Defs. Brief, pg. 14, ¶ 3.

The Governor also does not have support in his citation to *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905), which dealt with a local ordinance regarding quarantining sick people and vaccinations during a widespread dangerous outbreak impacting all age sectors.  Citation to *Jacobson* in fact support plaintiffs in this matter, and do not support the Governor's Executive Orders of the large gathering prohibition, closure of businesses, stay-at-home and mask Orders, as none of those cases speak directly to the standard of whether the state has met its burden that such orders, upon criminal threats to plaintiffs, impair their First Amendment interests in a reasonable, least restrictive means fashion.  *See, Church of the Lukumi Babalu Aye v. Hialeah,* 508 U.S. 520,546 (1993).

Defendants argue that the Governor has broad powers to "necessarily restrict" and limit free exercise and free speech under his "proclamation of a state of emergency and invocation of emergency powers", Defs. Brief, pg. 9, ¶ 1.  It is important to note, however, that the Supreme Court has already dealt with the power of review by this Court over the State Executive in matters where the State Executive impermissibly restrains First

Amendment activity of speech or association.  In *Elrod,* the Court wrote that the argument

advanced by Defendants in the instant matter fails because:

> "the executive's responsibility to insure that the laws be faithfully executed… has no applicability to the federal judiciary's relationship to the States…There can be no impairment of executive power, whether on the state or federal level, where actions pursuant to that power are impermissible under the Constitution. **Where there is no power, there can be no impairment of power. And our determination of the limits on state executive power contained in the Constitution is in proper keeping with our primary responsibility of interpreting that document.**

*Elrod v. Burns*, 427 U.S. 347, 352, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)(emphasis added).

For the reasons explained below, Plaintiffs satisfy each of these requirements and are

accordingly entitled to the requested relief.

### B.  Plaintiffs Are Substantially Likely to Succeed on the Merits of its Free Exercise Claim, its Freedom of Assembly Claim, its Free Speech Claim and its Claims under the Maryland Constitution.

**Essential Nature of Religious Free Exercise**

America was founded upon the tradition of religious freedom.  It was for that purpose

the Plymouth, Massachusetts settlers came on the Mayflower, signed the Mayflower

Compact on November 11, 1620, and established one of the greatest young nations on the

face of the earth.  The first Governor of that colony, William Bradford, recorded the struggle

for religious freedom and coming to the new world as follows:

> " [We] were hunted & persecuted on every side…For some were taken & clapped up in prison, others had their houses beset & watched night and day, & hardly escaped their hands; and were forced to flee & leave their houses & habitations, and the means of their livelihood. Yet these & many other sharper things which afterward befell them, [they] were better prepared to bear them by the assistance of God's grace & spirit. Yet seeing them-selves thus molested, and that there was no hope of their continuance there, by a joint consent they resolved to go into the Low-Countries, where they heard was freedom of Religion for all men;…

"…at length the conclusion was, to live as a distinct body by them-selves, under the general Government of Virginia; and by their friends to sue to his majesty that he would be pleased to grant them freedom of Religion…

*Of Plymouth Plantation,* Bradford, Governor William. 1620. Available at http://www.gutenberg.org/files/24950/24950-h/24950-h.htm, accessed May 13, 2020.

Patrick Henry, longest serving Governor of Virginia and American Patriot, was instrumental in ensuring the First Amendment protected religious free exercise, which the Founders saw as instrumental in actually allowing passage of the United States Constitution and establishment of the new government.[10]  Without the Bill of Rights, including the First Amendment Free Exercise clause and the Fifth Amendment Takings clause, neither Henry nor Thomas Jefferson were supportive of the new Constitution.  *Id.*

In the Christian Scriptures, the Greek word translated as "church" is "ekklesia", meaning literally the physical "assembly" of faith and appears at least 118 times in Scripture.[11]

Also, the Greek word for "fellowship" is "koinonia", which means "communion" and "right hand as pledge" and "a gift jointly contributed".[12]

The Christian faith bases its existence and practice upon the Judeo-Christian heritage of Holy Scripture, including:

**In-Person Assembling and Singing**

"I was glad when they said unto me, Let us go into the house of the LORD.  Our feet shall stand within they gates, O Jerusalem."  Psalm 122:1-2 (KJV)

"And many people shall go and say, Come ye, and let us go up to the mountain of

---

[10] *See, The First Amendment Encyclopedia,* https://mtsu.edu/first-amendment/article/1448/bill-of-rights, accessed May 13, 2020.

