# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ANTIETAM BATTLEFIELD KOA, *et al.*, | * | |
| | * | |
| *Plaintiffs*, | | |
| | * | No. 20-CV-01130-CCB |
| v. | * | |
| LAWRENCE J. HOGAN, JR., *et al.*, | * | |
| | * | |
| *Defendants*. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' RESPONSE TO MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
Bar No. 27523
KATHLEEN A. ELLIS
Assistant Attorney General
Bar No. 04204
SARAH W. RICE
Assistant Attorney General
Bar No. 29113
JUSTIN E. FINE
Assistant Attorney General
Bar No. 18731
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6398
asnyder@oag.state.md.us
kathleen.ellis@maryland.gov
srice@oag.state.md.us
jfine@oag.state.md.us

May 18, 2020

Attorneys for Defendants

# TABLE OF CONTENTS

Page

I.   RECENT LEGAL AND FACTUAL DEVELOPMENTS THAT BEAR ON THE ISSUES
     BEFORE THE COURT ................................................................................. 1

     A.   Governor Hogan's May 13, 2020 Order Further Relaxes the
          Restrictions in the March 30 Stay-at-Home Order........................................ 1

     B.   Updated Status of COVID-19 Litigation in Other Jurisdictions .................. 3

          1.   Recent Religious Liberty Decisions Tend to Underscore the
               Importance of Allowing for Drive-in Services and Other
               Alternatives to Traditional in-Person Services. ................................ 3

          2.   Recent Religious Free Speech and Assembly Decisions Have
               Denied Preliminary Relief.................................................................. 7

II.  THERE ARE EVIDENTIARY SHORTCOMINGS AND LEGAL AND FACTUAL
     INACCURACIES IN PLAINTIFFS' MEMORANDUM. ...................................... 8

     A.   Plaintiffs Continue to Deny the Existence of a Public Health
          Emergency and Yet Offer No Evidence in Support of That
          Unsupportable Position. ............................................................................. 8

     B.   The Anecdotal and Hearsay Evidence That Plaintiffs Offer Does Not
          Establish a Policy or Practice of Discriminatory Enforcement.................. 10

     C.   The Governor's Order Does Not Implicate Due Process Protections
          with Respect to Quarantine Decisions. ....................................................... 11

III. THE GOVERNOR'S ORDER DOES NOT VIOLATE THE FIRST AMENDMENT.............. 12

IV.  THE GOVERNOR'S ORDER DOES NOT VIOLATE THE DORMANT COMMERCE
     CLAUSE. ................................................................................................. 17

CONCLUSION ............................................................................................. 20

## DEFENDANTS' RESPONSE ARGUMENT

The plaintiffs' memorandum in support of their motion for a temporary restraining order gives this Court (and the defendants) the first look at the legal arguments that plaintiffs offer in support of their claims.  Although the defendants anticipated many of those arguments in their May 8 filing, *see* ECF 26-1, some aspects of plaintiffs' memorandum require a brief response, and there have been factual and legal developments over the past 10 days that the defendants wish to bring to the Court's attention.  Those developments confirm that plaintiffs are unlikely to succeed on the merits of their claims.

I.  **RECENT LEGAL AND FACTUAL DEVELOPMENTS THAT BEAR ON THE ISSUES BEFORE THE COURT**

    A.  **Governor Hogan's May 13, 2020 Order Further Relaxes the Restrictions in the March 30 Stay-at-Home Order.**

On May 13, 2020, Governor Hogan issued his most recent COVID-19 Executive Order, relaxing aspects of earlier orders and activating Stage One of Maryland's Roadmap to Recovery.  *See* Ex. 12 (Order No. 20-05-13-01, "Amending and Restating the Order of May 6, 2020, Allowing Reopening of Certain Business and Facilities, Subject to Local Regulation").  The new Order, which supplants the March 30, 2020 Stay-at-Home Order that was the focus of the defendants' earlier filing, does three things that affect this case.

First, the May 13 Order rescinds the requirement that Marylanders remain at home except when seeking "essential services."  *Compare* Ex. 12 *with* ECF 26-6, ¶II.a.  The effect of that aspect of the Governor's Order is that Marylanders may now leave their homes and move about for any purpose.  This undercuts plaintiffs' hyperbolic claims that the Order impermissibly places them under "house arrest."  *See, e.g.*, ECF 32 at 8.

