# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ANTIETAM BATTLEFIELD KOA, et al     :

     Plaintiffs,         :

   v.                               Case No. 1:20-cv-01130-CCB

                                     :

LAWRENCE J. HOGAN, et al             Honorable Catherine C. Blake

                                     :

     Defendants.          

                                     :

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

_/s/_____      _/s/_____

Daniel L. Cox Bar No. 28245         John R. Garza Bar No. 01921

THE COX LAW CENTER, LLC           GARZA LAW FIRM, P.A.

P. O. Box 545                           17 W Jefferson Street #100

Emmitsburg, MD 21727             Rockville, MD 20850

410 254 7000                          301 340 8200 ext 100

dcox@coxlawcenter.com            jgarza@garzanet.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PAGE

PLAINTIFFS' MEMORANDUM IN OPPOSITION OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ................................... 3

STANDARD ........................................................................................ 6

BACKGROUND.................................................................................. 10

I. PLAINTIFFS HAVE WELL-PLED, AND RECENT ROTESTS PROVIDE SUBSTANTIAL EVIDENCE, THERE IS NO "SUBSTANTIAL RELATIONSHIP" BETWEEN THE GOVERNOR'S ORDERS AND THE PUBLIC HEALTH. ................................................................................. 20

II. PLAINTIFFS HAVE WELL PLED A PLAIN AND PALPABLE INVASION OF CONSTITUTIONAL RIGHTS. ........................................................... 27

    A. PLAINTIFFS' FIRST AMENDMENT RIGHTS HAVE BEEN THREATENED, SILENCED, CHILLED, AND INVADED. .................................................. 41

    B. THE DORMANT COMMERCE CLAUSE PROTECTIONS OF PLAINTIFFS ARE BEING VIOLATED BY THE GOVERNOR PICKING WINNERS AND LOSERS WITHOUT ANY RATIONAL BASIS. ........................................................ 50

    C. ARTICLE 44 IS PLAIN, APPLICABLE AND JUSTICIABLE. ...................... 56

    D. PLAINTIFFS' DUE PROCESS RIGHTS HAVE BEEN VIOLATED ............ 59

CONCLUSION.................................................................................... 59

**PLAINTIFFS' MEMORANDUM IN OPPOSITION OF DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Plaintiffs incorporate herewith their pleadings in the instant matter as if fully set forth herein, including, but not limited to, their Response in Opposition to Defendants' Motion to Dismiss filed May 26, 2020, ECF 51.

The recent protests over the death of George Floyd, and the Governor's expressed support for such peaceful protests[1] where photos show hundreds of people are demonstrating without social distancing or masks, while at the same time banning churches, Legislators and businesses from gatherings of more than 10 people, indicate his executive orders are mistreating churches, businesses, and individuals herein with disparity and unconstitutional discrimination in violation of 42 USC § 1983 and the United States and Maryland Constitutions. In fact, a federal court in New York just ruled that Governor Hogan's Vice Chair of the National Governor's Ass'n, Gov. Cuomo, violated the Constitution, because his executive orders discriminated against religious worship.[2] As the Court noted, the Governor relaxing his Orders during the course of this litigation does not moot or negate the triable issues. ECF 40 at 8-9. The Governor and defendants herein continue to exert police powers under the Catastrophic Health Emergency Proclamations, and reserve powers

---

[1] Maryland Matters article, dated June 3, 2020, available at: https://www.marylandmatters.org/2020/06/03/hogan-lawmakers-praise-baltimore-protesters-police-for-keeping-the-peace-we-sort-of-wrote-the-book/ , accessed 6/26/20.
[2] Attached hereto as Exhibit 2.

to issue similar restrictive stay-in-home and lockdown orders, all in contravention to the statutory scope and Constitutional authority.

Presently, there are 3,075 court cases filed in the United States[3] involving COVID-19 executive orders or the fall-out from such orders.[4]  19 of those cases are here in Maryland, including the instant matter.  The sheer magnitude of the sweeping nature and novel impact on the civil rights of Marylanders and plaintiffs herein of the executive orders, and the potential of the orders being reinstated in various forms, demonstrates the importance this case.  It would be entirely premature to dismiss the instant action prior to discovery and a trial.

The government does not meet the standard for a 12(b)(6) motion to dismiss. The citizens of Maryland remain under a State of Emergency unitary rule of executive orders at this very moment, which next week will be 120 continuous days since the March 3, 2020 Catastrophic Emergency Health Proclamation and ensuing executive orders.  The Legislature has only authorized 30 days for proclamations of emergency powers by the Governor, yet at 120 days the Governor seeks to avoid scrutiny in discovery in this matter by seeking dismissal.  ECF 50, pg. 68.

The Governor's Catastrophic Emergency Health Proclamation, under Title 14, Public Safety Article 14-107, et seq., instructs the Governor that "a state of

---

[3] Attached hereto as Exhibit 3 is a chart of COVID-related court actions in nearly all 50 states.
[4] Hunton, Andrews, Kurth; A National COVID-19 tracking law firm.  Available at: https://www.huntonak.com/en/covid-19-tracker.html, accessed June 26, 2020.

emergency may not continue for longer than 30 days," unless the Governor clearly and with defined limitation sets forth 1) the nature of the emergency; 2) the areas threatened; and 3) the conditions that have brought about the state of emergency. *Id.*; Amend. Compl. ECF 50, pg. 68. Title 14-107 requires that a state of emergency may only continue until the threat of danger or emergency conditions cited no longer exist. *Id.* The Governor cited the potential for the health care system to be overwhelmed as the sole basis for the emergency powers and lock-down orders. He has since declared those dangers have passed and each "pillar" has been met for ensuring adequate health care facilities and supplies exist. The Governor may not therefore continue the Catastrophic Emergency Proclamations and executive order powers.

Title 14-106(c)(1) specifically requires the Governor "shall consider, on a continuing basis, steps that could be taken to prevent or reduce the harmful consequences of potential emergencies." *Id.*

The Court found in its TRO memorandum (ECF 40) that plaintiffs, to potentially succeed on the merits, must provide the Court with scientific authority which at least contradicts the purported medical expert set forth by the defendants. ECF 40, pg. 31. The plaintiffs, having well-pleaded their Complaint and Amended Complaint, require the discovery phase to determine the nature of the scientific evidence proffered by the Governor, and to provide their own expert(s) under the Rules of Evidence. The Governor, to defend his first-in-US-history executive orders

to close churches, lock people in their homes indefinitely, shutter businesses and forcibly require non-medical cloth coverings over the faces of United States citizens, provided one declaration of a medical doctor who has not been reviewed for expertise in each area of testimony under the Federal Rules of Evidence. The Court further held in the order that all these powers were "given" the Governor by the State Legislature of Maryland, something which the plaintiffs respectfully do not concede under the facts and law before the Court, requiring factual inquiry into the substance and extent of those purported statutory executive powers.

The Court cited *Jacobson*, ECF 40, *passim*, which case went to trial concerning novel public health executive order penalties. There, Jacobson had been provided opportunity to obtain and present evidence. *Jacobson* v. *Massachusetts*, 197 U.S. 11, 13 (1905). The same should apply in the instant matter.

The defendants 12(b)(6) motion is premature and must be denied.

## STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint need only assert "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 550 U.S. 544 (2007).

In considering a 12(b)(6) motion, the Court must accept as true all well-pleaded allegations in the complaint, *Twombly* at 570, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), including the Declarations provided that show without contravention "direct and plausible allegations" such that the legal claims are able to be sustained. *Twombly* at 570. Allegations that include the Governor's executive orders were unconstitutional both as written and as applied. Substantive allegations, each amounting to material and substantive assertions the Governor's actions went beyond the "necessities of the case" and "invaded rights protected under the Constitution." *Jacobson* at 23. These include locking down plaintiffs' churches under threat of arrest or criminal prosecution, locking all healthy people such as plaintiffs in their homes under threat of arrest or criminal prosecution, forcing all healthy persons such as plaintiffs to cover their faces with non-medical cloths in retail stores and to travel about under threat of arrest or criminal prosecution, threatening and inferring the threat of arrest and professional license targeting for exercising free speech in the right to peacefully protest chilled speech and invaded rights, interfering with the rights of seated members of the Legislative Branch to speak with constituents at protests greater than 10 people, and picking winners and losers in commerce without rational basis.

To deny a Rule 12(b)(6) motion to dismiss, a complaint must only contain a short and plain statement of sufficient factual matter, accepted as true, to "state a

claim to relief that is plausible on its face." *Id*., at 570, 127 S.Ct. 1955. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*., at 556, 127 S.Ct. 1955.

Plaintiffs 56-page Complaint and 105-page Amended Complaint, setting forth, pursuant to 42 USC § 1983, 10 causes of action which plead every necessary element in each cause of action – something not disputed by defendants. Additionally, plaintiffs' declarations and affidavits set forth specific and significant facts in support of their Complaint and Amended Complaint.