[11] Strong's Concordance.  ἐκκλησία, "assembly". Available at, https://www.blueletterbible.org/lang/lexicon/lexicon.cfm?Strongs=G1577&t=KJV, accessed May 13, 2020.

[12] Strong's Concordance. κοινωνία, Available at, https://www.blueletterbible.org/lang/lexicon/lexicon.cfm?Strongs=G2842&t=KJV, accessed May 13, 2020.

the LORD, to the house of the God of Jacob; and he will teach us of his ways, and we will walk in his paths: for out of Zion shall go forth the law, and the word of the LORD from Jerusalem."  Isaiah 2:3 (KJV)

"Not forsaking the assembling of ourselves together, as is the manner of some; but exhorting one another: and so much the more as you see the day approaching." Hebrews 10:25 (KJV)

"And when the day of Pentecost arrived, they were all together in one place."  Acts 2:1 (KJV)

"Therefore the redeemed of the LORD shall return, and come with singing unto Zion; and everlasting joy shall be upon their head: they shall obtain gladness and joy; and sorrow and mourning shall flee away."  Isaiah 51:11 (ESV)

**In-Person Sacramental/Ordinances and Worship**

"And Peter said to them, 'Repent and be baptized everyone of you in the name of Jesus Christ for the forgiveness of your sins, and you will receive the gift of the Holy Spirit.  For the promise is for you and for your children and for all who are far off, everyone whom the Lord our God calls to himself.  And with many other words he bore witness and continued to exhort them, saying, 'Save yourselves from this crooked generation.'  So those who received his word were baptized, and there were added that day about three thousand souls.  And they devoted themselves to the apostle's teaching and the fellowship, to the breaking of bread and the prayers.  And awe came upon every soul, and many wonders and signs were being done through the apostles.  And all who believed were together and had all things in common.  And they were selling their possessions and belongings and distributing the proceeds to all as had any need.  And day by day, attending the temple together and breaking bread in their homes, they received their food with glad and generous hearts, praising God and having favor with all the people.  And the Lord added to their number day by day those who were being saved."  Acts 2:38-47 (ESV).

"And when the hour came, [Jesus] reclined at table, and the apostles with him.  And he said to them, 'I have earnestly desired to eat this Passover with you before I suffer. For I tell you I will not any more eat of it until it is fulfilled in the kingdom of God. And he took a cup, and when he had given thanks he said, 'Take this, and divide it among yourselves. For I tell you that from now on I will not drink of the fruit of the vine until the kingdom of God comes.  And he took bread, and when he had given thanks, he broke it and gave it to them, saying, 'This is my body, which is given for you.  Do this in remembrance of me.  And likewise the cup after they had eaten, saying, 'This cup that is poured out for you is the new covenant in my blood."  Gospel of Luke 22:14-20 (ESV).

"When you come together, it is not the Lord's supper that you eat.  For in eating, each one goes ahead with his own meal.  One goes hungry, another gets drunk.