Second, the Order removes "spiritual" and "religious" gatherings from the prohibition on large gatherings and events and allows churches and other religious facilities to expand their in-person services from no more than 10 people to up to 50% of the facility's maximum occupancy. Ex. 12, ¶III.a. The new guidance represents another way in which the history of these orders demonstrates an effort to reduce burdens on religious practice, when consistent with public health. Even if, at some later date, the Governor may find it necessary to re-impose restrictions if public health circumstances require it, ECF 32 at 33, it is premature to consider such a speculative possibility and, in any event, there is no reason to believe that decision would be animated by anything other than the same compelling interests and narrow tailoring as the first Order.

Third, the May 13 Order authorizes local jurisdictions to tailor public health measures to their specific circumstances. Although the disease can spread wherever people are in sustained and close contact, that can happen differently, depending on whether one lives in a densely populated area or in an area that is home to, for example, meat-processing facilities. *See* ECF 26-2, ¶¶ 13, 15, 23, 37; *see also* Ex. 13. The reissued Order allows for regional variations in public health measures to address those differences as they begin to emerge. This aspect of the Order, along with the careful lessening of the Order's requirements described above, demonstrate just some of the ways in which the Order continues to be narrowly tailored to address the current public health threat.

The May 13 Order alters other aspects of the Stay-at-Home Order, though not in a way that directly affects this litigation. For example, the Order expands the range of retail businesses that may open to the general public, subject to the same 50%-capacity

requirement applicable to religious facilities.  Ex. 12, ¶III.b.  Manufacturing facilities,

barber shops, and beauty salons may re-open, subject to the same restrictions applicable to

other establishments.  *Id.* ¶III.c., d.  To address public health concerns that this type of

relaxation will lead to spikes in the incidence of the virus, *see* ECF 26-2, ¶37, the Order

authorizes the Secretary of Health and local health officers to issue directives to address

COVID-19 in any of the facilities permitted to re-open.  Ex. 12, ¶¶ I.b, I.c.ii, III.g.

The Order does not affect other aspects of the case.  Campgrounds remain open for

business, *see id.* ¶III.e.iv,; amusement parks remain closed, *id.* ¶IV.i.iv; and the 10-person

limitation on large gatherings and events remains applicable to the political protests that

the legislator-plaintiffs claim an absolute right to hold and attend, *id.* ¶II.

### B.     Updated Status of COVID-19 Litigation in Other Jurisdictions

There are several COVID-related cases underway across the country, as groups

press for the rapid reopening of state economies.  As the defendants observed in their initial

brief, the vast majority of those cases have resulted in the denial of preliminary relief along

the lines the plaintiffs seek here.  That trend has continued over the last ten days.

### 1.     Recent Religious Liberty Decisions Tend to Underscore the Importance of Allowing for Drive-in Services and Other Alternatives to Traditional in-Person Services.

Since defendants filed their initial response in this matter, at least two more federal

district courts have denied motions to preliminarily enjoin stay-at-home orders on Free

Exercise grounds.  *See Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782,

2020 WL 2468194, at *6 (N.D. Ill. May 13, 2020) ("Plaintiffs' request for an injunction,

and their blatant refusal to follow the mandates of the Order are both ill-founded and

selfish."); *Calvary Chapel of Bangor v. Mills*, No. 1:20-CV-00156-NT, 2020 WL 2310913 (D. Me. May 9, 2020).  In denying a stay pending appeal in *Elim Romanian Pentecostal Church*, the Seventh Circuit stated that the 10-person limitation on gatherings in the Illinois Governor's Executive Order was a justifiable response to an "extraordinary public health emergency" and "does not discriminate against religious activities" or "show hostility toward religion." *Elim Romanian Pentecostal Church v. Pritzker*, No. 20-1811 (7th Cir., May 16, 2020) (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and *Employment Div. v. Smith*, 494 U.S. 872 (1990)).  The Illinois order's "temporary numerical restrictions on public gatherings apply not only to worship services but also to the most comparable types of secular gatherings, such as concerts, lectures, theatrical performances, or choir practices, in which groups of people gather together for extended periods, especially where speech and singing feature prominently and raise risks of transmitting the COVID-19 virus." *Id.*