Plaintiffs declared at least 25 pages in their sworn declarations of uncontroverted facts attached to their complaint and amended complaint that Governor Hogan's executive orders violate their right to free exercise of religion, by forbidding their right to congregate in the house of the Lord, to call a congregation together as God commands and not as the Governor allows, to take the Eucharist or Lord's Supper in a body corporate and take collections, to sing and worship and to peaceable assembly for religious purposes, as well as for peaceful protest, by being ordered to remain in their homes indefinitely without any statutory or legal basis, to be forbidden from leaving their homes and speaking in public except by electronic means; and to be free from the Governor's established Religion via his "Faith-Based Commission" recommendations that were issued officially from his office to be used

as regulations in each delegated County and City for how Marylanders ought to worship God, each violation set forth under the First & Fourteenth Amendments and the Maryland Declaration of Rights. ECF 15, ¶¶ 4-7, 12, 14, through 15-3 and 32 through 32-5. Plaintiffs also well-pleaded that they did not consent to be forced into their homes, forced to close their businesses, nor consent to be forbidden from traveling about in violation of the Fourteenth Amendment, Maryland law, due process and equal protection. *Id.* Plaintiffs also well-pleaded that they objected to being stripped of their rights as U.S. citizens and Maryland citizens to be governed by a three-branch Republican form of government free from overreaching executive orders that issue in violation of such laws and constitutional protections. *Id.* Plaintiffs also objected to the violation of their rights as healthy persons, under illegal executive orders endangering their health, to cover their faces with non-medical cloths, as opposed to their rights of free speech under the First Amendment and Fourteenth Amendment due process, and under arts. 5, 8, 10, 13, 24, 40 and 44 of the Maryland Declaration of Rights.

Any dismissal of Plaintiffs claims at this early point in the novel case at Bar, without any discovery yet obtained, would be impermissible and premature.

## BACKGROUND

COVID-19 took the world by storm with predictions of millions of deaths and pandemic of Hollywood movie proportions. Governor Hogan along with celebrity doctors on TV convinced the citizens of Maryland that a significant percentage of the population would soon be dead or dying. We were told by the media, acting a press agent for politicians, that this pandemic would be like or worse than the Spanish flu that killed 50 million (perhaps 100 million with today's population). Even the Court stated "[t]he world is now in the grip of a public health crisis more severe than any seen for a hundred years." ECF 40 at 1.

The average citizen expected to know tens or even more of their friends, neighbors, acquittances sick or dead by now. That was months ago. Such has not occurred[5]. However, Marylanders missed their sons and daughters' graduations, long planned weddings were canceled, they fell prey to drug or alcohol addiction, many succumbed to cancer[6] because they could not get proper screening, they became depressed, committed suicide, suffered from loss of personal contact and lost their

---

[5] According to the CDC 47,247 people died in Maryland (2015) and 3,216 died of influenza pneumonia and lower respiratory disease whereas 2,900 residents allegedly died of COVID this year. Memo in Sup of Mot to Dismiss ECF 54-1 page 4, https://www.cdc.gov/nchs/nvss/mortality/lcwk9.htm.
[6] Governor claims that his citizen could go to the doctor under his house arrest order, ECF 54-1 at 9, but there was no doctor, dentist or other provider open to go see because he initially closed all elective health care facilities.

businesses – never to reopen and now sadly some have even been driven into pornography and prostitution to earn money for rent and food.[7]

But we now know that the warnings were wrong, COVID-19 does not kill like the 1918 Spanish Flu. We were told that when thousands went to the Lake of the Ozarks, Missouri and Ocean City, Maryland there would be mass deaths; yet, it did not happen. States that did not lockdown and which lived like Americans, not cowering in their homes for three months under penalty of criminal arrest, have no different outcomes than states that did lockdown. Any challenge to that truth is a material dispute that must withstand the scrutiny of the Rules of Evidence in trial.

And then, the media narrative moved on to the BLM protests whereby hundreds regularly violate the very same orders with no threat of arrest but rather, encourage kneeling before the executive order law breakers in submission. The hypocrisy of the defendants in the treatment of COVID protestors *vis a vis* BLM protestors crystalizes why this case must go on. And now, the protests have moved on to a general anarchist attempt to overthrow the police and create "autonomous zones" free of the rule of law and without any mandate or enforcement of social distancing or masks.

---

[7] https://www.bizpacreview.com/2020/06/12/tucker-rails-against-media-promoting-porn-from-home-our-daughters-are-selling-themselves-for-food-and-rent-933562

The U.S. Department of Justice sent a letter (see attached Exhibit 1) to the Montgomery County Executive on June 10 raising concerns with the treatment of religious institutions in Montgomery County. The County Executive is operating under the delegated authority, control and direction of the Governor. Only in the crucible of civil discovery through deposition testimony under oath and document review will the public know what really is going on. The public represented by the Plaintiffs in this case want to know the truth and have a right to the information in defense of their rights asserted in this matter.[8]

Additionally, the defendants' memorandum, ECF 54-1 pgs. 3-4, cites as support for the Governor's actions the established "Faith-Based workgroup" which his state-funded Office of Community Initiatives used to "develop" and "issue" religious regulations to "allow" "worship", and he cites those as the basis for his delegation of powers to local authorities for "more restrictive" religious regulations for worship, including: no Eucharist or Lord's Table in church or church parking lots for drive-in services (but ordering and eating burgers or pizza in a parking lot allowed even with person to person delivery), no hugging or touching, no collection of offerings (unless paying for fast-food), "seven-foot spacing" (because religion is apparently more catching for COVID19 than all other practices where only six-foot

---

[8] The recent release of Congressional testimony showing public officials telling one story to the public and another when under oath along with many other such incidents creates distrust among the public of government officials and decision makers which can be lessened with the ability to discover relevant facts.

distancing is required), "wearing of masks", "taking" and "reporting" to the government HIPAA-protected health information such as body temperatures from each congregant not required at essential businesses, "capping attendance", "refraining from congregational singing", and other regulations. These all establish religion as the Governor or local executives see fit, with a Governor-selected supra-religious body that actually developed church worship policies which were implemented via executive orders and by fear of reprisal of local churches, which invade the Constitutionally protected rights of the plaintiffs.

Plaintiffs do not concede, and they contest and oppose strongly, each and every document, declaration and exhibit of defendants in support of their motion to dismiss. Plaintiffs contest both the substance and authenticity of each, and demand strict proof under the Rules of Evidence, with opportunity for deposition cross exam. Plaintiffs, for purposes of discovery and trial, further contest each extra-judicial citation in the Court's ruling[9], as well as its factual findings including that the "world is in the grip of a public health crisis more severe than any seen for a hundred years" (ECF 40 at 1), as such are outside the record and pleadings which are to be seen in the light most favorable to the plaintiffs, and which go to the merits and gravamen of plaintiffs' case

---

[9] For example, the Court disputes Sweden's anti-lockdown policy because of a New York Times negative article, but this demonstrates the facts are necessary to be established in discovery under the Rules of Evidence, considering additional evidence continues to come out from experts about the improper reporting of Sweden's policies, and the efficacy of such policies state-side and internationally. See, NPR article out today, available at: https://www.npr.org/sections/coronavirus-live-updates/2020/06/26/883931594/swedish-disease-expert-says-who-covid-19-warning-is-a-total-mistake, accessed June 26, 2020.

regarding annual deaths from seasonal flu compared with deaths from COVID-19. ECF 50, pg. 69, ¶ 64 ("At no time has there been a state of war, or serious conditions such that 'extensive loss of life' actually or imminently exists under the…state of catastrophic health emergency.").  Data now available to the Governor proves that deaths in Maryland from COVID-19, which the Governor reported is about 2900 to date, is presently comparable to and even less than the seasonal flu[10], which last reported shows approximately 3300 annual Maryland deaths.  See, https://www.cdc.gov/nchs/nvss/mortality/lcwk9.htm, accessed June 25, 2020.  And over 60% of the deaths from COVID-19 were in nursing homes.

Plaintiffs dispute defendants' factual assertions: that "in just three months, Maryland has had 55,858 confirmed cases and 2,546 deaths".  This bald statement is supported by a link in the record and no access to dates of onset of the virus proven by discovery, which is widely reported now as now beginning as early as last September or October 2019 before a test allegedly existed in Maryland to be able to verify the presence of the virus, (see https://www.newsweek.com/coronavirus-outbreak-september-not-wuhan-1498566 accessed June 25, 2020), that statistical science shows there has been a much higher rate of infection of the cold-like virus, significantly lowering the death rate per capita ratio to merely .4% (see

---

[10] Medical science is now showing that COVID-19 is declining in acuity and severity rapidly, just like the seasonal flu.  See, https://www.pennlive.com/news/2020/06/upmc-doctor-sees-too-much-focus-on-rising-covid-19-cases-too-little-on-declining-severity-and-hospitalizations.html?fbclid=IwAR3GJaTuf-VZ6sUX2teKoQ6Q1tfgLXgBOBgCGrx9WgiSN-U8lJvdfm8RIs0 , accessed June 26, 2020.

https://www.wcnc.com/article/news/health/coronavirus/data-cdc-estimates-covid-19-mortality-rate/275-fc43f37f-6764-45e3-b615-123459f0082b, accessed June 25, 2020). Defendants bald factual assertions unsupported by sworn testimony or evidence also do not show redacted death certificates, which when discovered will show comorbidities and related medical conditions and complications of patients said to have died of COVID-19 in Maryland such that an expert will likely not be able to testify under oath that the person died from COVID-19, but that other comorbidities were potential or likely causes of death.

Plaintiffs dispute defendants' factual assertion that the Governor closed "all but essential businesses identified by" the Department of Homeland Security (DHS). ECF 54-1, pg. 2. President Trump identified churches as essential and Governor Hogan did not, nor did his delegated local officials. And this fact is a material issue in the case. Additionally, no businesses which Governor Hogan closed were identified by DHS for closure as "non-essential" or any other category. Indeed, the DHS specifically identified businesses required to remain open, not for any purpose of closure. ECF 49, pg. 29. Additionally, even if the Governor relied on a DHS list in good faith, the picking and choosing between which "non-essential" businesses may stay open, may open partially or may reopen fully, is replete with disparity.