What!  Do you not have houses to eat and drink in?  Or do you despise the church of God and humiliate those who have nothing?  What shall I say to you?  Shall I commend you in this?  No, I will not.  For I received from the Lord what I also delivered to you, that the Lord Jesus on the night when he was betrayed took bread, and when he had given thanks, he broke it, and said, 'This is my body, which is broken for you.  Do this in remembrance of me.  In the same way also he took the cup, after supper, saying, 'This cup is the new covenant in my blood.  Do this, as often as you drink it, in remembrance of me. For as often as you eat this break and drink this cup, you proclaim the Lord's death until he comes.  Whoever, therefore, eats the bread or drinks the cup of the Lord in an unworthy manner will be guilty concerning the body and blood of the Lord.  Let a person examine himself, then, and so eat of the bread and drink of the cup.  For anyone who eats and drinks without discerning the body eats and drinks judgment on himself.  This is why many of you are weak and ill, and some have died.  But if we judged ourselves truly, we would not be judged…So then, my brothers, **when you come together** to eat, wait for one another."  I Corinthians 11:20-31, 33

All Scripture, public domain and available at: https://www.blueletterbible.org (accessed May 13, 2020).


**The Governor's Orders Prohibiting In-Person Assemblies and Services Severely Burdens Plaintiff Ministers and Their Congregants and All Those Similarly Situated in Maryland.**


Plaintiff Rev. Christopher Ogne has set forth in his Complaint and Declaration, incorporated herewith, the Governor's overreaching into the pastor's church affairs and ordination before God.  See Ex. F-1 (ECF 15-1).  Rev. Ogne has been prevented from performing in-person services including worship, wedding, funeral and sacramental services.  This has severely burdened his religious free exercise and that of his congregation and any person in Maryland to whom he seeks to minister.  Pastor Steve Dixon has had the Maryland State Police go onto church property and serve a notice of potential criminal prosecution were he to reopen his doors for worship.  Pastor John Seay had the Maryland State Police arrive at his church on Easter Sunday to perform a "compliance check" or similar act of intimidation under threat of criminal charges and/or fines regarding the Governor's orders to close churches, which troopers Delegate Cox and his family witnessed leaving the area.  Each and every pastor plaintiff's declarations are hereby

incorporated as if fully set forth herein and are submitted as unrebutted evidence demanding an immediate temporary restraining order permitting them, their congregations and the Maryland public at large to worship according to the dictates of their consciences.

>    *a.   Plaintiffs Are Likely to Succeed on the Merits of its Free Exercise Claim under the U.S. Constitution.*

Defendants' blanket prohibition of in-person, indoor religious services significantly burdens Plaintiffs' exercise of religion. The prohibition is neither generally applicable nor neutral, and it is not narrowly tailored to achieve the legitimate public health and safety interests of the government. Thus, the prohibition violates the First Amendment right to free exercise of religion. Furthermore, even though the Governor just lifted the in-person ban of religious services, he stated the emergency continues until a vaccine is found and as such he may reinstitute severe measures such as those he lifted at any time. See generally, Declarations of pastors in the record supporting the complaint, which are adopted as if fully forth herein; and the Declaration of Rev. Gary Cox (Exhibit B, attached hereto).

The First Amendment protects the "free exercise" of religion, and this expressly prohibits the Governor and State from interfering with, prohibiting or suspending under threat of force, criminal or civil penalty or fine, for any length of time, the right to assemble physically, gather together and worship God according to the dictates of one's conscience. *See W Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts ... [such as the] freedom of worship and assembly."). This express prohibition against the State was incorporated against the states in *Cantwell v.*

*Connecticut,* 310 U.S. 296 (1940).

The Supreme Court thereafter held this prohibition mandates rigorous scrutiny and the potential striking down of non-neutral laws. "[A] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye v. Hialeah,* 508 U.S. 520,546 (1993). Satisfying this scruntiny are standards so high that the government action will only survive this test in rare cases, and the government bears the burden of proving its actions meet this extremely high test. *Id.* Defendants' prohibition on in-person religious services and deeming churches "non-essential", the arbitrary nature of its regulations towards churches in comparison with "essential" businesses left open, and the threatened criminal penalties for holding any services outside of its permission, impose a substantial burden on Plaintiffs' religious exercise. The Governor's actions must pass strict scrutiny to be both generally applicable and neutral. It is neither. And any relaxing of the ban on religious services does not remove this question, since the Governor asserts an ongoing right to impose substantial burdens on all churches in Maryland, including deciding the intimate details of worship.