Conversely, the Sixth Circuit recently granted an injunction pending appeal and permitted Kentucky churches to conduct in-person religious services of any size so long as they follow certain social-distancing requirements. *See Roberts v. Neace*, 2020 WL 2316679 (6th Cir. May 9, 2020).  Two other district courts in Kentucky have similarly granted preliminary relief, *see Maryville Baptist Church, Inc. v. Beshear*, No. 3:20-CV-278-DJH-RSE, 2020 WL 2393359 (W.D. Ky. May 8, 2020); *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, No. 3:20-CV-00033-GFVT, 2020 WL 2305307 (E.D. Ky. May 8, 2020), and the Eastern District of North Carolina has preliminarily enjoined that

State's order, *see Berean Baptist Church v. Cooper*, No. 4:20-CV-81-D, ECF 18 (E.D.N.C. May 16, 2020).

The new Kentucky decisions continue to distinguish between stay-at-home orders that completely prohibit in-person religious services, which generally have been enjoined, and orders that permit limited faith-based gatherings, which generally have not been enjoined. *See* ECF 26-1 at 24-28. "Over the last several weeks, the majority of courts . . . have concluded that a state does not violate the Free Exercise Clause when it limits in-person religious services to ten people, at least as long as the state permits drive-in services." *Calvary*, 2020 WL 2310913, at *6. The emerging legal consensus thus supports the denial of preliminary relief here.

Moreover, there is no reason to believe that the Sixth Circuit, were it faced with Maryland's order, would find fault with it. First, the Sixth Circuit repeatedly stated in its most recent opinion that—even applying strict scrutiny—the State could lawfully address its concern about the spread of the COVID-19 virus simply by "limit[ing] the number of people who can attend a service at one time." *Roberts*, 2020 WL 2316679, at *5; *see also id*. at *4. The Maryland Stay-at-Home Order did this by limiting religious gatherings to 10 or fewer people, and the new Order allows services to 50% of the facility's capacity.

Second, the Sixth Circuit observed that the Kentucky order had "serial exceptions" for some businesses, but not for places of worship, when—as the court believed—both types of gatherings "pose[d] comparable public health risks." *Roberts*, 2020 WL 2316679, at *3. The Maryland order, by contrast, places fewer restrictions, not more, on religious organizations than it does on schools, theaters, and other places where people congregate.

5

*See* ECF 26-1 at 20; *cf. Calvary*, 2020 WL 2310913, at \*6 n.13 (noting that the "courts [in Kentucky] were reviewing a different order than I have before me today").

Finally, the governmental defendants in the Kentucky lawsuits apparently failed to "answer[] [the court's] concerns that the secular activities permitted by the order pose the same public-health risks as the kinds of in-person worship barred by the order." *Roberts*, 2020 WL 2316679, at \*5.  Here, by contrast, Dr. Mitchell has explained that any activity where people congregate for a prolonged period presents a "much greater risk of transmission" than the more fleeting interactions that occurred in the retail context.  *See* ECF 26-2, ¶23.  And plaintiffs have not attempted to rebut this fact with sworn declarations by a public-health professional or medical doctor, or even with citations to reputable online public health sources.

The circumstances presented by *Berean Baptist Church v. Cooper* are also inapplicable here.  North Carolina's order limited indoor religious services to 10 people "unless impossible," which left it to local law enforcement to determine what is "impossible" for each religion's ecumenical needs, a circumstance that gave the court "grave concerns" about the orders' constitutionality.  No. 4:20-CV-81-D, ECF 18 at 13. The court also found the order discriminatory because it allowed funerals of up to 50 people, when the State "conceded that there is no public health rationale for allowing 50 people to gather inside at a funeral, but to limit an indoor religious worship service to no more than 10 people." *Id.* at 14.  By contrast, the Maryland order is neutral.[1]

---

[1] The Supreme Court of Wisconsin struck down that State's stay-at-home order, but did so because the order was issued through a process that failed to comply with Wisconsin

### 2.     Recent Religious Free Speech and Assembly Decisions Have Denied Preliminary Relief.

The district court decision in *Elim Romanian Pentecostal Church* is also notable because it denied a motion to preliminarily enjoin a stay-at-home order based on the First Amendment rights of free speech and assembly in addition to on religious liberty grounds. *See Elim Romanian Pentecostal Church*, 2020 WL 2468194, at *5. The court concluded that the order was constitutionally sound under the *Jacobson* standard and, "even if *Jacobson*'s emergency crisis standard does not apply, plaintiffs have failed to show any likelihood of success under traditional First Amendment analysis." *Id.*, 2020 WL 2468194, at *3; *see also Henry v. DeSantis*, No. 20-CV-80729, 2020 WL 2479447 (S.D. Fla. May 14, 2020) (dismissing challenge for lack of standing but concluding in dicta that Florida's COVID-19 executive order was within governor's emergency-power authority during a public-health crisis).