Plaintiffs dispute defendants' factual averment that "the last of those…more restrictive orders was issued on March 30, 2020". ECF 54-1, pg. 2. This is strongly

disputed, as to this day the most restrictive executive order regarding facial coverings was issued not until April 15, 2020 and remains in place, and his delegation of powers order beginning May 13, 2020 to local authorities has authorized outrageously restrictive executive orders under his control including: banning the Eucharist (Howard County) (while still allowing wine and alcohol purchases and consumption in secular stores and in parking lot and "take-out" dining), banning attending the sick (while allowing secular deemed essential businesses to do so), forced face coverings in all public spaces (Anne Arundel and Montgomery Counties), and even today, the banning of gatherings larger than 10 people continues, along with the right to order all healthy Marylanders back into a stay-in-home house arrest if the local authority or the Governor deems they wish to do so. ECF 54-1, pg. 3; ECF 50 at 58.

Plaintiffs dispute defendants' assertion that an interpretive policy for the March 30, 2020 stay-in-home Order allowed for "remote worship…drive-up services, and…in-person services with up to 10 participants." ECF 54-1, pg. 3. Religious services were not expressly allowed for up to 10 participants in any Executive Order, and the Maryland State Police did not always state whether they might follow the Legal Counsel's interpretation of the Governor's Orders. Additionally, neither Mike Pedone, Chief Counsel for the Governor's Office of Legal Counsel, nor the Governor, "allowed" worship as the defendants herein believe – instead the plaintiffs, under criminal threat, had to forgo their natural and civil rights,

such as congregational gatherings, Eucharist celebrations, weddings, funerals, offerings and collections for the work of the church and the poor, and countless other worship practices. ECF 50, pg. 74. Additionally, plaintiffs were prevented from worshipping absent a threat of arrest, as plaintiff Rev. John Seay held Easter Services in his churches' outdoor parking lots, only to have two (2) State Police trooper cars patrol his parking lot – on Easter Sunday – causing intimidation and question of whether compliance and interpretation of the stay-in-home and prohibition on large gatherings were in fact exempted for drive-in church services. ECF 50, pgs. 74 A similar threat occurred for plaintiff Rev. Steven Dixon, who on March 24, 2020, had Maryland State Police, under Governor Hogan's direction, enter his church property which was recorded on video, and hand-deliver a threat of criminal prosecution if the pastor did not cease and desist "groups of more than 10 people in a gathering or at an event" which violation would be punished by "one year in jail, or a fine up to $5000, or both". ECF 50, pg. 75. The MSP notice went on to warn that "spiritual, religious…gatherings or events"…were prohibited, and that "non-essential businesses" must close. There is no language such as defendants represent to this Court of any exception provided in that notice to plaintiff Rev. Dixon, nor any other plaintiff.

Plaintiffs further dispute defendants' state office of religious representation being a "broad array of faiths and denominations" as the so-called establishment of

the office did not include all evangelical and non-denominational churches, nor did it include all faiths practiced in Maryland. ECF 54-1, pg. 4. More egregiously, however, is the entire concept of an Office of Religion in the Governor's office, which is disputed as being violative of the Establishment Clause. Additionally, it is disputed that all members of the so-called Faith-Based workgroup in the Governor's office actually recommended, in a recorded and clear vote, unanimously, any of the recommendations the Governor sets forth in his factual defense. ECF 54-1, pg. 4. Indeed, it is now known and averred on information and belief by plaintiff LCPL Repogle, that at least one of the members of that workgroup – a pastor later *fined* by Baltimore County under the Governor's delegation of powers to its County Executive, for worshipping God in their beautiful "unsafe" building a week earlier than the executive orders "allowed" worship - felt totally ignored by the Governor for their independent church's positions and practices of faith, and therefore resigned from the commission/workgroup with a lengthy letter of concern, which the Governor is holding back from this Court and your plaintiffs.

Plaintiffs dispute defendants' factual misstatement to the Court that "more than 500 physicians describe[d] the negative health consequences of stay-at-home orders" when it was over 600 physicians and growing, and that this fact along with President Trump's order to reopen churches, is part of the necessity to take discovery in this fast-moving factual case.

Delegate Cox, and the delegates and plaintiffs herein, dispute the factual finding by the Court – a finding not applicable here in a motion to dismiss - that Delegate Cox's right to speak was not chilled (ECF 40 at 29) by the threats from the Governor including the threat of arrest for violating the gatherings orders, and the threat of targeting Del. Cox's professional law license for speaking up against the Executive Orders (ECF 21; ECF 40 at 7, fn 13). Strict proof is demanded from discovery and plaintiffs have demonstrated that after disclosure to the Court by his staff member of the second targeting of Del. Cox by way of high-level Governor's office staff, the Governor's longest serving Chief of Staff abruptly resigned. ECF 49 at 30, ¶ 2.

Contrary to the defendants' statement, ECF 54-1 at 6, that plaintiffs must continually attach ever-changing data to their Constitutional Complaint and Amended Complaint, the plain and simple statement of violation of rights upon questioned grounds is sufficient and was properly alleged such as to permit discovery to commence. ECF 50 at 67-70, ¶¶ 55 through 67 ("fear alone is no indicator of reality concerning imminence of extensive loss of life. Not a single model, even the WHO the Governor cites in his original proclamation, indicated that extensive loss of life would occur in Maryland…Even if the Court [finds reasonableness in all acts] the ongoing situation belies any such finding"; disputing the grounds for continuing the emergency powers of the Governor).

Plaintiffs further dispute that they must demonstrate *any* medical or scientific evidence to show that the Governor has not followed the Constitution or statute, Public Safety Art. Title 14, as the statute does not provide any objective or expressed powers, in contravention to the Constitution, to: 1) order healthy persons to remain indefinitely in their homes; 2) wear face masks to enter into commerce and buy food; 3) refrain from assembling, including in church or places of worship; 4) refrain from doing business or participating in commerce unless granted permission by the Governor's office of legal counsel. ECF 50 at 67. The Governor agreed with plaintiffs herein when he wrote to this Court, "the Constitution is not suspended during a state of emergency", ECF 26-1 at 9, and thus discovery and a trial are necessary to protect the constitutional rights of plaintiffs.

Furthermore, the law allows for and requires that Plaintiffs be allowed to prove their case. Recent events prove the Governor selectively enforces his order against certain groups and allows other crowds to literally run through the streets of Maryland rioting and looting side by side by the hundreds or thousands with encouragement and no consequence.

## I. Plaintiffs Have Well-Pled, And Recent Protests Provide Substantial Evidence, There Is No Substantial Relationship Between the Governor's Orders and The Public Health.

Plaintiffs have consistently disputed and challenged any "self-evident" so-called proof that the "Governor's orders" have any "real and substantial relation to

protecting public health", and plaintiffs' entire amended complaint and all incorporated pleadings they filed including declarations repeatedly assert that the actions of the Governor are unreasonable, not the least restrictive and in no way rationally connected to any purposeful "picking and choosing," nor the violations of Constitutional rights. ECF 54-1 at 8. See hereinabove citations, ECF 50 at 67-70.

The Governor attempts to use *Jacobson* as a back-door burden-shifting device through his 12(b)(6) motion to dismiss, to deny plaintiffs' right to discovery and a trial, by claiming their view of the facts supporting the Governor's actions are "self-evident" to be constitutional. ECF 54-1 at 7-8. Such an argument does not comport with the Constitution, Rules of Evidence nor the case law. Instead, that case stands for the right to a trial under the Rules of Evidence whenever the constitutional liberties of plaintiffs are alleged to be invaded by an executive asserting extraordinary police powers upon claims of community health protection. The "real and substantial relation" test is a mandate for the Governor – not the plaintiffs – to demonstrate both substance of the nature of the health emergency and the procedural and as-applied executive actions taken under police powers, under the Rules of Evidence and not by whimsical assertion outside of examination and scrutiny. *Jacobson v. Massachusetts*, 197 U.S. at 28-31 ("We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in…such an arbitrary, unreasonable

manner, or might go so far beyond *what was reasonably required* for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons. *Wisconsin, M. & P. R. Co.* v. *Jacobson*, 179 U. S. 287, 301, 45 L. ed. 194, 201, 21 Sup. Ct. Rep. 115; 1 Dill. Mun. Corp. 4th ed. §§ 319-325, and authorities in notes; Freurid, Police Power, §§ 63 *et seq.*"). Defendants therefore admit that plaintiffs properly disputed the assertions of the Governor, which are material issues of fact in dispute in the instant case, demonstrating plaintiffs have well-plead their Amended Complaint sufficient to allow discovery to proceed. There is no evidentiary mandate to attach, as part of a plain and simple pleading under the Rules, *supra,* "affidavits of health officials" that rebut the Governor's yet unqualified "expert" in order to proceed on a constitutional claim. Plaintiffs' constitutional rights do not proceed only if one obtains a doctor's affidavit at this early stage in litigation. "It is well established that 'a fair trial in a fair tribunal is a basic requirement of due process.'" *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)(internal quotation omitted).