Government action is not generally applicable if its prohibitions substantially under-include non-religiously motivated conduct that reasonably might endanger the same alleged governmental interest that the Executive Order or law is designed to protect. *Lukumi,* 508 U.S. at 542-46. Here, the Governor's Orders have explicitly banned in-person, in-side religious worship services, while hardly regulating the hundreds of stores and businesses he has left open. "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason. *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872,

110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).  A compelling state interest includes "only those interests of the highest order." *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). And the least-restrictive-means standard is "exceptionally demanding." *Hobby Lobby,* 573 U.S. at 728.  To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious practitioner or objector.  *Id.*

"As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Maryville,* 2020 WL 2111316, at *3. Here, Defendants' orders have "serial exemptions for secular activities," many of which "pose comparable public health risks to worship services." *Maryville,* 2020 WL 2111316, at *3. Defendants' exception for "essential" businesses allows law firms, grocery stores, gun shops, construction and hardware stores and in-person businesses, to continue to operate so long as they follow social-distancing and other health-related precautions. But the orders "do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of essential services." *Id.* The orders are thus clearly not generally applicable.

Additionally, the Defendants' Orders have been enforced in a discriminatory manner and are subject to strict scrutiny.  "[M]ere compliance with the requirement of facial neutrality" does not shield state action from First Amendment scrutiny.  *Lukumi*, 508 U.S. at 534.  Courts instead must look beyond a law's superficial neutrality and assess the actual operation of the law. *See id.* at 535 ("The effect of a law in its real operation is strong evidence of its object.").  In that case, the City of Hialeah (Florida) instead of enforcing ordinances they purported were neutral and generally applicable on their face—regulating

the keeping and killing of animals— in practice it instead targeted members of one belief (the Santeria religion) and their actions (animal sacrifices). *Id.* at 524–25, 533–35. No similar actions were taken by Defendants with regard to shoppers at local "essential" stores. Because the "large gatherings" prohibition has been selectively enforced, it is not neutral. Furthermore, because the Governor deemed churches "non-essential" he targeted them for specific enforcement that was burdensome and not neutral, nor was it ever intended to be.

Government actions that burden religious practice and are either not neutral or not generally applicable must satisfy a compelling governmental interest and be narrowly tailored to achieve that end. *Lukumi,* 508 U.S. at 546. Here, the government's prohibition cannot be "narrowly tailored" because the ban on in-person religious services was absolute and remains within the assumed powers of the Governor to be absolute.  Less restrictive means of achieving the legitimate public safety interests are clearly possible: without banning or threatening to ever close churches and ban pastor plaintiffs herein from calling congregations to worship God, services could be held consistent with social distancing precautions that are designed to limit the spread of COVID- 19, as Defendants allow with similar secular activities. *See Maryville,* 2020 WL 2111316, at *2 ("The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches."). Plaintiff pastors have committed to follow the same or similar social distancing precautions with their congregations as followed by comparable non-religious establishments. But Defendants' prohibition does not provide any exception for religious services consistent with in-person, indoor services and consistent with deeming the same "essential" so that they are never closed indefinitely again.

By taking action to close Plaintiffs' churches and cut off their access to and Free Exercise of their faith, even when voluntarily modified to follow reasonable social distancing precautions, Defendants have not narrowly tailored their action to any interest, more less any compelling interest.  Thus the Governor has violated Plaintiffs' constitutional right to free exercise of religion.

> b.    *Plaintiffs are Likely to Succeed on the Merits of their Freedom of Assembly Claim under the US.  Constitution.*

Defendants' blanket prohibition on assembling, the stay-at-home and large gathering order inclusive without exception of even co-equal branch of government Legislators by way of intimidation and threat to prevent political assembly, protest and redress of grievances, and forbidding in-person, in-door religious services also significantly burdens plaintiffs freedom of assembly.  The Governor's prohibition is not narrowly tailored to achieve the legitimate public health and safety interests of the government. Thus, the prohibition violates plaintiffs' First Amendment right to peaceably assemble.