The Eastern District of California reached the same conclusion in *Givens v. Newsom*, No. 220CV00852JAMCKD, 2020 WL 2307224 (E.D. Cal. May 8, 2020), in which the plaintiffs unsuccessfully sought to temporarily restrain the enforcement of the California stay-at-home order as an infringement of their right to protest after the California Highway Patrol denied them a permit to hold in-person rallies at the State Capitol. *Id.* at *2. In denying plaintiffs' motion, the district court, reliying on *Jacobson*, stated that "the judiciary must afford more deference to officials' informed efforts to protect all their

---

administrative law, and therefore its decision is not applicable here. *Wisconsin Legislature v. Palm*, No. 2020AP765-OA, 2020 WL 2465677 (Wis. May 13, 2020).

citizens, especially their most vulnerable, against such a deadly pandemic." *Id.* at *4. Alternatively, the court upheld the California order under traditional First Amendment analysis because it, like Maryland's order, was content-neutral, temporary, and did not "foreclose all channels of communication." *Id.* at *5-*6.[2]

## II.   THE EVIDENTIARY SHORTCOMINGS AND LEGAL AND FACTUAL INACCURACIES IN PLAINTIFFS' MEMORANDUM.

### A.   Plaintiffs Continue to Deny the Existence of a Public Health Emergency and Yet Offer No Evidence in Support of That Unsupportable Position.

Although the fact that Maryland is in the midst of a once-in-a-century public health crisis is generally known throughout this jurisdiction, the defendants included with their initial brief the declaration of Dr. Clifford Mitchell, who has been closely involved in the monitoring of, and response to, the COVID-19 pandemic here in Maryland. Dr. Mitchell's declaration establishes that the outbreak continues to pose a significant threat to the State of Maryland. *See* ECF 26-2, ¶¶ 34-36. As plaintiffs appear to concede, Governor Hogan's early action successfully "flattened the curve," but that does not mean that the pandemic is over here in Maryland. By slowing the rate of infection, those early actions prevented Maryland's healthcare system from being overwhelmed in the way that we saw in Italy and New York City, but hospitals continue to see high numbers of COVID patients and the

---

[2] The appeal in *Lighthouse Fellowship* is unlikely to be decided soon, as the Fourth Circuit has scheduled appellants' initial brief for June 15, 2020, *Lighthouse Fellowship Church v. Northam*, No. 20-1515, ECF 3 (4th Cir. May 4, 2020), and, as of May 17, 2020, no party had requested expedited review or an injunction pending appeal.

deaths continue to exceed normal numbers.  *See* ECF 26-2, ¶¶ 33-34; *see also* Md. Dep't of Health, *Coronavirus*, https://coronavirus.maryland.gov/ (last viewed May 18, 2020).

Plaintiffs deny all this.  They assert, incorrectly, that COVID-19, "[a]s the name suggests, . . . is the 19th coronavirus identified to date," ECF 32 at 13, but the 19 refers to the *year* it was first identified, *see* ECF 26-2, ¶5, not that it is the 19th such disease, as if that would suggest it is nothing unusual.  Plaintiffs also assert that other causes of death eclipse the loss of life from the current crisis, *see* ECF 32 at 5, and they take issue with the models used by the CDC and the Maryland Department of Health, *id.* at 6, but they offer no evidence to back up these assertions and nothing to rebut Dr. Mitchell's declaration, which forms the only factual record on which to decide the motion for preliminary relief.