In *Jacobson* everyone except the young were required by the town legislation (not an executive order) to get a smallpox vaccination. The Court found that there, of course, may be "circumstances or by regulations that are so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." *Id.* at 47. Such circumstances are present in this case.

Current affairs prove with crystal clarity that the implementation of the Governor's Order violates modern Constitutional requirements, that is, the implementation treats the Plaintiffs differently than others similarly situated. Plaintiffs intend to amend their complaint with permission as the final pretrial approaches, as current events are moving too fast for constant amendment. Only through discovery and trial may the facts of why the differing implementations of the executive orders have been asserted can be ascertained and equal rights sustained for now and future Americans.

For instance, while plaintiffs herein were threatened if they were to speak at peaceful protests against the lock-down orders (ECFs 32-3, 32-4, 32-5), recent anti-police protests that have led to nation-wide riots were actually praised by the Governor here in Maryland. There have been no threats of arrest or any arrests for violating the COVID-19 Orders. Why the different treatment? Why threaten to arrest churchgoers, small business owners, legislators and so many others, and let preferred groups literally run wild in Ocean City for instance?[11] Will the facts show that the burning or vandalism of churches and businesses and attacks against people by roving large groups of people are not prosecuted, but the worship of God or the lawful

---

[11] Ocean City Mayor Rick Meehan released the following statement: "We are equally horrified by the actions displayed on social media video depicting violence and unruly crowds…" available at, https://baltimore.cbslocal.com/2020/06/10/ocean-city-maryland-boardwalk-fights-latest/, 6/26/20.

provision for your family in the same buildings are targeted for criminal charges while we are under the current emergency powers executive orders and proclamations? Only through discovery will we find out. The "easing" of restrictions is not enough. A small business operates on a razor thin margin; restricting a restaurant or gym to 50 per cent capacity is severely damaging to the business owner and is a taking of 50% of that businesses' income.

Furthermore, the weight of medical evidence is now indicating that COVID-19 is similar in death rate to a seasonal flu, *supra*. The Baltimore Civic Center was set up to handle thousands of COVID patients and ended up handling none. Even Dr. Fauci announced that the "Stay-at-Home" orders are causing more harm than good: "Stay-at-home orders intended to curb the spread of the coronavirus could end up causing **"irreparable damage."**[12] Defendants downplay his statement that continued lock-downs might do "irreparable damage" because that would support plaintiffs' case. ECF 54-1 at 10. Instead, defendants argue the Governor is doing "*precisely*" what Dr. Fauci recommends – a slow and cautious reopening. *Id.* However, this is beside the point of the case, which is that our constitutional rights may not nap nor may they be waived during an emergency. The irreparable damage is now admitted by the leading health expert defendants rely upon. Reopening slowly

---

[12] White House health advisor Dr. Anthony Fauci said. CNBC interview of Dr. Fauci, 5/22/2020 (available at: https://www.cnbc.com/2020/05/22/dr-anthony-fauci-says-staying-closed-for-too-long-could-cause-irreparable-damage.html , accessed May 22, 2020).

has nothing to do with whether the constitution was violated under the facts, and little to do with the ongoing overreach of the executive orders that are still in place, both issues which merit discovery and a trial.

On April 22, 2020, Dr. Scott W. Atlas published a medical opinion article in The Hill entitled "The Data Is In, Stop the Panic and End the Total Isolation Now….**Fact 1:** The overwhelming majority of people do not have any significant risk of dying from COVID-19. The recent Stanford University antibody study now estimates that the fatality rate if infected is likely 0.1 to 0.2 percent, a risk far lower than previous World Health Organization estimates that were 20 to 30 times higher and that motivated isolation policies."[13]

Defendants cite *Jacobson* to assert that plaintiffs somehow have a burden – under defendants' motion to dismiss – to prove without discovery or access to the data and facts the Governor relied upon to issue Catastrophic Emergency executive orders, to disprove the Governor's actions as reasonable and substantial relation to a health emergency.  ECF 54-1 at 11-12.  Defendants further assert, citing *South Bay United Pentecostal Church v. Newsom*, 590 U.S. _____ (May 29, 2020), to assert what was cited in error in that case, namely, that the Court does not have the 'background, competence, and expertise to assess public health".  *Id.* at 1.  The

---

[13] Dr. Scott W. Atlas, Data Is In, Stop the Panic and End the Total Isolation Now, April 22, 2020, (Available at: https://thehill.com/opinion/healthcare/494034-the-data-are-in-stop-the-panic-and-end-the-total-isolation accessed 5/22/2020).

error is that the Court there cited to *Jacobson*, while that case expressly stated the opposite – that the Court must be competent to examine health laws to protect the rights of the people:

> We are **not** to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect…the individual concerned. 'All laws,' this court has said, 'should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence.

*Jacobson*, 197 U.S. at 39(bold emphasis added).

It seems true that if the Governor's top, unelected, non-constitutional-office-holding-lawyer is competent to write laws for the entire state, with criminal penalties attaching, shifting the same as they do day by day and interpretation by interpretation, then the constitutionally sworn Court would be competent to do at least the same. The Court, if it says that all emergency matters are unattainable by the Court's review even though they are argued, petitioned and ruled upon in a secret "Star Chamber" court in the Executive's office of legal counsel, would sadly discount the propriety of its own necessary role in our government of checks and balances.

The data is growing that the executive orders went well beyond the necessity of the case as to be arbitrary, *Id.* at 28, and which have "lead to injustice, oppression, or an absurd consequence", *Id.* at 39. The Court is therefore not only competent, but required, to allow justiciability, discovery and a trial for the

violations of the constitutional rights of plaintiffs. It is also demonstrated that discovery is needed as well concerning the ongoing business closures, 10 person rule and additional arbitrary mandates under Executive Orders and delegated executive orders.[14] Thus, it is imperative that this Court deny defendants' motion and allow discovery and a trial to protect the lives, liberty and livelihoods of all Marylanders.

## II. Plaintiffs Have Well Pled A Plain and Palpable Invasion of Constitutional Rights.

Contrary to defendants self-serving averment, this Court has not held that plaintiffs "failed to plead" a cause of action in the instant matter. ECF 54-1 at 12. Plaintiffs' have well-pled numerous declarations under oath plainly and straightforwardly identifying how their rights have been invaded in real and palpable ways under the orders, and their 105 page Amended Complaint details plainly all such facts and elements of invasion of their rights. ECF 50.

The Court stated in *Elim Romanian Church, et al v. Pritzker, Gov. of Il,* 590 U.S. _____ (May 29, 2020), that "if circumstances warrant" reverends and congregants being denied church services may seek relief. Circumstances now so warrant relief and the right to discovery and a trial protects plaintiffs' right to seek

---

[14] See article, 600 Physicians Say Lock-downs Are A Mass Casualty Incident, May 22, 20202, https://www.forbes.com/sites/gracemarieturner/2020/05/22/600-physicians-say-lockdowns-are-a-mass-casualty-incident/#6d4ae91150fa accessed 6/4/20, **600 Doctors Sign Letter Saying Lockdown a 'Mass Casualty Event')**.

the same at law. The Governor makes no effort to stop, charge, arrest someone who goes to protest the police, but that same person may not congregate in Church to pray for the police, unless the Governor issues a permission under his executive orders.

Cases are few that have cited *Jacobson*, but one of interest in the Fifth Circuit involved forcible vaccination and/or treatment of inmates without due process of law. *McCormick v. Stalder*, 105 F.3d 1059 (5th Cir. 1997). That case improperly "under-ruled" by reference the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210 (1990), where the Court upheld Fourteenth Amendment due process rights for prisoners whenever the state forces medical decisions on inmates, by then citing to *Jacobson* in support of its decision to dismiss the inmate's appeal which was based upon constitutional violations and forcible vaccination or treatment while in custody. However, *Washington v. Harper*, made it clear that prisoners are afforded the same due process rights as all Americans in mandating a three-part constitutional test, while also expanding those rights to whatever the state law provides for protection of constitutional rights.

Here in Maryland, our Constitution adds additional and stronger due process protection of rights than the federal constitution. Defendants cite *McCormick*, which purports to grant prison officials broad power to administer drugs to inmates against their will is inapplicable for two reasons. First, the healthy population of Maryland are not to be treated as prisoners. Second, it is wrongheaded and unconstitutional to

allow the State to not provide due process to all its citizens, whether prisoners or residents.  See also, *Turner v. Safley*, 482 U.S. 78, 89-90, 107 S.Ct. 2254, 2261-62, 96 L.Ed.2d 64 (1987) (identifying criteria that must be met if a prison regulation impinges on an inmate's constitutional rights).

The Governor fails to meet his burden that all healthy people must be required to submit to house arrest under emergency Executive Orders because he declares a pandemic, thereby granting him extraordinary powers to suspend the Constitution, all supposedly "to prevent the spread of disease."  *Washington v. Harper*, 494 U.S. 210, 227, 110 S.Ct. 1028, 1039-40, 108 L.Ed.2d 178 (1990)(test and forcible measures by government for medical purposes require due process for prisoners, and by implication, all residents).

Even in times of emergency or averred medical necessity "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks and citation omitted).  There, the Court held that the determination by this Court whether the procedures were constitutionally sufficient required analysis of the government and private interests involved.  *Matthews*, 424 U.S. at 334.  "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*

Here, there has yet to be any procedural safeguards permitted Plaintiffs and as such the constitutional claims of Plaintiffs must proceed to discovery and a trial, and will prevail on the merits.