The First Amendment of the U.S. Constitution protects the "right of the people peaceably to assemble." The Freedom of Assembly Clause was incorporated against the states in *De Jonge v. Oregon,* 299 U.S. 353 (1937). "The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights." *Whitney v. California,* 274 U.S. 357, 373 (1927). When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available. *See, e.g., San Antonio Jndep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 16-17 *(1973);Dunn v. Blumstein,* 405 U.S. 330 (1972).

Here, as discussed above, Defendants' prohibitions cannot satisfy strict scrutiny because less restrictive alternatives of achieving the legitimate public safety interests are

easily possible.  Legislators may not be prevented from speaking at large gatherings, large gatherings may not be prevented when they are protesting the same Executive Orders or other political issues, and church services may easily be held - all consistent with social distancing precautions that are designed to limit the spread of COVID-19, as Defendants allow with similar secular activities.  *See Maryville,* 2020 WL 2111316, at *2 ("The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches.").  Plaintiffs have committed to follow the same social distancing precautions followed by comparable "essential" businesses, activities, and establishments.  But despite the ability and willingness to take these precautions, Defendants' prohibition does not provide any exception for political speech, rallies and protests and religious services, because the threat of criminal arrest, charges and/or fines were clearly made – including in the newspaper by a member of the Maryland State Police saying "just because we didn't charge anyone yet [at the rally] doesn't mean I won't get you later."  This is unconscionable chilling of the right to peaceably assemble and to redress grievances, and to practice one's faith like Plaintiffs, where reasonable guidelines would be followed to satisfy the public health interests at issue. By not allowing Plaintiffs' in-person assemblies and services, even when modified to comply with the relevant public health guidelines, Defendants have not narrowly tailored their action to the claimed interest, and therefore are violating Plaintiffs constitutional right to peaceably assemble.

      c.    *Plaintiffs are Likely to Succeed on the Merits of its Free Exercise Claim under the Maryland Constitution, Declaration of Rights.*

Article 36 of the Maryland Constitution, Declaration of Rights protects the "freedom of religion." Md. Const., Decl. Rghts. §§ 36. That article says in part, "all persons are equally

entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice…". *Id.*

In *McMillan v. State*, 258 Md. 147, 265 A.2d 453 (1970), the Court of Appeals of Maryland held that these free exercise of religion protections may not be abridged except on the demonstration of a compelling state interest. Thus, for the same reasons that the prohibition of in-person church services would violate the free exercise clause of the United States Constitution, it would violate the free exercise sections of the Maryland Constitution, Declaration of Rights, art. 36.

> d.       *Plaintiffs Are Likely to Succeed on the Merits of Their Free Speech Claims.*

Few visuals are more shocking to the present state of affairs as the Governor's mandatory "face coverings" order to enter into commerce. It pictures both the government gagging of speech and its forcible demonstration of government speech – all in the name of "safety". Such "safety" has no rational basis in medicine nor was it even recommended practice during the height of the coronavirus crisis. The Governor only ordered mandatory mask-wearing under criminal penalties in retail stores on April 17, 2020 – well after the peak he indicated was occurring over Easter.

Additionally, the Delegates plaintiffs herein had their speech chilled by the Governor's "large gathering prohibition" order, by his placement of the National Guard surrounding the Maryland General Assembly doors and steps during the 2020 Session, and by the "stay-at-home" order.

The Governor's Executive Orders were neither content neutral, nor were they narrowly tailored to serve a significant governmental interest, and they left no actual (other than virtual) alternative channels for communication of information" open. *Ward v. Rock Against Racism*, 491

U.S. 781, 791 (1989). The Orders targeted even Legislative speech, inferred arrest for the same in writing from his office to plaintiff Delegate Cox herein, as well as targeted with his State Troopers the protests of his own Executive Orders – something rarely seen in Maryland history. At no time was the Governor meeting any compelling state interest in restricting and chilling such speech, because at the very moment of the Rally he was permitting thousands of people to speak at Walmart, and had also regularly held his own public speeches and assemblies with over 27 people at his press conferences.