Plaintiffs also reject the use of data and projections from outside of Maryland to support the Governor's renewed proclamation of a state of emergency and the existence of a catastrophic health emergency.  *See* ECF 32 at 6.  But, as Dr. Mitchell explained, the virus does not respect jurisdictional boundaries; the first three cases in Maryland were travel-related, and the virus spread rapidly within Maryland after their confirmation.  ECF 26-2 ¶33.  Furthermore, it is beyond dispute that the COVID-19 disease first appeared in China and has since spread throughout the world, with 4,556,274 reported cases and 307,248 reported deaths worldwide as of May 16, 2020.  *See Coronavirus*, Wash. Post, https://www.washingtonpost.com/coronavirus/ (last viewed May 16, 2020).   Of those numbers, 1,436,213 cases and 86,651 deaths have occurred in the United States.  *Id.*  There is nothing in the Governor's emergency powers authority to suggest that he must wear blinders when evaluating the public health risk to Marylanders.

Plaintiffs also claim that only residents of the large Maryland political subdivisions are at risk, and that people in the more rural districts are not at risk. *See* ECF 32 at 7. Again, plaintiffs offer no support for that proposition, and it is demonstrably not true. The data, widely available through the Washington Post website cited above, demonstrate that Kent County, Maryland's smallest, has the highest death rate per 100,000 residents and that Charles and Carroll counties have the fourth and fifth highest death rates. *See* Ex. 13.[3] Similarly, Wicomico and Kent counties have the second and fourth highest rates of infection in the State, with Caroline, Frederick, and Charles counties joining them in the top 10. *Id.* Quite simply, residents in all parts of Maryland are at risk of being infected with COVID-19 and at risk of dying from that infection. *See also* ECF 26-2, ¶37.

### B. The Anecdotal and Hearsay Evidence That Plaintiffs Offer Does Not Establish a Policy or Practice of Discriminatory Enforcement.

While they deny the existence of a public health emergency without *any* basis in fact, the plaintiffs rely exclusively on anecdote and hearsay to support their assertion that the order is being discriminatorily enforced against religious institutions, political protesters, and non-essential businesses. ECF 32 at 24, 35, 39. That police cars are seen driving near a church, *id.* 31, or near a political rally, *id.* 37, does not establish discriminatory enforcement any more than does an out-of-court statement that the Governor is rumored to believe that this lawsuit is frivolous and worthy of professional

---

[3] The Maryland Department of Health's COVID-19 dashboard has daily updates on the number of COVID-related deaths by county, which, when compared to publicly available population data, can be used to derive these same figures. *See* https://coronavirus.maryland.gov/.

sanction, *see* ECF 21, ¶11.  By contrast, the only admissible evidence about the State Police's enforcement policy—the declarations of Maj. Dofflemyer and Sgt. Nelson, ECF 26-3, 26-4—is unrebutted.  That evidence establishes that, while the State Police troopers do visit churches and businesses to advise them of the Governor's order and to educate them about the public health benefits of avoiding large gatherings, there is no policy of targeting churches, political rallies, or any other gathering or business for enforcement.

C.   **The Governor's Order Does Not Implicate Due Process Protections with Respect to Quarantine Decisions.**

The plaintiffs argue in their memorandum that the requirement that Marylanders stay at home except when seeking "essential services"—a requirement that was rescinded with the issuance of the Governor's on May 13 Order, *see* Ex. 12—qualified as a form of "quarantine" that, under the relevant statutes, must be implemented in accordance with certain procedural requirements.  *See* ECF 32 at 8, 13, 40-41.  Not so.

Section 14-3A-03 of the Public Safety Article sets forth the Governor's power to issue orders after proclaiming a catastrophic health emergency.  That provision sets forth three categories of orders.  The first, set forth in paragraph (b), governs the acquisition and rationing of the facilities and material needed to treat an outbreak, *see* (b)(1), (2), the issuance of orders requiring individuals to submit to testing or treatment, (b)(3)(i), (ii), and, relevant here, the establishing of "places of treatment, isolation, and quarantine" and requiring individuals "to go to and remain in places of isolation or quarantine" until they no longer pose a threat to the public, (b)(3)(iii), (iv).  The second, set forth in paragraph (c), authorizes the Governor to order any health care provider to join in surveillance,

treatment, and suppression efforts.  And the last, also relevant here, is paragraph (d), which authorizes the Governor to "order the evacuation, closing, or decontamination of any facility" and to "order individuals to remain indoors or refrain from congregating."