This Court should apply strict scrutiny and allow the Plaintiffs to prove their case. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs…." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). Here, the executive orders single out religious beliefs for discrimination, by permitting eating a sandwich from the local McDonalds which is known to be handled by multiple persons prior to being handed to the customer, and also handling cash with the server, while at the same time prohibiting the same exact conduct at a worship service.

Indeed, the George Floyd protestors are handled very differently than the Reopen protestors or the legislator Plaintiffs. As time goes by the stark differences are becoming more and more easy to discern. The lockdown orders as applied is not neutral or generally applicable and is not justified by compelling government interests nor are they narrowly tailored.

The Governor's Orders must be subjected to strict scrutiny because they are not neutral or generally applicable, and therefore "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531–32. "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. The Orders are not facially neutral, issuing "Faith-Based Recommendations" which have been distributed to the local authorities and have been implemented in delegated executive orders as mandates under criminal penalty. See, https://goci.maryland.gov/wp-content/uploads/sites/2/2020/05/Faith-Based-Recommendations.pdf, accessed 6/2/2020. Those draconian rules have included the following implementations which violate the religious beliefs of Appellants: no singing in worship, no worshipping with your face uncovered, no hugging or extending the right hand of fellowship.

In the context of the state's police powers, restricting the rights of plaintiffs violates Fourteenth Amendment due process mandates since "we do not accept the State's contention that these statutes should be upheld if there is *any possible basis* for concluding that they serve a rational purpose. *Loving v. Commonwealth of Virginia*, 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)(emphasis added); see also, *Meyer v. State of Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042

(1923), and *Skinner v. State of Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Similarly, the in the instant matter the Governor and his delegated designees singled-out Churches in banning gatherings larger than 10 people. The executive orders single out consensual sacramental worship and collection of offerings, weddings and religious gatherings; while permitting consensual eating and exchanging of cash for secular businesses, and large gatherings for "essential" businesses and recent protests (but not those protests that plaintiffs were to attend opposing the Governor's Executive Orders). The executive orders single out religious affection and religious touching, while not proscribing the same in any other context. Furthermore, Christians are compelled to attend to the sick, Matthew 10:8, but are not allowed to help the sick and especially the elderly in nursing homes.

Even if the Court were to find neutrality *and* validity[15] in the Orders generally, as applied there is no neutrality, since they target religious gatherings differently from non-religious gatherings. In a grocery store, gas mart, or Walmart, one may readily sing along with the store music top 40, be in the presence for hours of hundreds of people, and even purchase a bottle of juice and package of crackers and eat them while checking out or while shopping, but the same activities in

---

[15] The executive orders cite to no valid, legal authority allowing the Governor to order all healthy citizens to remain inside indefinitely under house arrest, to wear face coverings in order to buy goods, to not worship God with sacraments, singing and consensual assemblies. Appellants do not concede the Governor has such statutory power.

churches are banned under the Orders. At liquor stores and restaurants, one can even carry-out wine or beer and may now consume the same in the parking lot while eating. But not so Holy Communion. At restaurants, masks are not required. In a retail store – and every other location - the social distancing rule is six feet. But not so at religious gatherings, where executive orders and the Governor's Religious "Faith-Based" established commission recommendations, now enforced in many counties, required **seven feet** social distancing, no singing, masks at all times, no touching, no collection of offerings in person, no eating the Lord's Supper. Here in Maryland, the executive orders go "beyond the necessity of the case" and "invade[] the domain of…rights secured by the Constitution…". *Jacobson* at 28. This mandates the case move into discovery and a trial because the plaintiffs have stated a plain and palpable invasion of their constitutional rights.

In determining general applicability, courts focus on disparate treatment of similar conduct. *Lukumi*, 508 U.S. at 542. A law is not generally applicable where "inequality results" from the government "decide[ing] that the governmental interests it seeks to advance are worthy of being pursued only against conduct with religious motivation." *Id.* at 543. And under the historic rule of police power and inequality, the constitutionality of a statute should never be based upon proscription of conduct by government power, and nor does a claim to equality of treatment survive a rational basis test for those statutes. *Loving v. Commonwealth of Virginia*,

388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). ("**we do not accept the State's contention that these statutes should be upheld if there is any possible basis for concluding that they serve a rational purpose**.").  There is no "non-essential" exception in the Constitution.

The Governor's Orders fail neutrality on facial examination and fail both neutrality and general applicability in actual enforcement. They explicitly distinguish between "Essential Businesses," "Retail Businesses," and "Faith Based Organizations," treating the former categories more favorably, while singling out "Faith Based Organizations" for more stringent treatment. As stated in the Amended Complaint and declarations, the Governor defies his own gathering order by permitting over 27 people to gather at his calling of press conferences.  Indeed, the Press was expressly exempted from his orders which designated them "essential" while favoring their speech over religious speech, when he refused to so designate religious or legislator free exercise and free speech as "essential."  This discrimination against religious entities and the delegates herein is illegal, illogical and unconstitutional, and invades their plainly protected constitutional rights. See *First Baptist Church v. Kelly*, No. 20- 1102-JWB, 2020 WL 1910021, at *6 (D. Kan. Apr. 18, 2020) (Kansas stay home orders expressly limiting in-person church services not neutral, applying strict scrutiny under Free Exercise claim, enjoining orders).

In *Roberts v. Neace*, No. 20-5465, 2020 WL 2316679 (6th Cir. May 9, 2020), the Sixth Circuit Court of Appeals granted an emergency preliminary injunction against Kentucky's ban on "mass gatherings" as applied to church attendance. In its *per curiam* opinion, the Court found that the plaintiff congregants were likely to succeed on the merits of their Free Exercise claim because "the four pages of exceptions" to the limit on mass gatherings likely removed the stay home order "from the safe harbor for generally applicable laws." *Id.*, 2020 WL 2316679, * 3. Quoting *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012), the Court noted that at some point an "exception-riddled policy" becomes "the antithesis of a neutral and generally applicable policy." *Id*. (internal quotation marks omitted).

Similar or more severe restrictions do not apply to "secular" gatherings. *South Bay United Pentecostal Church v. Newsom,* 590 U.S. _____ (May 29, 2020). The Governor exempts Press gatherings, his own press conference gatherings, and certain large protests – yet while threatening churches with criminal charges for similar gatherings – and still threatening them. Delegate Cox was also threatened with arrest under the Governor's prohibition of large gathering Orders for being scheduled to speak at a peaceful Rally to Reopen Maryland, for protesting the Governor's Orders, and to travel outside his home to the Capital of Maryland where his Legislative Office is, while the Governor praises the recent protests in Baltimore City which numbered in the thousands of people who did not practice

social distancing.[16] Governor's and local authorities' executive orders do not "exempt or treat more leniently only dissimilar activities, such as operating grocery stores, banks and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods." *South Bay* at 2. His orders treat all businesses he deems essential as exempted from the lock-down. That includes companies – *including his own* - where large numbers of employees, in close proximity to each other, for extended periods of time, remain together, converse, can talk and may even sing and eat if they so choose to do so while they work.

In fact, the Governor's executive orders are *more* draconian and not "lenient" towards pastors, singling out religious entities for adverse treatment. To the extent citizens are permitted to exceed the mass gatherings limitation at the workplace but not at their place of worship, the Sixth Circuit noted that "the two groups of people [are] often the *same people*—going to work on one day and going to worship on another." *Id*. (emphasis in original). The Governor "permits" them to comply with CDC guidelines at one place, but not the other. "The distinction defies explanation," as the Sixth Circuit observed. (*Id*.).

---

[16] https://governor.maryland.gov/2020/06/02/i-couldnt-be-more-proud-of-the-city-of-baltimore-governor-hogan-discusses-demonstrations-in-baltimore-city-on-wbal-news-radio/, accessed 6/2/2020)

Because the Orders are neither neutral nor generally applicable and strengthened by the assembly (association) and free speech claims, strict scrutiny applies under the Court's free exercise hybrid test. The instant case "present[s] such a hybrid situation" because it is a free exercise claim connected with a communicative activity and parental, association rights under the Fourteenth Amendment. *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

The Orders mandate that parents cover the faces of their children "age 2 and up", to stay inside and out of sunlight and off playgrounds, abstaining from athletics and school and church, and even proscribing Sunday School of any kind. There is no rational basis for such draconian orders, as just two months ago it was urged by all government advisors not to cover the face for science shows sunlight and exposure to fresh air actually kills the COVID-19 virus in 90 seconds, and children are scientifically shown to not transfer the virus to others easily, each showing the lack of efficacy under science for any benefit of the Orders. Strict scrutiny immediately applies, because the parental rights to be free to determine the care, custody and control of one's children and to raise them in the faith of the family, is protected under the First and Fourteenth Amendments, which is strengthened here by the hybrid religious-speech First Amendment protections.

Further, the Orders mandate no assembly or association in gatherings beyond 10 people, regardless of whether the CDC guidelines are followed, but does not do so for gatherings and protests praised or deemed "essential" by the Governor. Thus, the Orders impermissibly target and burden the free exercise of Christians and others whose faith hinges upon worship of God in the assembly and with the sacraments or church ordinances. "…[D]ecisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, see *Cantwell v. Connecticut*, 310 U.S., at 304-307, 60 S.Ct., at 903-905;…or the right of parents, acknowledged in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), to direct the education of their children, see *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).