Plaintiffs easily meet the likelihood of success on the merits of their Free Speech claims.

*e.*     *Plaintiffs Are Likely to Succeed on the Merits of Their Claims Under the Maryland Constitution, Declaration of Rights.*

The Governor does not possess powers over the co-equal branch of government, the Legislature, to order them to remain in their homes indefinitely without providing for an exception, or to threaten or infer a threat and/or intimidation that participating in a protest Rally would violate his March 17 "large gathering prohibition" order. Nor does he hold power to make other veiled threats or intimidation, seeking to silence any Legislator who seeks to speak about any issue. *See,* **Md. Const., Decl. Rghts. Art. 8.** ("That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."). The Fourth Circuit has held that the separation of powers of government requires a flexible and "proper inquiry focuses on the extent to which [the Executive Order] prevents the [Members of the Legislature] from accomplishing [their] constitutionally assigned functions." *U.S. v. Brainer*, 691 F.2d 691, 698 (4th Cir. 1982). Here, the chilling of the absolute right of the Legislators to exercise their constitutional offices was in violation of the Maryland Constitution. Furthermore, the

Executive has no power to suspend the law as to constitutional officers, including said Legislators, and by his refusal to exempt the same from his Executive Orders and to mandate they comply, violated the separation of powers and the sovereign and independent right of the Legislative office and privilege.

Furthermore, even in times of emergency or crisis, the Maryland Constitution may not be suspended by any statute, such as Title 14 of the Public Safety Article, or Executive Order or Proclamation of a Catastrophic Health Emergency thereunder.  Md. Decl. of Rghts. Art. 44.  In an opinion on this forbidden "Plea of Necessity" suspension of the Constitution in times of emergency, the Maryland Court of Appeals has ruled: "If emergency is a valid excuse, the legislative body or courts of equity can at any time determine the fact of an emergency; so that at the very time when property interests and individual liberties most need protection we may find that these rights and liberties so sacredly protected and guarded by the Constitution are in fact afforded no protection; it having been nullified by legislative or judicial fiat." *Kenly v. Huntingdon Bldg. Ass'n*, 166 Md. 182, 170 A. 526, 531 (1934).  In the instant case, Title 14 of the Public Safety Article, by interpretation of the Governor in his response brief, grants the Executive Branch sweeping authority to violate the Right to Free Exercise of Religion, Right to Assemble, Right to Conduct Lawful Business, Due Process, Closure of Courts, and the authority to suspend statutes of the state or a locality in the case of any declaration of emergency – as deemed not by science or Legislative decision, but by one person, The Governor. This is a blatant violation of Article 44 of the Maryland Declaration of Rights' prohibition on the suspension of the Constitution under any plea of necessity.  Yet, not even Title 14-3A is being followed by the Governor – for in that statute it requires that any quarantine or isolation of any Marylander must be accompanied by due process within three (3) days being provided notice of the right to appear in a circuit court and to be checked

to see if you are actually sick. *Id.* If the person is not sick, they must be allowed to leave quarantine and may not be held longer than 30 days in any isolation without a circuit judge's court order. *Id.* Instead, the Governor completely violated the statute and quarantined and isolated *healthy* Marylanders – and not just those in heavily infected areas of the state, but in every corner even where there were little to no coronavirus cases.

*     *     *

For the foregoing reasons, Defendants' Orders violate the United States' constitutional guarantees of free exercise of religion and freedom of assembly, as well as the Maryland Constitution's protections of religion, speech, separation of powers and the  right to not have the Constitution suspended for any plea of necessity. As a result, Plaintiffs have established a substantial likelihood of success on the merits of the claims set out in its Complaint.