The quarantine provisions of paragraph (b) are limited to a situation in which a person refuses to comply with an order under § 14-3A-03(b)(3) to submit to vaccination, medical examination, treatment, or testing.  Pub. Safety § 14-3A-04.  As plaintiffs point out, the decision to place someone in quarantine triggers certain due process rights, including the right to a hearing in circuit court to contest the order.  *See id.*, § 14-3A-05(c). But those rights are implicated by an isolation or quarantine order issued under § 14-3A-03(b)(3), *see id.* § 14-3A-05(c)(1), not an order requiring individuals "to remain indoors or refrain from congregating," which is issued under § 14-3A-03(d).  But that is exactly what the Governor's order is:  It required individuals "to *remain* indoors" in their own homes, not to "*go to*" a "place of isolation and quarantine."  They are two different types of orders under the statute, and the due process protections that plaintiffs describe apply to the latter and not the former.

## III.   THE GOVERNOR'S ORDER DOES NOT VIOLATE THE FIRST AMENDMENT.

Plaintiffs continue to claim that the Governor's order violates several aspects of the First Amendment, but they have not grounded any of those claims in fact or in law. Factually, it is not true that measures like these have never, "in the history of this country," been necessary to combat a public health crisis.  *See* ECF 32 at 13.  Putting aside the obvious fact that most States have put in place similar measures *this year*, restrictions on religious gatherings and other traditional places of assembly, such as theaters, concerts,

and schools, are a common tool for addressing public health crises, including the influenza

pandemic in the early 20th Century that plaintiffs identify. *See*, *e.g.*, *Epidemic Situation*

*Grave; Blake Forbids Services in Churches by Latest Order*, Balt. Am., Oct. 11, 1918, at

14 (with deaths in low hundreds, Baltimore City banned churches, poolrooms, and

cancelling all public assemblies and parades)[4]; *cf.* ECF 32 at 13.  Temporary restrictions

on gatherings are a necessary and focused response to a public health threat that—even

with social-distancing measures in place to "flatten the curve"—still claims dozens of lives

each day.  *See* https://coronavirus.maryland.gov/.

Nor do plaintiffs explain how the March 30 Order, which restricted *all* gatherings

to no more than 10 persons, is not neutral.  The prohibition on gatherings does not have

exceptions and does not distinguish between "essential" and "non-essential" gatherings.

All gatherings are restricted equally.  Yes, some retail businesses were allowed to remain

open without restriction to the number of customers, but retail businesses do not pose the

same public health risk that sustained gatherings do.  As Dr. Mitchell explains, the risk of

viral transmission is "much greater" when people gather together in one place for a

---

[4] This and other articles describing Maryland's response to the 1918 flu pandemic can be found at the online "Influenza Encyclopedia" maintained by the University of Michigan and available at http://www.influenzaarchive.org/.  *See, e.g.*, *Flu Ban in Queen Anne's*, Balt. Sun, Jan. 13, 1919, at 5, http://hdl.handle.net/2027/spo.5870flu.0000.785 (schools, churches, and amusement places were closed while stores were subject to reduced hours); *Worcester "Flu" Abating*, Balt. Sun, Jan. 16, 1919, at 7, http://hdl.handle.net/2027/spo.8570flu.0000.758 (schools and churches closed for approximately a month); *Influenza Decreasing*, Balt. Sun, Jan. 26, 1919, at 15, http://hdl.handle.net/2027/spo.6770flu.0000.776 (schools, churches, theaters, moving picture shows, and other places where people congregate still closed in Easton after improvement).

prolonged period of time, as opposed to when they pass each other in the aisle of a retail establishment.  ECF 26-2, ¶23.  Plaintiffs offer no explanation, and certainly no evidence, to the contrary.

Plaintiffs also offer no factual support for their assertion that the Governor's order "hardly regulat[es] the hundreds of stores and businesses he has left open."  ECF 32 at 33.  Even if that estimate were accurate, hundreds more stores and businesses have been required to close or reduce their operations in ways that religious institutions have not.  And the workplaces that have been allowed to operate continue to have to meet additional obligations and satisfy local health authorities to operate safely.  *See* Order No. 20-04-05-02, "Delegating Authority to Local Health Officials to Control and Close Unsafe Facilities."  As discussed above, the distinctions drawn by the Order are rational and narrowly tailored to address the evolving public health risks presented by each activity.