Like the instant case, the hybrid test has been shown to support a protection for free exercise where speech is also involved. These include: *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (invalidating compelled display of a license plate slogan that offended individual religious beliefs); *West Virginia Bd. of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628

(1943) (invalidating compulsory flag salute statute challenged by religious objectors). *Smith II* at 881.

Also like the instant case, the *Smith II* court stated as well that "it is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns. Cf. *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 3251-52, 82 L.Ed.2d 462 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State [if] a correlative freedom to engage in group effort toward those ends were not also guaranteed"). *Smith II*, 494 at 882.

The Orders are not the least restrictive means to any compelling government interest – they outright banned religious worship of more than 10 persons – while never even seeking to tailor a less restrictive measure such as the allowances made to the Governor's press conferences (27+ people), Governor's office COVID-19 task force & staff meetings (11+ people), essential business staff (unlimited), lines and congregants at Walmart, Lowes and other big-box stores (900 or more at times, depending on the location) See *First Baptist Church v. Kelly*, 2020 WL 1910021, at *8 (ban on in-person church services of more than 10 persons not narrowly tailored). The state could easily establish less restrictive alternatives to outright bans on the in-person worship of God, such as meeting reasonable sanitization and

hygiene protocols that "secular" "essential" businesses are permitted to establish and use to stay open.

Finally, as to the nature of online services or drive-in services, the only evidence before the court demonstrated that not every member of the congregation had access to the necessary technology for online services, nor do the Appellants accept the Governor determining the means of faith and worship, when that requirement is left to God alone, and the ordained reverend leadership in each particular denomination.  Particularly when God requires believers to 'not forsake the assembling of ourselves together.'" *On Fire Christian Ctr., Inc. v. Fischer*, 2020 WL 1820249, at *7– 8, citing, Hebrews 10:25.

Holy Communion is one of the sacraments of the Christian faith. Some Jewish sects require a *quorum* for certain prayers.  It is not possible in a drive-in service, particularly under the Governor's orders mandating no person-to-object-to-person connection. Neither is intimate corporate prayer, or genuine fellowship one with another,

The First Amendment guarantees the free exercise of religion as well as free speech and the right to peaceably assemble. The Governor's Orders infringe these rights, without adequate justification.  Only through discovery and a trial can these remarkable infringements be adequately tested.

As demonstrated by the often-contradicting scientific pronouncements, and statements of leaders such as the President himself that Churches are "essential," the facts as currently alleged are likely to change as discovery proceeds and trial is scheduled. The Court must allow the evidence to accumulate. The defendants' motion to dismiss is premature and must be denied.

**a.    Plaintiffs First Amendment Rights Have Been Threatened, Silenced, Chilled and Invaded.**

Defendants claim the restrictions on large gatherings regulate the time and manner in which speech can be expressed. ECF 54-1 at 15. Why are some protesters allowed to congregate in the thousands while praised, and other citizens are threatened with arrest if they were to congregate in their House of God to give Him praise? Why may some kneel in large gatherings out of protest, raising clenched fists to signify power, while plaintiffs herein are banned from kneeling before the Almighty and raising their hands to signify His Power, in any gathering larger than 10 persons? This must be explored. The Court previously found as a fact that "asymptomatic individuals may spread the virus." ECF 40 at 20-21. However, the science is not narrow or one-sided, nor settled, and must be tested by the Rules of Evidence.[17] The Defendants seek to require the Plaintiffs to show more effective ways to "flatten the curve" but as demonstrated *supra*, in places

---

[17] https://news.yahoo.com/walks-back-claim-asymptomatic-transmission-175455156.html

where no such Orders were implemented medical facilities were never overwhelmed, even in Maryland, many went to the beach in Ocean City for over a month now, and not one hospital has been overwhelmed and ventilators are unused.

Facts can be inconvenient, but the facts have developed showing that some protests are ok, and some are not. Barring legislators from attending protests does great violence to the Constitution. The constitutional "channel" of communication and debate may not, by command of the Md. Constitution, art. III, sec. 18, be in any way prevented for a seated Delegate or Senator. This is a factual determination that requires a trial. Not since September 17, 1861 have members of the Maryland legislature been subject to arrest for doing their job. *Ex parte Merryman*, 17 F. Cas. 144 (C.C.D. Md. 1861) (No. 9487). Plaintiffs require discovery and a trial to avoid a repeat of this mistake of history. Plaintiffs assert that the Governor cannot suspend constitutional law pursuant to Pub. Safety 14-107(d)(1)(i). *See Trump v. Hawaii*, 138 S.Ct. 2392, 2424, 201 L.Ed.2d 775 (2018).

Federal case law does not preclude state constitutional claims under the State Constitution's guarantee of the federal right under art. IV, section 4, of the United States' Constitution, and under Md. Const. Decl. of Rights, Arts. 5, 8, 10, 13, 24, 32, 40 and 44. See, Rees, Charles A. (1978) "State Constitutional Law for Maryland Lawyers: Individual Civil Rights," University of Baltimore Law Review: Vol. 7: Iss.

2, Article 4; Available at: http://scholarworks.law.ubalt.edu/ublr/vol7/iss2/4, last accessed May 26, 2020).

The Constitution of Maryland forbids any other branch of government from intruding upon the Legislator's sole authority to perform their duties and right of speech, debate and to hear from constituents in person and bring redress of grievance for citizens.  See, Md. Const., Decl. of Rights, arts. 5 (English common law guaranteed), 8 (Legislative…powers of government…forever separate and distinct from…other [branches]; no person exercising…of one said [government] departments shall assume or discharge the duties of any other), 10 (speech and debate in the Legislature not impeachable), 13 (every [person] hath a right to petition the Legislature for redress of grievances in a peaceable and orderly manner), 24 (no [person may be]…imprisoned or disseized of his…liberties or privileges…or in any manner deprived of his life, liberty or property…), 40 (that every citizen of the state ought to be allowed to speak, write and publish his sentiments on all subjects), 44 (the Constitution of the United States, and of this State, apply as well in time of war, as in time of peace; and any departure therefrom, or violation thereof, under plea of necessity…is subversive of good government, and tends to anarchy and despotism).

Neither *Jacobson*, nor the other cited cases *In re Abbott*, 954 F.3d 772 (5th Cir. 2020) and *Robinson v. Attorney Gen.*,  -- F.3d – 2020 WL 1952370, at *5 (11th Cir.

April 23, 2020) support the unprecedented actions of Governor Hogan to overreach and trample on the Bill of Rights for each and every Plaintiff and Marylander.

Similarly, Maryland State law, Transportation Article 5-1001, provides a right to travel, albeit via air. "Section 5-1001. Lawfulness of operation. (a) Legislative policy. -- There is a public right to freedom of transit in air commerce through the airspace of this State." MD Code Transp. 5-1001 Lawfulness of operation (Maryland Code (2019 Edition)). By implication, there is no rational basis to allow for the right to travel only by air, when the recognition of the right is founded in federal due process rights under the 5th and 14th Amendments, and therefore also under the Maryland Constitutional provisions. See, Rees, Charles A. (1978) "State Constitutional Law for Maryland Lawyers: Individual Civil Rights," University of Baltimore Law Review: Vol. 7: Iss. 2, Article 4. Available at: http://scholarworks.law.ubalt.edu/ublr/vol7/iss2/4, last accessed May 26, 2020)(Attachment 1, herewith). There, professor Reese writes: "The state constitution, to the extent that it is more protective of individual rights than the federal constitution, may provide the only protection for individual rights." *Id.* Under state equal protection constitutional law, Marylanders have more protection than under the federal constitution from "provisions that have no counterpart" including the right to not have "local" or "special" laws passed "in any case" not directly supported by an "existing general law," Md. Const. art. III, § 33; as mentioned, *supra*, the right to

travel; to have the right of English Common law, art. 5; due process beyond the federal protections, which state provision includes the due process excerpt from the Magna Carta mandating our protection from being "imprisoned…in any manner" nor "deprived of life, liberty or property" except after a jury trial or by the Law of the land, art. 24; and even to not have the provisions of either the federal or state constitutions violated or suspended during any time including times of necessity, art. 44. This Court should not overlook these expanded protections of Plaintiffs and should deny the Defendants' motion to dismiss.

Here, imprisoning all Marylanders in our homes by way of an Executive Order mandating "house arrest" and leaving the home only upon permission of the Governor by way of a few limited, "deemed-safe" activities, violates the Maryland Constitution, Decl. of Rights, Article 24. This is because the language of art. 24 states "imprisoned *in any manner*" and gives no exception for pandemics, particular when reading *in para Materia* with art. 44. Additionally, the plain language of the constitutional provision requires the citizen to be provided a jury trial and/or a duly promulgated law prior to the loss of liberty – not an executive order without specific basis in law. It is telling that the Governor has never cited to any specific statutory language giving him precise power to lock us in our homes under criminal threat, to prevent large gatherings under criminal threat, to force us to cover our faces under criminal threat. This is because he cannot do so. Instead, he ill-advisedly states he

has "broad" emergency powers, to do basically whatever he wishes from time to time. Marylanders have time and again forbidden such behavior by their government officials, as has the United States ("…any departure therefrom, or violation thereof..is subversive of good government, and tends to anarchy and despotism."). Md. Const., Decl. of Rights, art. 44; see also, *Strickland v. Washington*, 466 U.S. 668, 704, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)("Recognizing the unique seriousness of [a death penalty] proceeding, we have repeatedly emphasized that " **'where discretion is afforded** a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'")(emphasis added). The court went on to quote Justice Marshall: "'This Court has always insisted that the need for procedural safeguards is particularly great where life is at stake. *Id*., citing, *Barefoot v. Estelle*, 463 U.S. 880, 913-914, 103 S.Ct. 3383 3405, 77 L.Ed.2d 1090 (1983) (dissenting opinion).