**C.     Enforcement of the Orders Will Inflict Irreparable Injury on Plaintiffs if the TRO is Not Issued.**

The Supreme Court held in *Elrod v. Burns* that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). The Maryland Constitution protects the same types of rights that the Free Exercise Clause protects, and for the same reasons, an infringement of those rights also constitutes irreparable harm. *See, e.g., 0 Centro Espirita Beneficiente Uniao do Vegetal v. Aschcroft,* 389 F.3d 973, 995 (10th Cir. 2004) (en banc) (per curiam) ("[The plaintiff would certainly suffer an irreparable harm, assuming of course that it is likely to succeed on the merits of its RFRA claim."), *sub nom. Gonzales v. 0 Centro Espirita Beneficiente Uniao*

*do Vegetal,* 546 U.S. 418 (2006).

Defendants' threatened actions will deny Plaintiff ministers and its congregants and the public the right to practice their faith as their sincerely held beliefs compel them to practice. More specifically, without a temporary restraining order, Plaintiffs and its members will lose the right to celebrate the upcoming Lord's Day according to their sincerely held religious beliefs. Defendants' actions thus prohibit Plaintiffs from carrying out its religious mission. This restriction on Plaintiffs religious practices constitutes immediate and irreparable harm to the Church.

Defendants' threatened actions to the State Legislators herein, and refusal to acknowledge their absolute right to speak to constituents, travel about, and exercise their constitutional office without suspension of Art. 44 of the Md. Declaration of Rights, and of the public's right to redress grievances and attend assemblies while voluntarily practicing the same social distancing and hygiene that the public – many times the very same people – practice lawfully under the Executive Orders at a Lowes, or Walmart.   See Declaration of Delegate Warren Miller (Exhibit B), Declaration of Delegate Neil Parrott (Exhibit C) and Declaration of Delegate Dan Cox (Exhibit D).

### D.  Granting A TRO Would Not Cause Substantial Harm to Others.

A temporary restraining order would not cause substantial harm to others because all participants do so voluntarily and Plaintiffs are committed to hygiene and health consistent with social distancing precautions to ensure the safety and well-being of others, of plaintiff ministers'

members and congregants, and of the Members of the Legislature.  Plaintiffs will voluntarily observe the Governor's and the CDC's recommended social distancing and hygiene practices during the present proclamation of a coronavirus crisis.

There would be no harm to others, but even if someone may argue the same, the balancing tips strongly towards the Plaintiffs because anyone else who may be concerned or vulnerable, may simply continue to stay at home.  This is precisely what the Governor has recommended in his press conference just today (May 13, 2020).

**E.      The Public Interest in Protecting the Constitutional Right to Free Exercise of Religion, Free Speech, Assembly and Separation of Powers Requires Entry of a TRO.**

Finally, the public interest is well-served by a temporary restraining order that prevents Defendants from unlawfully burdening the exercise of religion, the free speech of Plaintiffs and the public, the assembly of the public for redress of grievances, and the separation of powers, all pursuant to equally applicable health and hygiene practice.

At all times the public interest is served because the Executive Orders are immediately and irreparably harming the public, and denying them their rights under law.

### F.     Conclusion

For all the foregoing reasons, Plaintiffs motion for a temporary restraining order should be granted.

Dated: May 13, 2020                             Respectfully submitted,

                                                /s/ Daniel L. Cox, Fed. Bar
                                                No28245
                                                THE COX LAW CENTER, LLC
                                                P.O. Box 545
                                                Emmitsburg, MD 21727

Phone: 410-254-7000
Facsimile: 410-254-7220
E-mail: dcox@coxlawcenter.com
www.OldLineStateLawyers.com

John R. Garza, Fed. Bar No.01921
Garza Law Office, P.C.
Garza Building
17 S. Jefferson St.
Rockville, MD 20850
Philip J. McNutt, Esq.
Philip J. McNutt Law Office
11921 Freedom Drive
Suite 584
Reston, VA 20190
703-904-4380 (DD)
202-379-9217 (fax)
pmcnutt@mcnuttlawllc.com

*Attorneys for Plaintiffs*