As for their legislator claims, plaintiffs appear to contend that legislators possess heightened First Amendment rights outside of the floor of the legislature, and that the orders at issue here violate their "absolute right . . . to exercise their constitutional offices."  ECF 32 at 39.  Again, not so.  Although legislators do have special rights when speaking on the floor of the General Assembly, *see Blondes v. State*, 16 Md. App. 165, 175 (1972) (discussing Maryland's "legislative privilege" from prosecution and suit), their free speech rights outside the legislature are the same as other citizens' and are subject to the same content-neutral time, place, and manner restrictions that may apply.  *See* ECF 26-1 at 31-36.  With respect to exercising their offices in the sense of gathering as a legislative body, the Governor's orders are not the reason the legislators are not currently sitting in session

in Annapolis.  The House of Delegates and Senate adjourned, on their own initiative, on

March 18, 2020, and legislative leadership determined not to hold a special session for

health reasons.  *See* Bryan Renbaum, *General Assembly Leaders Postpone May Special*

*Session*, MarylandReporter.com (Apr. 20, 2020), https://marylandreporter.com/2020/

04/20/general-assembly-leaders-postpone-may-special-session/.

In terms of legal sufficiency, the plaintiffs' arguments do nothing to disturb the

conclusion that the Maryland Orders are a constitutionally appropriate response to a public

health emergency.  Plaintiffs' only response to *Jacobson* is that the Governor's powers are

limited to the "necessity of the case" and that, because there actually is no public health

emergency in Maryland, the Governor must have overstepped his bounds.  *See, e.g.*, ECF

1, ¶¶ 51, 52; ECF 32 at 5-7.[5]  But because the plaintiffs, as discussed above, offer no

evidence in support of their head-in-the-sands denial of the continuing crisis, their legal

argument that *Jacobson* does not control must also fail.

But even if plaintiffs were correct that *Jacobson* did not apply here, the Governor's

orders would still pass constitutional muster as a reasonable, content-neutral restriction on

the time, place, and manner of speech.  As the defendants explained in their initial brief,

the restriction on gatherings is (1) content neutral; (2) "'narrowly tailored to serve a

---

[5] Plaintiffs also cite *Kenly v. Huntingdon Building Ass'n*, 166 Md. 182 (1934), for the proposition that the statutes conferring on the Governor emergency powers violate Article 44 of the Maryland Declaration of Rights, but they cite to a concurring opinion of only one member of the Court of Appeals of Maryland, and in a case that has nothing to do with public health emergencies.  No decision of the Court of Appeals has ever construed Article 44, much less applied it to invalidate the critical public health emergency powers that the General Assembly has conferred on the Governor here.

significant governmental interest'"; and (3) "'leave[s] open ample alternative channels for communication of the information.'"  ECF 26-1 at 30-32 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Finally, the Governor's order would survive strict scrutiny even if that more exacting standard applied.  Although "'it is the rare case' in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest . . . those cases do arise."  *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (citation omitted). Recently, the Supreme Court has found compelling a State's interest in "preserving public confidence in the integrity of the judiciary," *id.*, and "safeguard[ing]" schoolchildren "from speech that can reasonably be regarded as encouraging illegal drug use," *Morse v. Frederick*, 551 U.S. 393, 397 (2007).  A government's desire to "protect" "the safety of its members" against "an epidemic of disease," *Jacobson*, 197 U.S. at 27, is a compelling interest of even greater magnitude.  *See In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020) (noting "state's critical interest in protecting the public health").

As for narrow tailoring, it too is a demanding standard, but is met here.  There is "no 'less restrictive alternative'," *Central Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)), available to the State to control this pandemic.  COVID-19 has no cure and no vaccine, and the only way to stop the spread of this highly contagious and lethal virus is to minimize interpersonal contact through social distancing measures.  ECF 26-2, ¶10. Unlike the orders invalidated on Free Exercise grounds elsewhere, the Maryland Order—

particularly in its current form—leaves open multiple options to gather in worship while minimizing the risk of viral transmission.