Here, both the Governor, intervenors and Plaintiffs have agreed that the matters before the Court impact the saving of lives. All parties want the elderly and the infirm or those with comorbidities to be protected, especially considering the outrageous death rate in nursing homes by COVID-19. All parties, or at least Plaintiffs, recognize the historic and grave health and safety impacts that locking all of Maryland up in their homes, shutting down businesses, forcing face coverings,

preventing worship and in-person gatherings larger than 10, preventing access to health care, preventing access to those family members receiving health care, and so on.

Additionally, under state law, allowing for anyone who is wealthy enough to fly to leave their homes to travel for any reason *as a matter of right*, while preventing all others from leaving their homes, violates due process under both federal and state provisions. *Id.*

The proper application of the historic case of *Jacobson*, supra, for quarantine is supported directly by Maryland law, where the statute mandates that sick people must be given due process of law if they are quarantined. Md. Code Ann. Public Safety 14-3A-05. To be clear, the Plaintiffs are petitioning this Court to apply the due process rights they possess under their own federal and state constitutions which also mandate that state law must be applied and done so equally. "…[C]ertain rights, such as "liberty" and "property," that are within the procedural protections of the due process clause of the fourteenth amendment, may be defined with reference to state law." *See Reese*, supra, pg. 301, citing, *Paul v. Davis*, 424 U.S. 693 (1976); *Goss v. Lopez*, 419 U.S. 565 (1975); *Riger v. L&B Ltd. Partnership*, 278 Md. 281, 363 A.2d 481 (1976).

Contrary to the specious arguments of the Governor and defendants, and respectfully contrary to this Court's footnote 17 in its memorandum, ECF 40, page

12 in the instant matter, it is clear that the Governor violated Public Safety Article, Title 14 and 14-3A-01 et seq., by ordering, "directing" and mandating, under penalty of criminal law, all Marylanders' to remain in their houses unless he says that we can come out. This egregious violation of constitutional rights also violated Titles 14 and 14-3A-01 et seq. because that statute does not provide for such an Executive Order. And even if this Court were to now discover such powers within those state Articles, the law under Public Safety Title 14-3A-05 – which is titled "Directive for Isolation *or* Quarantine" - mandates both the notice and a hearing to all such "isolated" persons – which would include Plaintiffs and, by application, the entire state of Maryland. The Legislature mandated that in any time of Executive-Ordered isolation, those affected must be provided due process, and the Governor has failed and refused to do so, violating the rights of all residents of Maryland. Therefore, there is not a rational basis for a constitutional ruling that permits the Governor to exercise such powers when no power as such exists. Md. Code Ann. Public Safety 14-3A-05(emphasis added). Merely because of the novelty of the fact that no Governor has ever tried to isolate the entire population of this State before, under penalty of criminal prosecution, without due process or notice and a right to a hearing or jury trial, does not mitigate nor should it cause this Court to be swayed against the law to dismiss the case as the Governor has demanded. Even if the Court believes the Governor has such extraordinary powers – to isolate healthy Marylanders without due process

while providing due process to those sick who are quarantined – it must still permit discovery and a trial on the matter to ascertain whether such powers were carried out unlawfully and with factual discrimination or defect, as Plaintiffs have plainly and affirmatively alleged he has done.

Additionally, respectfully contrary to this Court's footnote 10 on page 5 of its Memorandum (ECF 40), there are no exceptions in the Governor's Executive Orders for anyone regarding wearing a face covering.  Plaintiffs have been turned away from stores for refusing to wear a mask even when requesting a reasonable accommodation for a health-related matter, which is protected information under HIPAA.  Instead, the Court points to "guidance" from the Md. Dept. of Health – which no business in Maryland is provided directly, and which is not included as a matter of law in any Executive Order.  Businesses are therefore left to look at the actual wording of Executive Orders – which cite within themselves to the criminal code of "1 year in jail and/or a $5000 fine" misdemeanor and may not in good faith look to any "guidance" for exceptions, absent an express declaration of the Governor himself within the "binding" executive orders mandating face coverings.

As demonstrated above, the Plaintiffs can also assert an as applied claim against the Governor which requires discovery and a trial on the merits.

For these reasons and more which shall be proven at trial after discovery is permitted, the Plaintiffs require a trial on the merits.

**b.      The Dormant Commerce Clause Protections of Plaintiffs Are Being Violated by The Governor Picking Winners and Losers Without Any Rational Basis.**

The Governor has not met any burden to prove "cases of actual necessity…[constituting] grave threats to the lives and property of others" such as would support the unilateral shutting down and destruction of the property of all Marylanders. *Bowditch v. Boston*, 101 U.S. 16, 18-19 (1880); *Jacobson v. Massachusetts*, 197 U.S. 11, 28 (1905). There the Court prevented "the guise" of police powers to violate rights **secured** by the Constitution:

> "as the laws there involved went beyond the necessity of the case, and, under the guise of exerting a police power, invaded the domain of Federal authority, and violated rights secured by the Constitution, this court deemed it to be its duty to hold such laws invalid."

*Henning Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 28, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765 (1905).

The issue before the Court is, has the Governor met his burden to prove that he has both legal authority and just cause to order the closure of churches, schools, businesses, and to order people to remain in their homes and wear face coverings – all apart from specific statutory authority and constitutional confines. It's not a question of which method is best to fight a disease. In fact, Sweden has lost approximately the same people per capita as Maryland to COVID-19, all while not trampling on business or individual rights. Maryland has a population of 6 million

and a death rate of 42 per 100,000 from COVID-19.  Sweden has a population of 10

million and a death rate of 43 per million.  Yet Maryland now has skyrocketing

unemployment, rising suicide and overdose deaths, and a disastrous loss of

businesses, depression, domestic violence, etc.  All because the Constitution was and

is not being followed . See McMillan, Herb, Maryland Reporter, "Questions For

Authority       During       A       Pandemic",       June       3,       2020

https://marylandreporter.com/2020/06/03/questions-for-authority-during-a-

pandemic/ accessed June 3, 2020 (Sweden has the same rate of death as Maryland

per capita – without locking down the economy).  There is no pandemic exception to

Constitutional  freedoms.  The  overreaches  of  the  executive  orders  must  end

immediately.

    The  gravamen  of  the  Commerce  Clause  claim  is  that  Governor  has  erred  in

both his dormant commerce clause argument and general police powers argument,

by claiming a right to pick and choose businesses that he deems are "essential" in

order to advance his own speculations of how to protect the public.

    "Under  our  form  of  government,  the  use  of  property  and  the  making  of

contracts are normally matters of private and not of public concern. The general rule

is that both shall be free of governmental interference. *Nebbia v. People of State of

New York*, 291 U.S. 502, 523, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469 (1934).

At no time does the Governor provide the Court with any lawful exception to this

general rule, which would require evidence of affirmative, not speculative, harm to society. *Id.* The Governor relies on Dr. Mitchell's statement that because COVID19 "droplets" can spread via person to person (like most viruses and colds), that somehow provides justification of the closure of all businesses deemed by the Governor to be "non-essential" or "non-life sustaining", (ECF 26-1); and that "any harm that Plaintiffs might suffer" are "a result of…temporary restrictions." *Id.* at pg. 48.

"The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it. The convention must have used the word in that sense, because all have understood it in that sense; and the attempt to restrict it comes too late." *Gibbons v. Ogden*, 22 U.S. 1, 190, 9 Wheat. 1, 6 L.Ed. 23 (1824). The commerce clause protects American businesses' rights from State overreach in providing "The Congress shall have Power…to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The federal rule protecting all businesses is that States may not "discriminate against" business, nor "impose undue burdens" on businesses in interstate commerce. *Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018).

"The modern law of what has come to be called the dormant Commerce Clause…rebuffs attempts of states to…curtail[] the movement of articles of

commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535, 69 S.Ct. 657, 93 L.Ed. 865 (1949). "Thus, not all economic harms or anticompetitive choices are remedied through the application of the dormant Commerce Clause, but rather only those that ***unjustifiably burden*** interstate commerce. *Brown v. Hovatter*, 561 F.3d 357, 363 (4th Cir. 2009)(emphasis added). A court will consider whether the state laws "*unjustifiably ... burden* the interstate flow of articles of commerce," *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); see also *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir.2005)." *Brown* at 363.

In determining if a state law unjustifiably burdens interstate commerce, the courts generally apply the *Pike* test, under which the challenged law will be struck down only if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)(emphasis added). *Brown* at 363.