Nor are the orders over-inclusive or under-inclusive.  That is, the public health also requires that the food, shelter, and security needs of the population be met.  Using the federal government's designation of "critical infrastructure" to identify the "essential businesses" that provide those needs, *see* Ex. 12, ¶IV.h., is a narrowly tailored approach to ensuring that the 10-person limit on gatherings maximizes protection of public health. Further evidence of narrow tailoring is that the orders have already been relaxed, as the Governor's May 13 Order most recently demonstrates.  *See Grutter v. Bollinger,* 539 U.S. 306, 342 (2003) (regulation aimed at eliminating discrimination must be "limited in time" where regulation should, over time, eliminate the compelling interest).

## IV.   THE GOVERNOR'S ORDER DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

Plaintiffs' analysis of the dormant Commerce Clause suffers from several flaws, three of which merit special attention.[6]  First, plaintiffs adhere to their position that Congress's power to regulate interstate commerce is exclusive, when the Supreme Court has made clear that, "[a]lthough the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation." *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766 (1945). To the contrary, "'the States retain authority under their general police powers to regulate

---

[6] Plaintiffs offer no argument in support of their takings claims, which, as discussed in the defendants' initial brief, fail on several grounds.  *See* ECF 26-1 at 38-44.

matters of legitimate local concern, even though interstate commerce may be affected.'" *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (citations omitted).

Second, plaintiffs assert that Adventure Park USA engages in interstate commerce, but "that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978).

Finally, plaintiffs ignore entirely that modern dormant Commerce Clause jurisprudence "is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (citation omitted). Although there is no allegation here that the Orders favor Maryland businesses over out-of-state competitors, state enactments, like this one, that are "justified by the threat of death or disease" are upheld even under the Court's "tier one" analysis, which applies where a state law discriminates against interstate commerce, and which is otherwise "'a virtually per se rule of invalidity.'" *Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996) (citation omitted).

Plaintiffs are correct that—if *Jacobson* did not control here—their dormant Commerce Clause claim would ultimately be governed by the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See* ECF 32 at 21-22. Under that test, "a court must uphold the challenged law if it 'regulates even-handedly to effectuate a legitimate local public interest . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Just Puppies, Inc. v. Frosh*, No. CV

ELH-19-2439, 2020 WL 607026, at *20 (D. Md. Feb. 7, 2020) (quoting *Pike*, 397 U.S. at 14). "'[O]nly a small number of cases' have invalidated a law under *Pike* balancing," and those cases "generally involved" regulation of "inherently national" activities, "such as interstate transportation." *Id.* at *27 (quoting *National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012)). In *Pike*, the Court struck down an Arizona prohibition on transporting cantaloupes grown in Arizona for packaging in another State because "the State's tenuous interest in having the company's cantaloupes identified as originating in Arizona cannot constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant in the State." 397 U.S. at 145. That does not remotely describe the requirement that Adventure Park USA close to stop the spread of the virus. Moreover, the economic burden that must "clearly" outweigh the gubernatorial order's important public health benefits is the burden on the "*the flow of interstate commerce*" and not the burden on a particular business. *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009) (emphasis in *Brown*). The "Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon*, 437 U.S. at 127-28.

The burdens that plaintiffs describe are not burdens on the flow of interstate commerce, but the burden on a *business*, which—like most everyone else—is suffering economically during the current crisis. "These are not burdens for Commerce Clause purposes." *Just Puppies*, 2020 WL 607026, at *27. And plaintiffs offer nothing to suggest that the burden on that business—even if it properly implicated the *Pike* balancing test— "clearly" outweighs the public health benefits of the Governor's order, the evidence of

which is unrebutted by plaintiffs.  With a burden that is not legally cognizable, and no evidence calling into question the important public health benefits on the other side of the ledger, plaintiffs' dormant Commerce Clause claim is so deficient that it falls comfortably within that category of cases that require dismissal under *Pike* balancing.  *See id.*, at *21.

## CONCLUSION

The plaintiffs' motion for a temporary restraining order should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Adam D. Snyder
ADAM D. SNYDER
Assistant Attorney General
Bar No. 27523
KATHLEEN A. ELLIS
Assistant Attorney General
Bar No. 04204
SARAH W. RICE
Assistant Attorney General
Bar No. 29113
JUSTIN E. FINE
Assistant Attorney General
Bar No. 18731
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6398
asnyder@oag.state.md.us
kathleen.ellis@maryland.gov
srice@oag.state.md.us
jfine@oag.state.md.us

Attorneys for Defendants