As discussed above the Orders do impact out-of-state commerce because suppliers of outdoor theme parks and carnivals for all local fire departments, which involve out-of-state businesses, were banned from Maryland. Second, the harm is so excessive as to be the most extreme and incendiary act of a Governor against

businesses in his state in the history of Maryland, putting many out of business solely by his arbitrary orders. The only "putative local benefits" averred by the Defendants is "certain businesses deemed non-essential are to reduce the interactions between individuals that could spread COVID-19," citing the declaration of an unchallenged and untested "expert," unsupported by scientific proof attached to his declaration, in the fields of business and commerce safety, Dr. Mitchell. Mitchell claimed that the sole reason for the closure of Adventure Park USA, which he had never visited nor had any knowledge of regarding its safety, operation or other major factors regarding its function in commerce, was that "children…might be accompanied by older individuals when they go to Adventure Park…" and older individuals are a concern group for developing COVID-19. This self-serving averment of Defendants defies both logic and the facts before the court and is betrayed by more recent events. First, as previously declared by Adventure Park USA, the average age of attendees are families with their own children and young adults between 18 and 25. Second, even if children are accompanied by older adults, that does not provide any "putative local benefit" to the local businesses to shut down the business, when a rational less restrictive approach exists, namely, requesting children be accompanied by healthy adults who are not in the age range of over 60 years old. Additionally, the Governor himself belies this decision by opening golf courses up to all, including those over 60 who may ride around on carts with 20-year-old people, yet the Adventure Park USA

and its rides and miniature golf remain closed by his Orders, all which defy any rational basis.

The Governor and Defendants cite to his assembled "expert panel," and the United States Department of Homeland Security list of "essential" business industries needed to maintain infrastructure in case of an attack or natural disaster. Defs. ECF 26-1. The only evidence for the Governor's conduct is the advice of Dr. Mitchell who has already been proven to be wrong in many substantive and material points.

The purpose of the DHS critical infrastructure guidance relied upon by Dr. Mitchell is to guide the Governors of the states to determine, in times of national attack, natural disaster or other national emergency, which areas of critical infrastructure must be immediately kept open at all costs. See, https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19 , *accessed on May 26, 2020.* As written, the critical, or "essential", infrastructure sector are those businesses which *must* be up and running even if the owners are incapacitated because of some national emergency. Contrary to the bald factual arguments for the shut-down orders, it has nothing to do with granting any power or persuasion to shut down businesses due to a seasonal flu or even an emergency. Particularly when those businesses are fully capable of performing any health recommendations under CDC guidelines.

Additionally, not only are the factual averments of Dr. Mitchell disputed on their face as bald conclusions unsupported by any medical evidence before this Court, the Governor has refused and rejected an MPIA request by Reopen Maryland, LLC for the minutes, records, proceedings and notes of its so-called expert panel upon which it claims it relied to make these unprecedented shut-down decisions. See article, Reopen Maryland Rally, *Maryland Matters (available at:*

https://www.marylandmatters.org/2020/05/15/protesters-at-annapolis-reopen-rally-call-for-an-end-to-tyranny/ *, last accessed May 26, 2020).* The Governor's decisions are arbitrary and capricious "based upon" advice received from what he is also claiming is a "nongovernmental unit" and thus not subject to MPIA disclosure. *Id.* Defendants should not be able to avoid discovery as they have resisted the MPIA.

Contrary to Defendants' limitless claim to power, the Governor does not hold unfettered "latitude" in such impure "economic regulation" and in unequal application of its police powers. *American Entertainers*, *LLC* v. *City of Rocky Mount,* 888 F.3d 707, 720, 723 (4th Cir. 2018). Discovery and trial must take place as soon as possible.

**c.** **Article 44 Is Plain, Applicable and Justiciable.**

Article 44 of the Maryland Declaration of Rights states unequivocally:

> That the provisions of the Constitution of the United States, and of this State, apply, as well in time of war, as in time of peace; and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good

Government, and tends to anarchy and despotism.
Md. Decl. of Rights art. 44.

Defendants discount Maryland Constitution's Decl. of Rights, art. 44, as "never been construed by the Court of Appeals of Maryland," "[i]n the more than 150 years since its adoption" (ECF 54-1, pg. 21, ¶ 1), while arguing that the Governor has unchecked, unilateral powers under the Md. Code for "catastrophic health emergencies" that are "unprecedented" for more than "100 years". ECF 54-1, pg. 3, ¶ 2. Defendants fall short of any standard to grant a motion to dismiss at this point. Their novel argument on the grounds to dismiss this claim is a false one: namely, that article 44 was solely purposed "to prohibit the imposition of martial law 'in time of war,' not to hamstring a statewide response to a public health emergency." ECF 54-1, pg. 20, ¶ 3. However, two problems immediately proceed from defendants' argument to dismiss this Constitutional protection. First, in the instant matter there is no evidence to support defendants' construing of the article to a limitation forbidding martial law, especially when article 32 of the Md. Const., Decl. of Rights, specifically addresses forbidding martial law in Maryland. Article 44 was intentionally made the law of the land to protect Marylanders not only in times of war, but also *as in time of peace*". Dfs. Mot. ECF 54-1, pg. 21; Md. Const. art. 44. It protects from overreaching executives who, "in time of a plea of necessity or any other plea", suspend "the United States Constitution and the Maryland

Constitution" which "shall apply without departure therefrom or violation thereof".

*Id.* (emphasis added). This is not an optional constitutional protection from the State, and was further strengthened by banning any civil or criminal threat against a Delegate for *any* debate, wherever they may be. Md. Const. art. III, sec. 18. It is what the Governor swore to uphold when he took his oath of office, and the gravamen of the claim that must proceed to discovery is that he has egregiously departed from the same in his overreaching orders.

Second, defendants argue that plaintiffs' questioning of the limits of executive orders under the provisions of the Constitution, including art. 44, during any time of "necessity" will "hamstring a statewide response to a public health emergency." ECF 54-1 at 20. Defendants appear to try and leave the *Jacobson* framework and return to their prior "scope of review" argument disfavored by the Court (ECF 40 fn 15), and which case law they had cited relied upon the overturned Japanese Internment Camp executive orders of World War II by a constitutionally-violating executive power about which the Supreme Court has "express[ed] what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—"has no place in law under the Constitution." 323 U.S., at 248, 65 S.Ct. 193 (Jackson, J., dissenting). See, *Trump v. Hawaii*, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018). Here, for defendants to once again argue that plaintiffs may not even bring a case during a time of necessity, when

*Jacobson* and the Constitutional framework it relies upon in addition to the Maryland Constitution here, expressly states the opposite, is demonstrative of the lack of legal or evidentiary authority of the Governor to dismiss the instant action. To take "unprecedented" actions such that some folks are locked in their homes for 45 days under penalty of criminal prosecution without due process, notice or a hearing, some folks are forced to wear face coverings, some folks are prevented from worship of God in their church as they practice, and some folks are prevented from doing business, each triggers the analysis required in *Jacobson*. 197 U.S. at 28.

Although the Court in the TRO held plaintiffs herein had not "*at this point* demonstrated that the defendants have violated their 'clearly defined legal rights' (ECF 40 at 30, emphasis added), under art. 44 and *Kenly v. Huntingdon Bldg. Ass'n*, 166 Md. 182 (1934)(Digges, J. concurring), plaintiffs must be permitted discovery to prove that defendants have violated their rights under the law and constitution.

**d.**  **Plaintiffs' Due Process Rights Have Been Violated.**

The Governor claims that his Orders are "quasi-legislative in nature and thus do not implicate procedural due process." ECF 54-1 at 24. The Governor states that he has not quarantined anyone but has only "directed" their movement and "required (some) people to refrain from 'congregating.'" ECF 54-1 at 23. For so many above-stated proofs, this is a rose-colored lens view of the draconian orders. The issue of

what conduct constitutes a "quarantine" or "isolation" is a factual issue for the trier of fact. Simply calling an order a "stay at home" order does not change the nature of the order into something allowed by statute. The trier of fact must hear testimony and make determination on this issue. For sure, the Plaintiffs, who are not sick, believe they have been quarantined, isolated, or as they call it, put under house arrest. The only thing missing is the ankle bracelet.[18]

To circumvent due process requirements, the Governor simply declares some people "essential" such as lawyers, judges, insurance executives, store clerks, BLM protestors, and some "non-essential" such as teachers, students (unless they are rioting), barbers, Reopen MD protestors, Legislators, and small business owners. The Governor argues that since the house arrest is not particularized to one person then the protections found in the Maryland Public Safety Article no longer apply. This despite the clear language in §14-3A-05(c)(1) "An individual or **group of individuals isolated** or quarantined . . ." (Emphasis supplied) which clearly refers to isolation of plaintiffs as individuals, or as "group of individuals." Plaintiffs, the members of a Church or workers at a business, or members of the State Legislature, are both individuals and/or groups of individuals. The fact that the Governor has isolated many groups does not relieve him of the due process requirements.

---

[18] The Governor is already planning for future lockdowns and perhaps bracelets or other monitoring will be implemented in the "second wave." https://www.baltimoresun.com/coronavirus/bs-hs-testing-and-tracing-coronavirus-20200415-q6r3cxjmrrbcfbtijec56glm3u-story.html

## CONCLUSION

For all these reasons the Court must DENY the Motion to Dismiss, and issue

a scheduling order for discovery and trial in this case.


Respectfully submitted,

_/s/_____
Daniel L. Cox Bar No. 28245
THE COX LAW CENTER, LLC
P. O. Box 545
Emmitsburg, MD 21727
410 254 7000
dcox@coxlawcenter.com

_/s/_____
John R. Garza Bar No. 01921
GARZA LAW OFFICE, P.A.
17 W Jefferson Street #100
Rockville, MD 20850
301 340 8200 ext 100
jgarza@garzanet.com


CERTIFICATE OF SERVICE

I hereby certify that the above Response in Opposition to Defendants' Motion to
Dismiss was delivered to all parties of record via the ECF filing system.

/s/_____
Daniel L. Cox